**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| IN RE ADIENT PLC SECURITIES LITIGATION | : | Civil Action No. 1:18-cv-09116 CONSOLIDATED SECURITIES LITIGATION<br><br>DEMAND FOR JURY TRIAL |

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 10

III. PARTIES ..... 11

IV. SUBSTANTIVE ALLEGATIONS ..... 14

A. Company Structure ..... 14

B. Adient's Financial Reporting Periods ..... 16

C. Background ..... 16

D. SpinOff Roadshow and Registration Statement ..... 19

E. Serious Problems within the SS&M Segment Plagued Adient Throughout the Class Period, Were Made Known to the Individual Defendants, But Were Not Disclosed to the Market During that Time ..... 22

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ..... 34

A. Overview of Defendants' Fraudulent Conduct ..... 34

B. Defendants Made Materially False and Misleading Statements and Omissions Regarding Adient's SS&M Business and Its Margin Expansion ..... 35

1. First Day of Trading – October 31, 2016 ..... 35

2. Fourth Quarter Fiscal 2016 Results – November 8, 2016 ..... 36

3. Deutsche Bank Global Auto Industry Conference – January 11, 2017 ..... 40

4. First Quarter Fiscal 2017 Results – February 3, 2017 ..... 41

5. Bank of America Merrill Lynch Auto Summit – April 12, 2017 ..... 43

6. Second Quarter Fiscal 2017 Results – April 28, 2017 ..... 44

7. Third Quarter Fiscal 2017 Results – July 27, 2017 ..... 46

8. J.P. Morgan Auto Conference – August 8, 2017 ..... 48

9. Royal Bank of Canada Global Industrials Conference – September 14, 2017 ..... 50

10. Materialization of the Risk and Continued Materially False and Misleading Statements and Omissions ..... 51

(a) Fourth Quarter and Full Year Fiscal 2017 Results – November 2, 2017 (*First Partial Disclosure*) ..... 51

(b) Barclays Global Automotive Conference – November 15, 2017 ..... 59

(c) Deutsche Bank Global Auto Industry Conference – January 17, 2018 (*Second Partial Disclosure*) ..... 60

(d) First Quarter Fiscal 2018 Results – January 29, 2018 (*Third Partial Disclosure*) ..... 67

(e) Second Quarter Fiscal 2018 Results – May 3, 2018 (*Fourth Partial Disclosure*) ..... 74

(f) Wells Fargo Industrials Conference – May 9, 2018 ..... 82

(g) Lowered Guidance And Abrupt Ouster Of CEO McDonald – June 11, 2018 (*Fifth Partial Disclosure)* ..... 83

(h) Third Quarter Fiscal 2018 Results – July 26, 2018 ..... 85

(i) Appointment of New CEO – September 13, 2018 ..... 90

(j) Preannouncement Of Fourth Quarter Fiscal 2018 Results – October 19, 2018 ..... 90

(k) Fourth Quarter Results – November 9, 2018 (*Sixth Partial Disclosure*) ..... 91

C. The Goodwill Impairment Charge Recorded in the Second Quarter of Fiscal 2018 Was a Triggering Event that Required Testing of Other Assets ..... 96

1. Adient Assured Investors that SS&M's Reported Long-Lived Assets Had Survived Recoverability Analyses ..... 96

2. Adient's Assurances Regarding the Recoverability of Reported Long-Lived Assets Were Based on False Representations of a Forthcoming SS&M Turnaround ..... 98

3. The Fourth Quarter of Fiscal 2018 Impairment Charges Were Premised on the Same Logic Underlying the Second Quarter of Fiscal 2018 Impairment Charges ..... 99

4. Adient Also Falsely Assured Investors that Reported Deferred Tax Assets Had Survived Recoverability Analyses in the Second Quarter of Fiscal 2018 ..... 102

D. Adient Violated Item 303(a)(1)-(3) of Regulation S-K by Failing to Disclose Known Trends and Uncertainties ..... 105

E. False SOX Certifications ..... 107

VI. POST-CLASS PERIOD EVENTS ..... 108

VII. ADDITIONAL SCIENTER ALLEGATIONS ..... 111

A. Insider Stock Sales by CEO McDonald During The Class Period Were Highly Unusual And Suspicious In Timing and Amount ..... 113

1. The Proceeds from Adient Stock Sales During the Class Period by the CEO and General Counsel Were Highly Suspicious In Amount ..... 114

2. The Timing of McDonald's Stock Sales Was Highly Suspicious ..... 114

3. The Presence of 10b5-1 Trading Plans Does Not Absolve McDonald of Liability ..... 115

B. Margin Growth In The SS&M Business Was Extremely Important To The Company's Success Post Spin-Off and Defendants Spoke of it Frequently ..... 117

C. Statements By Former Adient Employees Corroborate That Defendants Knew Or Were Reckless In Not Knowing That The Company's Margin Growth Was Not Achievable Given The Persistent and Deteriorating Issues In The SS&M Business ..... 119

D. McDonald's Abrupt Ouster as CEO Near The End Of The Class Period Provides Strong Evidence Of Scienter ..... 119

E. The Company Admitted that Senior Management, Including the Individual Defendants, Closely Tracked the Problems in the SS&M Segment And Were At Least Reckless in Setting Guidance for the Company ..... 121

F. The Fact That the Individual Defendants' Compensation Was Closely Tied To The Company's Topline Growth Provides Strong Evidence Of Scienter ..... 122

VIII. LOSS CAUSATION/ECONOMIC LOSS ..... 124

IX. CLASS ACTION ALLEGATIONS ..... 128

X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ..... 130

XI. NO SAFE HARBOR .......... 131

XII. CONTROL PERSON ALLEGATIONS .......... 132

XIII. CAUSES OF ACTION .......... 135

PRAYER FOR RELIEF .......... 139

JURY TRIAL DEMANDED .......... 140

Lead Plaintiff Bristol County Retirement System ("Bristol County" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned counsel, hereby brings this Consolidated Amended Class Action Complaint (the "Complaint") against Adient plc ("Adient" or the "Company"), former Adient CEO R. Bruce McDonald ("McDonald") and Adient CFO Jeffrey M. Stafeil ("Stafeil") (collectively, "Defendants").[1] The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Co-Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Adient; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of Adient and Johnson Controls with knowledge of the matters alleged herein; and consultation with experts in the areas of: (1) accounting; and (2) loss causation and damages.[2] Co-Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Lead Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Adient during the period from

[1] McDonald and Stafeil are collectively referred to as the "Individual Defendants."

[2] Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2, etc.). All CWs will be described in the masculine to protect their identities.

October 31, 2016 to November 8, 2018, inclusive (the "Class Period"), and were damaged thereby. The action is brought against Adient and certain of its former officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Adient became a public company on October 31, 2016 when it was spun off from Johnson Controls International plc ("Johnson Controls" or "JCI"). Prior to the spinoff, Adient was JCI's automotive seating and interiors business.[3]

3. Adient designs, engineers, and manufactures automotive seating for all vehicle classes and all major original equipment manufacturers ("OEMs"). It claims to be the largest global automotive seating supplier in the world with a thirty five (35) percent market share. Important to this Action, nearly half of its annual revenues derive from the sale of metal components used in seat frames produced by its Seat Structure and Mechanism ("SS&M") segment. The SS&M segment was also called the "Metals" division until a name change in 2017. The terms "SS&M", "Metals" and "SS&M/Metals" are used interchangeably by the Company and others to refer to that business segment, and so the terms are used interchangeably in this Complaint as well. "Seat mechanisms" include seat recliners, tracks, and height adjusters.

4. From the date of its formation, and in statements to the investing public in the months leading up to the effective date of the spinoff, Defendants highlighted improvements in the efficiency of the Company's capital-intensive SS&M/Metals business as a key driver of its success. Defendants repeatedly emphasized to investors that the Company was "solidly on track" to deliver 200 basis point margin expansion by 2020, a feat that depended, in large part, on

---

[3] Johnson Controls started as a building controls company in 1885, with the invention of the first electric room thermostat. It diversified into other segments, including batteries and automotive, in the mid-1980s.

operational and financial improvements in its core SS&M business. But these statements were false and misleading.

5. While Defendants repeatedly touted supposed improvements in Adient's SS&M/Metals business, and a supposed steady trajectory toward 200 basis points of margin improvement, pointing to Adient's ability to overhaul its SS&M business with increased capital expenditures post-spinoff, Defendants failed to disclose material information that Defendants were aware of or were reckless in not knowing that rendered their Class Period statements false and misleading. Because Defendants chose to speak on the issues described herein, they had a duty not to mislead investors or withhold material information. Instead, Defendants created an impression of a state of affairs at Adient that differed in a material way from the one that actually existed.

6. Throughout the Class Period, Defendants' rosy statements were materially false and misleading when made in that Defendants failed to disclose:

(a) material known adverse facts and trends in Adient's core SS&M/Metals business including: (i) severe operational challenges and inefficiencies, (ii) increased costs and delays due, in part, to failure to follow Company policies (¶203), (iii) insufficient qualified personnel to timely launch Adient's programs, and (iv) other launch-related problems which were not weather or market related and which significantly increased customer chargebacks, decreased profitability on Adient's automotive seating contracts, and made a 200 basis point margin expansion unachievable;

(b) that the severe launch issues threatened ongoing relationships with Adient's customers, increased the risk of contract cancellations and reduced the likelihood of Adient winning new customer contracts;

(c) that instead of being a key driver of growth and margin improvement, SS&M was a "cash drain" on the Company; and

(d) starting in the second quarter of fiscal 2018, that the same events and conditions that triggered an impairment charge to goodwill warranted additional impairment recognition, including impairment related to long-lived assets such as property, plant, and equipment and deferred tax assets.

7. That the SS&M/Metals business was in complete disarray and that the Company was on a downward spiral throughout the Class Period was well known within the Company, despite Defendants' successful efforts to withhold these facts from investors. Former Adient employees with knowledge of the Company's business confirm that senior executives at Adient, including the Individual Defendants, were aware, from the beginning of the Class Period, that:

> • Due to lack of staffing (limited hiring and layoffs) before the Class Period, Adient did not have sufficient qualified personnel to successfully launch its programs in 2017. ¶¶ 49-83. This included a lack of resources specifically related to engineering and manufacturing. ¶¶72-78.
>
> • The lack of qualified personnel was a persistent topic in weekly/ bi-weekly Program Review Meetings where new launches and the lack of qualified personnel to work on the various launches was discussed. Program Review Meetings were regularly attended by the program managers and sometimes attended by more senior executives including Paul Lambert and Byron Foster (¶¶72-78), Adient Executive Vice Presidents ("EVPs") who reported to CEO McDonald.
>
> • CEO McDonald and EVP Eric Mitchell were informed during Profit Plan Reviews and Budget Review Meetings that Adient needed to properly staff the various programs in order to have successful launches. But McDonald and Mitchell would not approve additions to Adient's headcount. Similar headcount issues were discussed at Operational Meetings attended by Mitchell (McDonald's direct report). ¶¶49-63.
>
> • The top executives at Adient, including the majority of executives at the VP and EVP level, had limited or no operational

or manufacturing experience and failed to act on the repeated warnings of lower level employees with operational experience who raised "red flags" about the Metals business and the upcoming launches. ¶¶49-63.

• Adient was not achieving the vertical integrations, desired conversion rates, reduced manufacturing costs, and increased efficiencies and uptimes needed (at the plant level) necessary to achieve the 200 basis point margin expansion. ¶¶49-63.

• In November 2016, internal data indicated that Adient had launch challenges in North America and Europe. ¶¶64-71.

• Adient's problems at the plant level forced the Company to use expensive means to move parts around the country faster. Increased costs included outside consultants and sub-suppliers, premium freight costs (to fly parts between Adient plants and to customers), and additional expediting costs. ¶¶49-63; 72-78.

• Because Adient could not meet its deadlines within the first few months of launch, problems went from bad to worse quickly. ¶¶49-63.

• Delays at the plant level could not be ameliorated and, in fact, got worse during the Class Period. ¶¶84-88.

• Throughout 2017, there were escalating concerns about costs and its impact in SS&M/Metals. ¶¶64-71; 79-83. Executive Management received reports which detailed launch programs, cost overruns and delays. ¶¶72-78.

• These increased costs also were presented to executive management (including CEO McDonald, CFO Jeff Stafeil and EVPs Mitchell and Foster) during monthly Operational Review Meetings which CW-2 attended. ¶¶64-71.

• Project launch issues also were discussed in ad-hoc "Red Flag Meetings." ¶¶72-78.

• The problems in the Metals group that were disclosed by the Company beginning in late 2017 were problems that were percolating for years and did not happen "all of sudden" or overnight. ¶¶79-83.

8. Defendants' failure to disclose this information concealed risks related to the seriously deteriorating condition of Adient's SS&M business and deprived investors from

properly analyzing the Company's current state of affairs and prospects and rendered Defendants' Class Period statements false and misleading. It was foreseeable that the value of Adient's securities would be adversely affected when the concealed risks materialized.

9. The concealed risks materialized through a series of disclosures beginning on November 2, 2017. In connection with the release of quarterly financial results, the Company disclosed that it had experienced "launch challenges" in its SS&M division including late design changes, manufacturing issues, and supply chain interruptions.[4] Despite disclosing that launch challenges were expected to continue for a short time, McDonald falsely assured investors that the product launch headwinds were more directly related to one time occurrences such as hurricanes, flooding in Houston, Texas, earthquakes in Mexico City, rising freight costs, and not to recurring operational issues. Moreover, Defendants falsely represented that the Company was already ahead of these challenges and was "***solidly on track***" for delivering on the Company's "midterm financial commitment" and was "***well on our way to achieve 200 basis points of margin expansion that we've committed to achieve.***" Stafeil also falsely reassured investors that: ***"the progression to our 200-basis-point improvement in margins remains on track***." This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, caused Adient's stock price to fall from a close on November 1, 2017 of $84.93 per share to a close of $81.08 per share at the close on November 2, 2017, a decline of $3.85 per share, or 4.5%.

10. The hidden problems in the Company's SS&M business were further revealed on January 16, 2018, after market hours, when the Company disclosed that, "Headwinds impacting Seat Structures & Mechanisms (SS&M) have intensified" since Adient's fourth quarter earnings

---

[4] Adient's fiscal year runs from October 1st through September 30th. *See* ¶33.

call. This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $5.10 per share, **or 6.2%**, on January 17, 2018. Despite partially revealing headwinds in the SS&M business, Defendants continued to mislead the market by falsely reassuring investors that the 200 basis point margin expansion was still on track and that the launch issues were on "the other side of the mountain . . . and ***we're seeing recovery***." Defendants also falsely reaffirmed the 200 basis point margin expansion, stating: "***We still think it's a reasonable long-term view***" and "[a]nd that's 200 basis points from our LTM June 2016 EBIT margin. ***So that goal is still there***."

11. Then, on January 29, 2018, Defendants again announced disappointing quarterly financial results and pointed to "headwinds much more severe" in the SS&M business than previously disclosed. But yet again, Defendants falsely reassured investors that the Company was comfortable that the launch-related problems were "behind us." Defendants also falsely reassured investors that the 200 basis point margin expansion was still on track, stating: "***we certainly are not backing away from our commitment to deliver 200 basis points of consolidated adjusted EBIT margin improvement by the end of 2020.***" The news of continuing problems in SS&M, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $5.53 per share, or about 7.6%, to close at $66.77 on January 29, 2018.

12. Additional information about the hidden risks facing the SS&M segment and the achievability of the margin expansion plan were revealed on May 3, 2018, when Defendants announced that the Company was restructuring its business units and intended to shrink the SS&M business. Adient also announced that it would restructure its SS&M segment and

recorded a $299 million impairment charge. The Company also admitted, for the first time, that the 200 basis points of margin expansion was "no longer going to be achievable." This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $6.14 per share, or about 10%, to close at $55.84 on May 3, 2018.

13. Despite the decision to shrink SS&M, the Company concluded that no additional impairments of its other SS&M assets were necessary and maintained its full year fiscal 2018 guidance for revenue and adjusted EBIT. In fact, Adient now estimated that SS&M earnings would inflect from losses in the first half of fiscal 2018 to earnings in the second half of fiscal 2018. However, as described below, Adient's newly "updated" forecast for SS&M was merely another tactic designed to avoid the timely recognition of further impairments in the SS&M business.

14. Just one month later, on June 11, 2018, Adient unexpectedly ousted McDonald as CEO and Chairman of the Board, slashed the Company's earnings guidance for fiscal 2018, and revealed that, "[c]ontinued challenges impacting the Seat Structures & Mechanisms segment drove approximately half of the shortfall versus previous expectations. . ." This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $8.88 per share, or about 15.6%, to close at $48.10 per share that day.

15. The previously undisclosed risks about Adient's SS&M business were fully revealed on November 9, 2018 when the Company abruptly announced it was suspending its quarterly cash dividend, confirmed that issues in its SS&M business were still strongly impacting the Company's margins in 2018 and would continue to impact margins into 2019, and

announced massive asset impairment charges. Indeed, less than six months after Defendants' assurances that further impairments in the SS&M business were not required, Adient announced a variety of one-time charges totaling **$1.5 billion** that significantly impacted Adient's fourth quarter results, including an asset impairment of $718 million and an impairment on Adient's tax deferred assets. These were driven by the Company's materially deteriorating performance in SS&M. In addition, Adient announced that margins declined significantly for Q4 and the full year. New CEO Doug Del Grosso conceded that, "***we haven't been exactly spot-on with guidance***. . ." and CFO Stafeil admitted, "***some of the expectations that the [SS&M] group have on the performance of it, were a bit optimistic or proved to be a bit optimistic, based on the experience that they had***." In reaction to these shocking disclosures, which were a materialization of the risks concealed by the Class Period misrepresentations and omissions alleged herein, Adient's stock price plummeted from a close of $28.83 per share on November 8, 2018 to a close of $21.52 per share on November 9, 2018, a loss of $7.31 per share, ***or 25.4%*** on usually high trading volume.

16. The magnitude of the impairment was enormous. While SS&M's total assets were reportedly $2.1 billion as of September 30, 2017 (the end of fiscal 2017), after the impairment charges, SS&M's total assets were only $1.4 billion as of September 30, 2018 (the end of fiscal 2018). **Thus, the 4Q18 impairment charges wiped out over one third of SS&M's total assets**. **Additionally, the impairment charge wiped out approximately one third of Adient's total long-lived assets**.

17. Moreover, unbeknownst to investors, during the Class Period, Defendant McDonald had been selling Adient stock at a highly suspicious times and in large amounts ***totaling more than $5.6 million while in possession of material non-public information***

***regarding Adient's massive problems in its SS&M business***. McDonald unloaded a significant amount of stock in late November 2017, after the first partial disclosure, but before the remaining five partial disclosures, as Defendants were revealing the full extent of the problems in SS&M, and while the Company's stock was trading above $76 per share. At the end of the Class Period, Adient's stock dropped to $21.52 per share.

18. McDonald and Stafeil also timed the drip-drip disclosure of the concealed risks to take full advantage of the Company's short-term incentive compensation plan which was tied to the Company's top-line growth to earn exorbitant bonuses and perquisites for fiscal 2017 (which ran from October 1, 2016 to September 30, 2017) before the concealed risks were fully disclosed. For fiscal 2017: (a) McDonald earned total estimated compensation of $24.3 million, including more than $17 million in stock awards and $4.8 million cash bonus; and (b) Stafeil earned total estimated compensation of $5.6 million, including $3.2 million in stock awards and $1.4 million in cash bonus. Indeed, the value of McDonald's stock award and bonus in fiscal 2017 were more than 60% higher than in fiscal 2016. After the Class Period, Adient's new CEO Doug Del Grosso announced that the Company was changing its short-term incentive compensation away from growth to profitability and cash generation likely due to the disincentives caused by the program during the Class Period.

19. As a result of Defendants' false and misleading statements and omissions, the precipitous decline in the price of the Company's securities and the Lead Plaintiff's and other Class members significant losses were foreseeable to Defendants.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

22. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Adient's shares are listed on the New York Stock Exchange ("NYSE"), which is located in this District.

23. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

24. Court-appointed Lead Plaintiff Bristol County provides retirement, disability, and survivor benefits to approximately 2,500 retirees and 3,300 active employees of 14 Towns and 24 Districts and Authorities within Bristol County, Massachusetts. It is a sophisticated institutional investor that had approximately $675 million in total pension assets under management as of May 2018. As set forth in the Certification previously submitted to the Court (ECF No. 22-1), Lead Plaintiff purchased or otherwise acquired Adient's securities at artificially inflated prices during the Class Period and suffered damages upon the materialization of the concealed risks.

25. Defendant Adient plc is tax domiciled in Ireland with its principal executive offices located in Dublin. Adient's operations have 85,000 employees and the Company operates 234 manufacturing/assembly plants in 34 countries worldwide. Adient has corporate offices in Milwaukee, Wisconsin; Plymouth, Michigan; Burscheid, Germany; and Shanghai, China.

26. Defendant R. Bruce McDonald ("McDonald") was Adient's Chief Executive Officer ("CEO") and Chairman of the Board until his "retirement" from the CEO and Chairman positions on June 11, 2018. Prior to the spin-off of Adient, McDonald was the Vice Chairman of Johnson Controls from 2014 to 2016. Before that, McDonald was Chief Financial Officer of Johnson Controls for ten (10) years from 2005 to 2014 and Executive Vice President of Johnson Controls from 2006 to 2016. McDonald is a Chartered Accountant and a Certified Public Accountant ("CPA"). Until his "retirement," McDonald signed Adient's annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Adient's internal control over financial reporting. Until his "retirement," McDonald also participated in each of the Company's quarterly earnings conference calls described herein. McDonald was a direct and substantial participant in the fraud. McDonald's total estimated compensation during the Class Period was as follows:

(a) **$13.9 million for fiscal 2018** (including: (a) $1,530,000 in base salary; (b) $10,620,765 in Stock Award Value; and (c) $1,717,628 in Other Compensation);[5]

(b) **$24.3 million in fiscal 2017** (including: (a) $1,500,000 in base salary; (b) $17,046,774 in Stock Award Value; (c) $4,774,800 in Non-Equity Incentive Plan Compensation/Bonus;[6] and (d) $942,179 in Other Compensation); and

(c) **$21.2 million in fiscal 2016** (including (a) $1,030,000 in base salary; (b) $10,550,957 in Stock Award Value; (c) $1,375,368 in Option Award Value; (d) $2,966,402 in

---

[5] McDonald left his role as CEO and Chairman of the Board effective June 11, 2018 -- 3 1/2 months before the end of the fiscal 2018, but was paid his base salary through September 30, 2018.

[6] Adient's Non-Equity Incentive Compensation Plan is described in more detail in §VIII (F).

Non-Equity Incentive Plan Compensation/Bonus; (e) $295,618 in Change in Pension Value and Nonqualified Deferred Compensation Earnings; and (f) $4,970,477 in Other Compensation).

27. Defendant Jeffrey M. Stafeil ("Stafeil") has been Adient's Executive Vice President and Chief Financial Officer at all relevant times. As of January 17, 2018, the Metals/SS&M segment reported directly to Stafeil. During the Class Period, Stafeil signed Adient's annual reports and SOX certifications stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Adient's internal control over financial reporting. Stafeil also participated in each of the Company's quarterly earnings conference calls described herein. Stafeil was a direct and substantial participant in the fraud. Stafeil's total estimated compensation during the Class Period was as follows:

(a) **$3.75 million in fiscal 2018** (including: (a) $780,000 in base salary; (b) $2,552,994 Stock Award Value; and $421,581 in Other Compensation);

(b) **$5.6 million in fiscal 2017** (including: (a) $750,000 in base salary; (b) $3,199,977 Stock Award Value; (c) $1,427,250 in Non-Equity Incentive Plan Compensation/Bonus; and (d) $225,685 in Other Compensation); and

(c) **$1.46 million in fiscal 2016** (including (a) $725,000 in base salary; (b) $725,001 in Non-Equity Incentive Plan Compensation/Bonus; and (c) $13,443 in Other Compensation).

28. The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Adient's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Structure

29. Adient designs, engineers, and manufactures automotive seating for all vehicle classes and all major OEMs and claims to be the largest global automotive seating supplier in the world with a 35 percent market share. Nearly half of its annual revenues derive from the sale of metal components used in seat frames produced by its SS&M group, also called the Metals Group. In 2017, Adient renamed its metals business, "Seat Structures and Mechanisms." The seat structure is essentially the seat frame - the part a passenger sits on in the vehicle. The mechanisms are the recliners, tracks, and height adjusters.[7]

30. For most of the Class Period, Adient's business was structured in two segments, Seating and Interiors. During this time, the SS&M/Metals business was contained within the Seating segment. Adient restructured its reporting segments in the second fiscal quarter of 2018 ended June 30, 2018 so that SS&M would be a standalone reporting segment. The new three segments were: 1) Seating; 2) Seat Structures & Mechanisms (SS&M); and 3) Interiors.

---

[7] Mechanisms are not car brand or make specific and can be used across multiple platforms and vehicles. Adient considers its SS&M business the most highly engineered part of its business. "Complete seat" systems include seat structures, mechanisms, foam, trim, and assembly.

31. Up until the restructuring announced in Q2FY2018, Adient's business was divided in the following two segments, Seating and Interiors:

(a) ***Seating***: This segment produces complete seat systems for automotive and other mobility applications, as well as certain components of complete seat systems, such as seat structures and mechanisms, foam, trim and fabric for inclusion in complete seat systems that are produced by Adient or others. The Seating segment included the:

(i) *Consolidated Seating Business* – which was the complete seat and component business in North America, Europe and Asia with annual sales of approximately $17 billion, or half of the Company's overall revenues in fiscal 2017; and its

(ii) *Unconsolidated Seating Business* – a go-to-market business run through joint ventures, most of which were nonconsolidated with sales of about $8.7 billion and market share in China of between 45% and 50%.

(b) ***Interiors Business:*** This segment produces instrument panels, floor consoles, door panels, overhead consoles, cockpit systems, decorative trim and other products. Adient has a global joint venture with a Chinese company for automotive interiors wherein Adient owns 30 percent of the joint venture (sales of approximately $9 billion in 2017).[8] The Interiors business is approximately 50% in China and 50% outside of China.

32. Beginning in the second quarter of fiscal year 2018, as noted, the SS&M/Metals business became a third, standalone reporting segment within the Company.

---

[8] The joint venture is Yanfeng Global Automotive Interior Systems Co., Ltd., or "YFAI."

### B. Adient's Financial Reporting Periods

33. Adient's fiscal year runs from October 1 to September 30. The following chart breaks down each reporting period relevant to this Action:

| Reporting Period | Calendar Dates |
|---|---|
| **FY 2017** | **Oct. 1, 2016 – Sept. 30, 2017** |
| FY 2017 Q1 | Oct. 1, 2016 – Dec. 31, 2016 |
| FY 2017 Q2 | Jan. 1, 2017 – Mar. 31, 2017 |
| FY 2017 Q3 | Apr. 1, 2017 – June 30, 2017 |
| FY 2017 Q4 | July 1, 2017 – Sept. 30, 2017 |
| **FY 2018** | **Oct. 1, 2017 – Sept. 30, 2018** |
| FY 2018 Q1 | Oct. 1, 2017 – Dec. 31, 2017 |
| FY 2018 Q2 | Jan. 1, 2018 – Mar. 31, 2018 |
| FY 2018 Q3 | Apr. 1, 2018 – June 30, 2018 |
| FY 2018 Q4 | July 1, 2018 – Sept. 30, 2018 |

### C. Background

34. Prior to its announcement of the Adient spin-off, Johnson Controls had been deemphasizing its automotive business because it was making more money in other parts of its business. Because of this, Johnson Controls was neither investing capital in nor growing its automotive business. Thus, there was little growth from a top-line perspective.[9] Johnson Controls had been reducing personnel in its automotive business in the years leading up to the announced spinoff, leaving Adient's ranks depleted of operational talent.

35. Before the spinoff was complete, Defendants announced plans to heavily invest in the automotive seating business to spur growth and improve margins. Because the automotive seating business is a long cycle business – business that is won does not ship for two-to-three years.

[9] Top-line refers to a company's revenues or gross sales. When a company has "top-line growth," it is experiencing an increase in revenues or gross sales. A company's "bottom-line" refers to its net earnings or net profits.

36. Thus, from mid-2015 until the spinoff was complete, Adient concentrated on and trumpeted its growing net backlog of new business. Based on that backlog, Defendants repeatedly boasted that Adient was "***solidly on track***" for: (i) 200 basis points of margin expansion by 2020; and (ii) topline growth in 2018 and 2019. Defendants also represented that the Company's margin growth expansion would come predominantly from growth in its core SS&M/Metals business.[10]

37. However, as Adient booked its new stable of business, the Company failed to hire sufficient qualified personnel for its program launches and simultaneously made deep cuts to its ranks in an effort to cut costs, which left the SS&M/Metals business shorthanded and in disarray. Moreover, the existing management including McDonald, VPs and EVPs lacked sufficient operational experience and failed to act on warnings from employees with operational experience who raised red flags about the deteriorating Metals/SS&M business and the Company's upcoming launches.

38. By the time the Company's new programs started to launch in 2017, Adient was already facing a wide range of serious problems, including: (i) severe execution issues, including high cycle times and poor machine utilization rates; (ii) quality issues which resulted in containment costs and the implementation of additional contract milestones by certain customers once launch issues materialized; and (iii) increased extrinsic costs such as exorbitant premium freight shipping and alternate supplier costs.

39. Once Adient's launches fell behind, it was exceedingly difficult for the Company to deliver parts to its customers on a just in time basis (referred to by Adient and others as

[10] Because automotive seating is a fixed cost industry, improvements on the top line should positively affect margins.

"JIT").[11] These backups caused Adient's production and launch readiness to be further compromised. As a result, Adient could not fill its pipeline and had to fly parts between its various plants, thus incurring premium freight charges of several tens of millions of dollars per month. And, in some cases, the Company had to get outside suppliers to produce parts for them, adding further expense and reducing the profitability of its customer contracts.

40. Rather than hire or subcontract with the requisite personnel who could assist with launch execution, in the second half of 2017, CEO McDonald cut Selling, General, and Administrative Expenses ("SG&A") which further worsened product launch problems. And, as problems worsened, Adient shifted personnel resources to launches experiencing the most severe problems (calling these relocated personnel "tiger teams"), thus causing delays and increased costs on other projects where personnel were lost. These issues only exacerbated launch problems during the Class Period.

41. Near the end of the Class Period, Defendants announced that Adient was dramatically shrinking its Metals/SS&M business (which had previously been promoted as the Company's growth engine) due to deteriorating conditions in that business. And, for fiscal 2018, the Company announced massive impairment charges in its SS&M business, alongside a net loss of $1.685 billion for fiscal 2018 primarily attributable to overall lower profitability within SS&M and Seating. The impairment charges in 4Q18 wiped out over one third of SS&M's total assets.

---

[11] Adient boasts on its website that its "just-in-time" manufacturing can take as little as 90 minutes from original order to final delivery. "With such quick turnaround times, our customers know they can trust us to always deliver." https://www.adient.com/approaches/manufacturing

Additionally, the impairment charge wiped out approximately 33% of Adient's total long-lived assets.[12]

42. Following the Class Period, the Company stated the following about SS&M: "Although the segment is important to our overall business . . . [f]or too long, the segment has been a cash drain on the company."[13]

**D. SpinOff Roadshow and Registration Statement**

43. On April 27, 2016, Adient filed with the SEC a Registration Statement on Form 10 in connection with the spinoff.[14] Between June 27, 2016 and September 26, 2016, Adient filed five amendments to the Registration Statement on Form 10.

44. During a September 15, 2016 investor meeting leading up to the October 31, 2016 spinoff, Defendants made a number of statements that echoed and previewed their Class Period misstatements and omissions, in which they told investors why Adient was a "solid investment," saying that an "[u]pward trend in profitability" was "expected to continue" and ". . . 200 bps of margin improvement expected over the mid-term[.]" McDonald represented:

> **Our business is on an upward trajectory. If you look at our margins we have strong margin improvement in automotive as we've gone through 2016, and we expect that momentum to continue on. We think we have about 200 basis points of margin expansion.** When Jeff comes up and goes through his presentation, he'll really take you through a walk of where that 200 basis points comes from. . . . **when you think about the 200 basis points of margin expansion, it really comes from some things**

---

[12] A long lived asset is any asset that a business expects to retain for at least one year or more than one accounting period. Once acquired, the cost of a long lived asset is usually depreciated (for tangible assets) or amortized (for intangible assets) over the expected useful life of the asset.

[13] 2/7/19 Earnings Transcript ("Earnings Tr.").

[14] Form 10 is a filing with the SEC used to register a class of securities for potential trading on U.S. exchanges for any company with over $10 million in total assets and 750 or more shareholders. The Form 10 registration statement automatically becomes effective sixty days post filing.

> **that we have 100% control, self-help**. . . . **Our metals operations, you know, we're sort of in the – I'd say the third or fourth inning of integrating our metals operations. That drives a significant amount of margin expansion opportunity for us**.[15]

* * *

> **I talked a little bit about our profitability and our 200 basis points of margin expansion**. . . . we have been focusing on margin expansion. You can see on a year-to-date basis our margin -- our segment income is up about 13%. So our margins '16 over '15 are up. Our '15 over '14 are up. **We're on an upward trajectory**. The actions that I talked about around leaner corporate office, that would benefit this. The SG&A initiatives that we have globally, that will benefit this. **And the metals improvement opportunity**, that will benefit this. And Jeff will sort of spend a bit more time deep diving each one of these three, **so upward profitability trajectory.**

* * *

> **We have 200 points in our gunsights that we control, and we're a strong cash generating business. And I think you'll see that we're going to be able to really quickly deleverage our balance sheet and turn it into shareholder value for our new shareholders.**

45. Stafeil echoed McDonald's commitment to a 200 basis point margin expansion:

> **What we're talking about a 200 basis point opportunity to improve our margins, really on a flat sales environment in the next several years**. Because of some of that lack of investment, you know, the previous two years before we announced the spin and separation from Johnson Controls, our order book is probably flattish for the next few years, **but with that we have lots of opportunity to self-help to improve our margins**. It's going to be driven by a number of things, but you can think of SG&A. I'll give you some examples of that as we go forward, but if you compare our SG&A profile to some of our peer group **there's an opportunity**. We started to address that, and you can see that in our 2016 numbers. You'll see more of it in our 2017 and continuing forward.

* * *

[15] Unless otherwise noted, emphasis is added throughout.

> As you look at the metals business, or the metals opportunity, and I'll have a slide here in a second to go in that in just a little bit more detail, **we see really a 1% to 2% opportunity to increase Adient's total margin with tackling some of the issues in that metals business.** . . . There's probably a little of hedge in that number, too, **but such that we really come out and we see a 2% margin opportunity, again, not in one year, probably not in two years, but by that 2020 timeframe.** And I think you can model it, you know, fairly steady increase on our path to get there.

46. During the question and answer ("Q&A") session, McDonald again confirmed the Company's margin growth expansion would come from, among other things, growth in the Company's core business, including its SS&M business:

> **Colin Langan - UBS - Analyst**
>
> Yes, I just, on the 200 basis points of margin expansion that you're forecasting, how should we think about that between the core consolidated business and joint venture equity income growing. And when you get to that 200 basis points where does that really put you relative to your direct competitors on an apples-to-apples basis? And also should we think of you being able to do better than your direct competitors since you're more vertically integrated?
>
> **Bruce McDonald - Adient - Chairman, CEO**
>
> Yes . . . . I'll start on **the 200 basis points of margin expansion is not counting the fact that we would anticipate our Chinese equity income to grow**. So it's our core margin improvement in our base business is where we're looking to get that, Colin. So as -- as the China equity income becomes a bigger and bigger piece of the pie, you know, that upside to the EBITDA-type expansion that we talked about.
>
> * * *
>
> **Mike Ward - Seaport Global Securities - Analyst**
>
> Just to follow on the -- on the mechanisms on the metals business, is that included in the 200 basis point reduction in -- or improvement in margin you're looking at?

**Bruce McDonald - Adient - Chairman, CEO**

Yes.

**Jeffrey Stafeil - Adient - EVP, CFO**

Yes.

47. On October 31, 2016, Adient was formally spun off from Johnson Controls and became a standalone public company. McDonald, a former Johnson Controls Executive Vice President and Vice Chairman became the first Chairman and CEO of Adient. According to the Company's press release that day, "distribution of Adient ordinary shares took place at 12:01 a.m. ET on October 31, 2016. Adient issued one ordinary share for every ten Johnson Controls shares held on October 19, 2016, the record date for the distribution. No fractional shares of Adient were issued." Based on the approximately 935 million outstanding shares of Johnson Controls as of September 12, 2018, JCI expected that approximately 93.5 million Adient shares would be distributed.[16]

**E. Serious Problems within the SS&M Segment Plagued Adient Throughout the Class Period, Were Made Known to the Individual Defendants, But Were Not Disclosed to the Market During that Time**

48. Former Adient employees confirm that the SS&M/Metals segment was in absolutely disarray throughout the Class Period, and provide factual support for a strong inference of scienter on Defendants' part regarding the false and misleading nature of their statements.

---

[16] Upon becoming an independent company, the capital structure of Adient consisted of 500 million authorized ordinary shares and 100 million authorized preferred shares (par value of $0.001 per ordinary and preferred share). The number of Adient ordinary shares issued on October 31, 2016 was 93,671,810. 2017 10-K.

49. CW-1 was a Senior Leader in Commercial and Finance at Adient and previously Johnson Controls.[17] CW-1 had direct involvement with all groups within Adient including JIT, Metals/SS&M, Foam, and Trim. CW-1 reported one level below CEO McDonald. CW-1 had regular meetings with Mitchell and McDonald.

50. CW-1 explained that the challenge Adient faced was trying to re-grow the Company's top-line. CW-1 stated that prior to the spin-off, the former Johnson Controls CEO Alex Molinaroli was de-emphasizing its automotive business because the company was making more money in other parts of its business; thus, it was not booking business at a replacement rate for the automotive business to sustain the top-line. CW-1 stated that under Molinaroli, the automotive top-line would begin to decrease.

51. According to CW-1, by the time Adient was spun-off from Johnson Controls in October 2016 (the start of fiscal 2017), Adient faced two years (through fiscal 2019) with its top-line projected to be flat or falling. From 2015 until departing Adient, the task was to significantly grow the top-line of the business, including not losing any replacement business.

52. CW-1 reported that after Adient booked a record amount of business in fiscal 2016 and 2017, the Company needed to hire additional employees for these launches, but neither McDonald nor Mitchell would approve the headcount increases. CW-1 stated that Mitchell and McDonald also cut Selling, General, and Administrative Expenses ("SG&A") in 2017, which exacerbated product launch problems in the second half of 2017. CW-1 added that Adient did not have the depth of operational leadership anymore and fundamentally did not have the

---

[17] Lead Plaintiff believes that the details of the responsibilities of CW-1, CW-2, and CW-3 contained herein are sufficient to satisfy the requirements of the PSLRA. However, Lead Plaintiff can provide additional specificity, including exact titles for these three (3) CWs, to the Court through an *in camera* submission.

development teams, like Program Managers, Manufacturing Engineers and Launch Managers that were needed to launch the programs successfully.

53. CW-1 confirmed that by March 2017, Adient had limited launches, with a majority starting in the second half of the calendar year 2017 and continuing for 24 months. CW-1 reported that product launches are where you either make or break it: "You either hit your hurdles, your efficiencies, and a working design. If not, you start to burn through the money."

54. CW-1 explained that Adient and Johnson Controls did not have the right people with the right discipline to run the Metals business. The Metals business had historically been through multiple restructuring programs to fix the business over 20 years. CW-1 stated that part of the problem was that the top executives at Adient, including the majority of executives at the VP and EVP level, had limited or no operational or manufacturing experience. CW-1 also confirmed that these executives ignored the repeated warnings of lower level employees with operational experience who raised red flags about the Metals business and the upcoming launches. According to CW-1, such warnings "fell on deaf ears" and were ignored by top Adient management including Foster, Mitchell and McDonald.

55. CW-1 confirmed that from March 2017 until his departure in Q4 2017, only a few product launches were underway including BMW and Daimler programs that launched first in the US and then in Europe, and then a launch for Ford. CW-1 stated that Adient was not hitting its efficiencies or scrap rates in these launches due to execution issues and increased extrinsic costs. CW-1 stated that because the Company made different parts in different plants, it could not fill its pipeline and had to fly parts between its various plants, thus incurring premium freight charges. Adient spent over $21 million in one month on premium charges.

56. CW-1 reported that the Company's launches became so bad that Adient slowed Ford down to the point where Ford's launch of its new Expedition SUV was affected. CW-1 explained that Adient could not ship metals to Magna, the Company that assembled the Ford seat. This continued for several months. These program delays likely resulted in Adient incurring charges of $10- $15 million. CW-1 also confirmed that Adient declined or lost business on the Ford F150 metals because of these problems. CW-1 also confirmed that other Adient customers were looking to transition their seating business away from Adient due to the Company's launch failures.

57. CW-1 stated that Adient's top-line growth strategy for fiscal 2020 was based on multiple factors occurring within two to three years of its launches, including: (i) achieving certain vertical integrations (referring to how much of its own parts a company manufactures) and conversion rates, (ii) reducing manufacturing costs; and (iii) increasing efficiencies and uptimes. Because Adients' SS&M business was moving from a breakeven business towards a projected 10-15% business, it was imperative that the Company have its Metals product launches proceed successfully.

58. CW-1 explained that automakers' ramp-ups go from slow to fast. If suppliers cannot meet their requirements within the first few months, things go from bad to worse quickly. CW-1 also reported that the Company was so focused on trying to build parts and to keep its customers running, it failed to timely collect on receivables for tooling. CW-1 stated that Adient had $90 million in receivables that was not collected from its customers for tooling.

59. During his tenure, CW-1 attended Profit Plan Reviews and Budget Review Meetings with Mitchell and CEO McDonald. Sales bookings were discussed at these meetings. CW-1 stressed to Mitchell and McDonald that they needed to properly staff the various programs

in order to have successful launches. CW-1 stated that at Budget Plan Meetings for FY 2018, the Commercial Teams and the Launch Teams were asking for more than 100 incremental employees to execute Adient's business. EVP Mitchell and CEO McDonald would not approve additions to the headcount. CW-1 stated: "They could have afforded to hire but they were spending money on the wrong things" including headquarter and office upgrades and a second Company airplane.

60. CW-1 also attended monthly Operational meetings with EVP Mitchell who reported back to CEO McDonald on these meetings which focused on winning new business. CW-1 informed Mitchell that Adient did not have sufficient resources to target new business. CW-1 stated: "We didn't have the resources to support the business that we had already won." Mitchell failed to approve the hiring of additional personnel for existing or new business.

61. CW-1 received and reviewed various reports regarding sales, forecasts, and launches. CW-1 attended weekly and biweekly forecast outlook meetings which were also attended by Mitchell. During these meetings, the executives analyzed various financials and tried to figure out a plan if the Company expected a variance for the month. CFO Stafeil also held monthly or bi-monthly reviews regarding forecasting and cash collections. Mitchell and Stafeil also held separate monthly or bi-monthly operations meetings at which the Metals business was discussed.

62. CW-1 reported that Byron Foster met with customers regarding Adient's launch issues and that EVP Mitchell often met with customers on commercial issues and high-profile launches. According to CW-1, Foster and Mitchell reported any launch issues and customer meetings directly to McDonald.

63. CW-1 confirmed that because the Company internally projected that top-line for fiscal 2017 and 2018 would be flat or falling, its short-term incentive compensation/bonus plan focused heavily on top-line growth. According to CW-1, Mitchell and McDonald were extremely focused on their personal bonuses at the end of fiscal 2017 (September 2017). Mitchell and McDonald thoroughly analyzed the Company's metrics to make certain their bonuses would get paid. CW-1 also confirmed that at the end of fiscal 2017, Mitchell and McDonald were well aware of the launch problems and increasing costs facing Adient because of those issues and how it would affect the Company's future financials. CW-1 added: "They were just happy to get paid at the end of the year and then took their lumps in the first quarter."

64. CW-2 was a senior executive involved with SS&M launches from before the spin off until the end of fiscal 2017.[18] CW-2 reported that the Metals division had been the "sore spot" across the Company for many years starting before the spinoff from Johnson Controls. According to CW-2, the Metals division's revenue was based, in large part, on internal sales to Adient's Complete Seat division. According to CW-2, there was a desire by executive management at Adient to run the Metals division at the same efficiency as the Complete Seat division. According to CW-2, this was not possible due to operational variance, costs of poor quality/scrap and the complexity of the metals business.

65. CW-2 advised that after the spinoff, Adient was split between two EVPs, Byron Foster and Eric Mitchell. During CW-2's tenure at Adient, Mitchell was responsible for China (joint venture), SS&M and some other functional areas. During CW-2's tenure, Foster was in charge of Program Management as well as Complete Seat and supply chain. Foster did not take over SS&M until after CW-2 left the Company.

[18] Prior to his tenure at Adient, CW-2 served in various roles at Johnson Controls.

66. According to CW-2, the data he was seeing in the November 2016 time frame indicated that "the quality of execution" on launches continued to struggle on the development side in North America and Europe.

67. CW-2 confirmed that throughout his career at Johnson Controls and then Adient, he had direct interactions with CEO McDonald on many occasions. According to CW-2, McDonald put too much "false hope" in the ability to achieve targets that were unrealistic.

68. CW-2 stated that in Adient's pre spinoff layoffs in 2014/2015, the Company terminated too many people with institutional knowledge which was detrimental to the organization moving forward. He recounted that instead of getting rid of the "deadwood," Adient got rid of "green wood." CW-2 stated that he was very vocal to Foster about the fact that Adient's development program was highly understaffed. He was told Foster reported his concerns to McDonald.

69. CW-2 confirmed that costs (including the cost of poor quality -- scrap, containment, premium freight -- and other production related costs) were increasing, especially in the Metals segment throughout the launches in 2017. CW-2 also reported the increased use of premium freight costs related to new launch activity was a frequent occurrence at Adient. CW-2 recalled that Adient had to use air expeditors / premium freight to make up for missing scheduled deadlines. This became necessary because Adient was having difficulty in producing good parts. According to CW-2, during his tenure at Adient, there were times that the Company expended millions of dollars over the period of an order just in premium freight costs. CW-2 confirmed that such costs were part of a "standard operational packet" that was presented to executive management (including Mitchell, Foster, CFO Jeff Stafeil and CEO McDonald) monthly in the Operational Review Meeting which CW-2 also attended.

70. CW-2 recounted a meeting where ongoing performance issues with Metals and a "turnaround" program at Metals were discussed. CW-2 stated that the goal of this meeting was to address excess costs and focus on operational improvement and other related issues. CW-2 recounted that Paul Lambert, Vice President and General Manager of SS&M at the time, was managing the Metals "turnaround" program. CW-2 also attended the Program Review Meetings.

71. CW-2 confirmed that McDonald would have been aware of launch inefficiencies, cost overruns, engineering issues, and financial issues through his attendance at meetings and his communications with Mitchell, Foster, and Foster's predecessor, Paul Lambert.

72. CW-3 was involved with new launches for SS&M/Metals throughout the Class Period and described constant problems with the new launches. CW-3 confirmed that the turnaround in SS&M started in 2010 and involved a lot of restructuring. When that division was part of Johnson Controls, the Company terminated a lot of people needed for launching new programs. CW-3 stated that Metals had been in the "public eye" for a while and that decisions on resource allocation came from corporate.

73. CW-3 confirmed that the reductions in personnel in SS&M/Metals had a detrimental effect on Adient's launch programs. According to CW-3, at the same time that Adient was making substantial cuts in its workforce, it committed to a very high number of program launches. CW-3 recalled that beginning in 2015, there was a huge influx of new programs to be launched in 2017-2018, but not enough people to properly handle the launches. CW-3 explained that these programs have a three year development/production cycle which meant that they were slated to launch in 2017-2018. CW-3 stated that the lack of sufficient qualified personnel also contributed to quality issues on the launches.

74. According to CW-3, the lack of headcount was a persistent topic in weekly and bi-weekly Program Review Meetings where new launches were discussed. CW-3 confirmed that at these meetings, "program review dockets" which included details of the lack of personnel to work on the various launches were also discussed. According to CW-3, the Program Review Meetings were regularly attended by the program managers and sometimes by the more senior executives including Paul Lambert and, occasionally, Byron Foster. According to CW-3, launches were archived in "Gate Workbook", the program management software Adient used internally. CW-3 stated that reporting from Gate Workbook was circulated internally by email and reviewed at Program Review Meetings. CW-3 believes that executive management were receiving these reports which detailed launch programs, cost overruns and delays. CW-3 explained that the executives had separate program management reviews where they tracked the Program Management Organization.

75. CW-3 also confirmed that Adient's resource problems at the plant level forced them to use expensive means to get parts faster. These expenses included consultants, premium freights, and additional expediting costs related to tool vendors. CW-3 advised that the frequent use of premium freight is a "problem indicator," because the premium freight would be used to make up lost days.

76. According to CW-3, the Spring and Summer 2017 were the "height of chaos" at Adient. CW-3 explained that there was a lack of resources specifically related to engineering and manufacturing, so in turn everyone was spread too thin. CW-3 further explained that if launch program A (by example) was "toxic," there were no resources to work on launch program B which might have needed additional attention. He described it as Adient having to focus on the

"hottest fire" which ultimately had a domino effect on subsequent launches because there were "less and less resources."

77. CW-3 confirmed there were SS&M/Metals Program Management meetings on at least a monthly basis that were attended by Adient's senior executives. CW-3 explained that given the huge influx of programs/launches occurring at a "feverish" pace, many of the executives were being sent to the problematic plants to address the plant and project-specific problems. CW-3 confirmed that in all of 2016 and 2017, Adient sent their manufacturing leaders to address the problems at the plant level. CW-3 recounted how some of the top executives visited the plants in Coahuila, Mexico and Clanton, Alabama plant to manage problems on the ground.

78. CW-3 also periodically attended "Red Flag Meetings." CW-3 confirmed that anyone working on a project could red flag an issue via email to get the attention of the Company's executives. The Red Flag Meetings were "ad hoc" and "issue specific."

79. CW-4 was the former Director Global Product Management at Adient from April 2017 until October 2018.[19] CW-4 reported to Christine Feuell, the Global Vice President of Marketing during his tenure at Adient. CW-4 was responsible for, among other things, directing and implementing global product management over several product lines and offerings. CW-4 also was responsible for presenting new products to the Company's executive leadership including CEO McDonald on a regular basis. CW-4 was brought on from Johnson Controls to lead product strategy development for all of Adient's product management organization (which included both Complete Seat and SS&M).

[19] Prior to his tenure at Adient, CW-4 served as the Director, Global Market and Customer Intelligence at Johnson Controls from February 2012- April 2017.

80. CW-4 stated that in his role at Adient, he had two main goals - to present new products and present pricing strategies. CW-4 confirmed that throughout his tenure at Adient, there were escalating concerns about costs and their impact in both SS&M/Metals and Complete Seat. CW-4 reported that his job was stymied because of internal reluctance at Adient to provide him with exact pricing of materials needed for his Metals product launches. CW-4 stated that he was not being given the "proper toolset" to perform his job responsibilities and he would regularly go to his boss (Christine Feuell) to complain that he was unable to do a "roll-up" of future projects because he did not know Adient's true costs.

81. CW-4 reported discussions with Christine Feuell about concerns in the Metals group. CW-4 recounted how inefficiencies and difficulties in keeping up with schedules and cost targets were common knowledge throughout the Company. CW-4 stated that Adient had "overcut" personnel in the Metals group in approximately 2014 which was detrimental to the group during CW-4's tenure.

82. CW-4 also stated that launch problems in the Metals group that were disclosed by the Company beginning in late 2017 were problems that were, in his opinion and based on his position and tenure at the Company, percolating for years and did not happen "all of sudden" or overnight. Indeed, from the time CW-4 joined Adient in April 2017, executive management was already aware of problems in the Metals group. CW-4 confirmed that challenges with the Metals group's business was something that had been happening for a long time and culminated with the OEMs, including Ford and possibly BMW, missing deliveries.

83. CW-4 confirmed that he attended Product Strategy Meetings with CFO Stafeil, CEO McDonald and the entire leadership team on a quarterly basis. He added that on a monthly

basis, he also attended Product Strategy Meetings with EVP Paul Lambert, his boss Christine Feuell, Brian Grady and others.

84. CW-5, former Senior Transportation Manager for North America from May 2015 until November 2017, reported directly to John Santoro, Director of Global Logistics at Adient from April 2015 until December 2017, and was responsible for all North American transportation of "dedicated runs" which was the flow of scheduled transportation to move Adient product between its various plants.

85. CW-5 was very familiar with the increase in use of premium freight shipping within the Company which came to a tipping point in 2017 with a plant in Ramos, Mexico. According to CW-5, the Ramos plant was well known within Adient as the plant to "watch out for" because they "can't keep up." According to CW-5, the Ramos plant was "the most problematic" because it was the largest Metals plant for Adient and had the "biggest customer base."

86. CW-5 confirmed that in August 2017, there was a "minor flood" in Laredo, Texas – which borders Mexico – that lasted a "few days." This flood caused all ground transportation to be "choked off" which created a "bottleneck" that caused a need for increased air transportation at Adient. According to CW-5, this increased need for air transportation should have only been necessary for a few days, but instead it "never stopped" and was being used to the point that it was costing the Company "millions of dollars a month." CW-5 advised that the Metals segment was significantly increasing its use of premium shipping well before August 2017, and that "everybody knew Metals was having problems, and had been having problems for some time."

87. CW-5 confirmed that Jim Conklin, VP of Operations, who reported to Byron Foster, EVP at Adient, was constantly on the phone trying to deal with this matter. CW-5 stated that it soon became apparent that the real problem was not transportation, but that the plant in Ramos was not manufacturing parts fast enough, causing the continued need to use rush shipping. According to CW-5, this problem was occurring well before the flood in Laredo and the flood only uncovered the problems.

88. CW-5 advised that that Executive Vice Presidents were aware of the issues with the Ramos plant and the increased use of premium freight to move that plant's delayed parts around, and that other executives from the Company's Complete Seat segment were frequently being moved to the Metals segment in an effort to solve the problems, but the problems continued to grow worse.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A. Overview of Defendants' Fraudulent Conduct

89. Lead Plaintiff alleges that the statements highlighted in ***bold and italics*** within this section were materially false and misleading because, among other reasons, they omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or artificially maintained the price of Adient publicly traded securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information. As described below, Defendants created an impression of a state of affairs at Adient that differed in a material way from the one that actually existed.

### B. Defendants Made Materially False and Misleading Statements and Omissions Regarding Adient's SS&M Business and Its Margin Expansion

#### 1. First Day of Trading – October 31, 2016

90. On October 31, 2016, the Milwaukee Business Journal (Wisconsin) published an interview with McDonald entitled, "*Adient free to grow as independent company, CEO McDonald says*," during which McDonald explained that Johnson Controls had decided to spinoff Adient because JCI's automotive and non-automotive businesses were already operating independently and JCI was constraining capital spend in the auto business which was not growing as a result of that constraint. Post-spinoff, McDonald expected growth to resume in Adient's business and expected strong results for fiscal 2017 (ended 9/30/17). McDonald stated:

> ***Now we're pretty comfortable about the fact that in 2018 we'll see some growth again, in 2019 and beyond we'll get back to the type of growth numbers that we've historically posted in the business. One other thing to correct you on: we have guided to about $17 billion***.

91. That same day, *Reuters* quoted Defendant McDonald as stating, "***We think we have a couple hundred basis points of margin expansion we can deliver, based on things we have 100 percent control of***."

92. On October 31, 2016, theStreet.com published an article entitled, "*Self-Driving Cars Could Feature Reclining Seats and Handheld Controls, Says Adient CEO"* in which McDonald was asked whether he was seeing a downturn in the automotive market which was depressing Adient's sales. McDonald replied:

> I don't think we're at the beginning of a downturn at all. I think we're going to stay at the approximate level for the foreseeable future. ***I don't see any sort of shocks causing a downturn.***

93. McDonald's' statements about "a couple hundred basis points of margin expansion" Adient could deliver and grow in 2018 and 2019, contained in ¶¶90-92, were materially false and misleading when made in that Defendants failed to disclose:

(a) material known adverse facts and trends in Adient's core SS&M/Metals business including: (i) severe operational challenges and inefficiencies, (ii) increased costs and delays due, in part, to failure to follow Company policies (¶203), (iii) insufficient qualified personnel to timely launch Adient's programs, and (iv) other launch-related problems which were not weather or market related and which significantly increased customer chargebacks, decreased profitability on Adient's automotive seating contracts, and made a 200 basis point margin expansion unachievable;

(b) that the severe launch issues threatened ongoing relationships with Adient's customers, increased the risk of contract cancellations and reduced the likelihood of Adient winning new customer contracts; and

(c) that instead of being a key driver of growth and margin improvement, SS&M was a "cash drain" on the Company.

**2. Fourth Quarter Fiscal 2016 Results – November 8, 2016**

94. On November 8, 2016, before the market opened, Adient reported its financial results for the fourth quarter of fiscal 2016 ended September 30, 2016. That same day, the Company hosted a conference call to discuss its quarterly results. During the call, McDonald stated:

> ***Our guidance around margin expansion is really driven by 3 fundamental areas: one, improving our performance in our metals business; two, reducing our SG&A; and three, setting up a much leaner corporate overhead structure***. So you saw the first and second elements of that -- of those plans. You're sort of seeing the benefits of that showing up here in our fourth quarter numbers. Obviously, the impact of setting up a leaner corporate overhead

> structure, you will see right off the bat here when we get into our first quarter results. ***So anyway, great progress in terms of growing our margins here.***

95. Stafeil echoed McDonald noting, "***And then just business improvements we'll work to do on our march towards the 200 basis point target for margin improvement***." Stafeil also stated:

> We do expect that equity income will continue to add to our margin as we go forward because it comes in at 100%. ***But specifically, our goal of the 200 basis points -- or target, I should say, of the 200 basis point margin improvement is excluding our equity income and is really referenced from our [Last Twelve Months] results, trailing 12 months results last June, so one quarter ago. We've kind of cemented that number and are marching towards a 200 basis point improvement plan from that over the next, let's say, 3 years***.

96. In the Q&A section of the call, a Barclays analyst asked for an update on "the metals margin improvement exercise." Stafeil discussed the improvement in Adient's SS&M/metals business and large upcoming launches which would be huge drivers of that improvement:

> ***[W]e do see a big improvement in metals***. And I know it's been somewhat of a long road, but as you look at the metals business, there are a couple of components to the increase year-over-year. The big – all right, so that'd be – a couple of components to our increases as we move out a couple of years. The big one is really the launch of several new programs. ***We've mentioned we have some mega launches going on in the metals business. That's going to be the biggest driver. That will start to really impact our results, in 2017 a little bit but in 2018 and 2019 more specifically***. There's also some capacity that we have, primarily in Western Europe that needs to be transitioned to Eastern Europe to lower cost countries. That process is underway. The results will start to show a little bit more in 2018 than they do in 2017. ***So, yes we have seen a little bit of improvement on the metals side, but we expect that improvement to ramp up as those new programs come to launch and some of the restructuring initiatives go into full effect***.

97. During the same call, McDonald represented:

> ***[W]e're very comfortable with the plan that we have to improve metals.*** It's definitely not the plan that we thought it was going to be three, four years ago.
>
> If you look at the current product portfolio, put in a low-cost country operation and with the right manufacturing equipment, i.e., like we did in China, where we built the business from scratch, it is capable of earning double-digit margin. And so ***we're confident we're going to get there. It's a big – it has the driver of our 200 basis points of margin expansions*** being conservative, and it's just not going to happen -- not part of our plan in one or two years. It's going to take up to four years."

98. On November 29, 2016, Defendants filed Adient's Form 10-K for the fiscal year ended September 30, 2016. McDonald and Stafeil certified this filing.

99. In the 2016 10-K, Adient identified the following relevant risk factors:

> ***Adient's business success depends on attracting and retaining qualified personnel.***
>
> Adient's ability to sustain and grow its business requires it to hire, retain and develop a highly skilled and diverse management team and workforce. Failure to ensure that Adient has the leadership capacity with the necessary skill set and experience ***could*** impede Adient's ability to deliver its growth objectives and execute its strategic plan. Organizational and reporting changes as a result of any future leadership transition and corporate initiatives could result in increased turnover. Additionally, any unplanned turnover or inability to attract and retain key employees could have a negative effect on Adient's results of operations.
>
> * * *
>
> ***Adient's profitability and results of operations may be adversely affected by program launch difficulties.***
>
> The launch of new business is a complex process, the success of which depends on a wide range of factors, including the production readiness of Adient's and its suppliers' manufacturing facilities and manufacturing processes, as well as factors related to tooling, equipment, employees, initial product quality and other factors. Adient's failure to successfully launch material new or takeover

> business ***could*** have an adverse effect on Adient's profitability and results of operations.
>
> * * *
>
> ***A variety of other factors could adversely affect Adient's results of operations.***
>
> Any of the following could materially and adversely impact Adient's results of operations: the loss of, or changes in, automobile supply contracts, sourcing strategies or customer claims with Adient's major customers or suppliers; start-up expenses associated with new vehicle programs or delays or cancellations of such programs; underutilization of Adient's manufacturing facilities, which are generally located near, and devoted to, a particular customer's facility; inability to recover engineering and tooling costs; market and financial consequences of any recalls that may be required on products that Adient has supplied or sold into the automotive aftermarket; delays or difficulties in new product development and integration; quantity and complexity of new program launches, which are subject to Adient's customers' timing, performance, design and quality standards; interruption of supply of certain single-source components; the potential introduction of similar or superior technologies; changing nature and prevalence of Adient's joint ventures and relationships with its strategic business partners; and global overcapacity and vehicle platform proliferation.

100. Defendants' statements concerning "200-basis point of margin expansion," improvement in metals, growing margins, and discussions of Adient's launches in the Metals business, contained in ¶¶94-97 were materially false and misleading for the reasons described in ¶93. In addition, statements concerning launches in the Metals business were materially false and misleading and omitted to disclose that Adient did not have the ability or capacity to timely launch those programs and fulfill the launch orders.

101. Similarly, Adient's risk disclosures (¶99) were insufficient and violated Item 303 because they failed to disclose the known trends and uncertainties described in ¶93. For example, Adient specifically listed "Failure to ensure that Adient has the leadership capacity with the necessary skill set and experience could impede Adient's ability to deliver its growth

objectives and execute its strategic plan" and "Adient's failure to successfully launch material new or takeover business could have an adverse effect on Adient's profitability and results of operations" as "**potential risks**" when Defendants already knew, but failed to disclose, among other things, that due to massive layoffs before the Class Period, Adient did not have sufficient qualified personnel, including engineering and manufacturing personnel, to properly staff the various launches and that top executives at Adient failed to act on the repeated warnings of lower level employees with operational experience who raised "red flags" about the SS&M/Metals business and the upcoming launches.

### 3. Deutsche Bank Global Auto Industry Conference – January 11, 2017

102. On January 11, 2017, Stafeil and McDonald attended the Deutsche Bank Global Auto Industry Conference during which Stafeil told investors:

> ***We've talked about a journey towards 200 basis points of margin improvement over the next couple of years. We are doing a little bit better as we sit here today or it looks like we're doing a little bit better from the forecast standpoint**. **And thus we would think that our EBITDA and other earnings metrics should be, I'd say, very achievable and maybe even a little bit better as we look at that guidance*** . . . .That margin performance is driven by SG&A right out of the box. We will show better SG&A performance than we did in 2016 as we are part of Johnson Controls. We're continuing to make moves there and ***we're working on making a number of improvements in the metals part of the business, as well as in our total conversion cost in our operations. So strong margin performance to date and we're very optimistic as we look at margin going forward***.
>
> * * *
>
> So we drive future growth and we look for future earnings growth . . . . ***We will benefit from our margin drive, our reduction in SG&A, our improvement of the metals business*** . . . .We've done some restructuring efforts and we're in the midst of several restructuring efforts that are expected to give us $100 million of benefit. ***But all this should manifest itself over the course of the midterm to a 200 basis point improvement in our overall margin***.

* * *

> And then finally on guidance, I mentioned consolidated revenue was perhaps a little shy of our guidance at the moment, we'll continue to update you on that, ***but really everything as we look below that number is very strong driven by strong margin performance***.

103. McDonald also discussed Adient's SS&M/Metals business, stating, in part:

> And then secondly, our metals business, which historically has been an area where we have not earned the type of returns that we'd like to see. ***That business is on upwards trajectory, little bit more back-end loaded, so we will see stronger -- we will see steady improvements from metals over the next couple of years, but really starts to kick in the high gear in the years three and four. So that's really the margin expansion, so it's self-help. So all things that we can control, we don't need market growth, we don't need anything that we can't control to get that money***.

The Company's presentation slides for the call also reiterated this, stating, in part: "***Margin growth (SG&A improvement and metal performance)***."

104. This news drove the price of Adient shares up \$3.02, or over 5%, to close at \$61.56 on January 11, 2017.

105. Defendants' statements concerning margin growth, improvement in metals, and upward business trajectory contained in ¶¶102-103 were materially false and misleading for the reasons described in ¶93.

**4. First Quarter Fiscal 2017 Results – February 3, 2017**

106. On February 3, 2017, before the market opened, Adient reported its financial results for the first quarter of fiscal 2017 ended December 31, 2016. That same day, the Company hosted a conference call to discuss its quarterly results. During this call, McDonald stated: "***We also talked about earnings expansion through a number of self-help initiatives. We have a four-year goal here to get to 200 basis points improvement, and we're off to a great start.***" McDonald also stated: "***our margin expansion initiatives are well ahead of schedule***,

and we're seeing strong growth in our non-consolidated joint ventures. ***Our growth initiatives are gaining momentum***, and I'm really, really pleased with the start of the year, in terms of our cash position."[20]

107. Stafeil reiterated, "[r]egarding our goal to ***increase our margins by 200 basis points, excluding equity income, we're off to a very good start***," and further explained:

> ***Clearly, the results [posted] today, combined with the performance achieved in Q4 of last year, demonstrate we're on track to delivering our short-term margin improvements. Meanwhile the metals business is operating according to plan, and is expected to drive further margin expansion in late FY 2018 and FY 2019,*** after they complete some of their restructuring projects and execute on the significant new launch inventory and system.
>
> If you recall, at the Analyst Day of September, I mentioned progress on our margin initiative would be tracked against the LTM at June 30, 2016 results. Although we were using JCI's reporting definition at that time, which was slightly different versus Adient's adjustments and definitions today, ***the puts and takes do not change our commitment to delivering at least 200 basis points of improvement.***

108. In response to an analyst's question about the concerns investors should be thinking about, McDonald downplayed internally known problems in the Metals business, stating: "***Metals turnaround is beneficial to this year***, but it's really a 2018, 2019 story. Doesn't really move the needle a lot."

109. On February 8, 2017, Defendants filed Adient's Form 10-Q for the quarter ended December 31, 2016. McDonald and Stafeil certified this filing.

110. Defendants' statements concerning 200 basis points improvement, margin expansion, being off to a great start, well ahead of schedule and being "on track", and the Metals

---

[20] This information was also repeated in the Company's presentation slides for the February 3, 2017 call.

turnaround contained in ¶¶106-108 were materially false and misleading for the reasons described in ¶93. In addition, statements concerning launches in the Metals business were materially false and misleading and omitted to disclose that Adient did not have the ability or capacity to timely launch those programs and fulfill the launch orders.

### 5. Bank of America Merrill Lynch Auto Summit – April 12, 2017

111. On April 12, 2017, Stafeil and Detlef Juerss, Adient's Vice President of Global Engineering presented at the Bank of America Merrill Lynch Auto Summit. During the conference, Stafeil stated:

> We have a lot of opportunities to grow. ***We have in our investment thesis, I'm sure you have all focused and read on, a 200 basis point opportunity, an opportunity to continue to improve and drive our margins up by taking down our SG&A and improving and restructuring our metals business, both of which you have seen progress on***. We will continue to report progress as we move forward and how we are doing on those.
>
> We are also seeing benefits in our order book. So our order book, which had been, as John mentioned in his intro, was somewhat depressed during a time where Johnson Controls was trying to figure out what to do with auto. When we announced the spend two years ago, we've managed to go out and win significant amounts of new business. ***We are starting to see a pickup in our sales starting in really 2019 as that business we won starts to launch***.
>
> * * *
>
> And just a reminder before I turn it over to Detlef, ***the investment thesis that we put out when we originally came together is still intact***. I mean it is about -- taking advantage of our market position really emphasizing on earnings growth, and there's two components to that. ***It is that 200 basis point margin, and then it's the growth.*** The growth we're going to have in the consolidated business in 2019 or starting in 2019 and the growth we continue to enjoy on the unconsolidated side.

112. Stafeil's statements concerning new business wins and launches and margin expansion, including that the Company was currently seeing progress on the margin expansion, contained in ¶111, were materially false and misleading for the reasons described in ¶93.

**6. Second Quarter Fiscal 2017 Results – April 28, 2017**

113. On April 28, 2017, before the market opened, Adient reported its financial results for the second quarter of fiscal 2017 ended March 31, 2017. That same day, the Company hosted a conference call to discuss its quarterly results. During this call, McDonald stated:

> Although this is only our second quarter reporting our numbers as an independent company, ***we are well on the way to delivering on our midterm commitments, which are really simple. It's 200 basis points of margin expansion***, and that's without the benefit of a growing equity income base, accelerating our free cash flow, de-leveraging our balance sheet, and returning the seating business here, Adient, to its historic growth trajectory.
>
> * * *
>
> The other thing I would point out is many of these programs – I know we show a number of them in Europe and Asia here and South America - a number of these start to include our next-generation of global front and rear seat structures, particularly the VW Gen 2 program, which is a huge launch for us. A lot of that financial performance of our metals business has been tied up in introducing a couple of really big programs**.** ***And as that business continues to improve - - and in the quarter it did better than it had last year - - we are starting to see the accretive margin impact*** of launching those next-generation products into the market.

114. Stafeil added, "Regarding our goal to increase our margins by 200 basis points excluding equity income, ***we remain solidly on track***." Stafeil also stated:

> The results posted today, combined with the performance achieved over the past two quarters, demonstrate ***we are on track to deliver our short-term margin improvements. Meanwhile, the metals business is operating according to plan and is expected to drive further margin expansion in fiscal 2019 after they complete some of their restructuring projects and execute on the significant new launch inventory in the system***.

* * *

> ***But we should still continue to see margin improvement with the view of a lot of that 200 basis points we talked about***, or the really next big step of it, is going to be on the metals turnaround, which should start to really show in the numbers in 2019.

115. During the Q&A portion of the call and in response to an analyst's question on whether investors should be thinking about an upside from the 200 basis point margin expansion, Stafeil answered in part: "I don't know if there's a limit per se, because there's some element of the farther away science becomes . . . a little challenged" and "***if you look at that set of numbers and we have an opportunity as revenue continues to grow, which we think it will grow after 2019 with improved order book, to get some benefit of increased scale, which I think gives us an opportunity to go north of that number.***"

116. McDonald added "I think beyond 2020 we still have room to grow," "I do not think beginning to drive our SG&A lower, lower, lower," and "***the metals improvement I think the scale benefit that we can get might start to grow our footprint again or the capacity utilization could be a tailwind.***"

117. Defendants' statements drove the price of Adient shares up $1.22, or about 1.6%, to close at $73.56 on April 28, 2017.

118. On May 1, 2017, Defendants filed Adient's Form 10-Q for the quarter ended March 31, 2017. McDonald and Stafeil certified this filing.

119. Defendants' statements concerning margin and business improvements, improved book order, and the "on-track" statements contained in ¶¶113-116, were materially false and misleading for the reasons described in ¶93. In addition, statements concerning "execut[ing] on the significant new launch inventory and system" were materially false and misleading and

omitted to disclose that Adient did not have the ability or capacity to timely launch those programs and fill the launch orders.

### 7. Third Quarter Fiscal 2017 Results – July 27, 2017

120. On July 27, 2017, before the market opened, Adient reported its financial results for the third quarter of fiscal 2017 ended June 30, 2017. That same day, the Company hosted a conference call to discuss its quarterly results. During this call, McDonald assured investors that despite elevated commodity prices (flat as compared to 2Q17 and "[m]anageable. . . for the remainder of FY17" according to the Company slides for the earnings call), Adient was still "***on track***" with its margin expansion. McDonald stated:

> As you can see from our financial results that we posted today, ***we continue to make solid progress towards our margin expansion initiatives***. And we remain committed to delivering the SG&A reduction that we talked to here in 2017 and 2018. . . . ***I have no doubt in my mind that we're going to deliver here on our 2017 commitments despite the fact that we're seeing some headwinds in terms of top line pressure. I think we're really well positioned***, and we play the great foundation for Adient as we enter into 2018[.]
>
> * * *
>
> So we're 3 quarters way through a year here in fiscal 2017. And I guess, my overall comment is I think ***we're solidly on track in terms of delivering the commitments that we've made to the investment community, both here in the short term, but also the trajectory on to deliver our midterm commitment.***

121. Stafeil similarly assured investors that Adient was "solidly on track" to achieving at least 200 basis point of margin expansion:

> Now let's move to slide 12. We included a chart showing our progress towards our goal to increase Adient's margin by 200 basis points, excluding equity income. As you can see from the chart on the left-hand side of the slide, ***we're solidly on track and have made significant progress over the past 4 quarters***. . . .
>
> * * *

> Operational performance also contributed to the margin performance in the quarter and personally offsetting these benefits as discussed earlier are unfavorable commodity, material cost and FX. Meanwhile, ***the metals business is continuing to execute towards the 2019 margin expansion target.*** The business is working to complete several restructuring projects and execute on significant new launch inventory in the system.
>
> * * *
>
> [O]ur solid third quarter results combined with our strong first half performance provide a firm foundation for us to achieve our commitments in 2017 and beyond.

122. McDonald also noted that the improvements Adient was making in its SS&M/Metals business were fully within the Company's control and would not be influenced by the market factors:

> So, I mean, when we say, just to be clear, 150 basis points is worth $240 million, $250 million. 2/3 will have done this year and 1/3 next year. ***And yes, we're absolutely confident we can get it.*** The fact that actually the sales are dropping here because we haven't backed away from the 250, from basis points 5 years, it will be a little bit better. But we're very comfortable with only 2/3 of the way done. If you just look at annualizing what we've done, that's sort of in the bag. We have some work to do to get to next year. But we've got road maps, and we will continue to work those. So very -- I mean, the self-help part of our story, look SG&A is 100% within our control and the improvements that we need to make in the metals operation are 100% within our control and ***there is nothing that the market influences those 2 initiatives.***
>
> * * *
>
> ***We're committed to the margin expansion that we talked about in our investment thesis and taken on a bunch of business that's going to be below that when it launches in 2 or 3 years' time as a full game tour.***

123. On July 31, 2017, Defendants filed Adient's Form 10-Q for the quarter ended June 30, 2017. McDonald and Stafeil certified this filing.

124. Defendants' statements concerning solid progress towards margin expansion and the "solidly on-track" statements contained in ¶¶120-122 were materially false and misleading for the reasons described in ¶93.

**8. J.P. Morgan Auto Conference – August 8, 2017**

125. On August 8, 2017, Stafeil and McDonald presented at the J.P. Morgan Auto Conference. On margin expansion and improvements in SS&M/metals, McDonald stated:

> But in terms of our margin bridge on how we get the new points, this is really the roadmap. We said couple of hundred basis points of SG&A savings. That probably came sort of half from setting up a leaner corporate structure, it's done, and half from cutting our -- ***the supporting SG&A infrastructure we have in the business. That is sort of work in progress here. It's gaining momentum and will be done and behind us by the end of 2018.***
>
> Next point is fixing our metals operations. This is really more of an – '19 and '20. It really revolves around closing a few of our big Western European footprints. We're kind of in a mode in our metals business. We've got half full. We're migrating our product portfolio and our manufacturing footprint. So we're sort of in the halfway point of that. And it sort of reaches the tipping point in 2019. ***We start to see a big bump up in our margins as real metals performance.***

126. Stafeil further assured investors:

> ***[O]ur stated thesis was we were going to increase our margin 200 basis points from our June LTM results, excluding equity income.*** You can see the journey so far through 4 quarters. We went from 4.47% to a 5.22%, so about 75 basis points achieved. And we did that with quite a bit lower revenue. If revenue had been helpful to us, and it will be here in the next couple of years, we'll have some amplification on that. This is still a fixed cost industry, so improvements on the top line should have some improvements on margin as well. . . . If you look at the drivers of our growth, the drivers of our future earnings, things that Bruce talked about. In the middle of the page here, you talk about some of the self-help opportunities: ***The improved operational performance, the G&A reduction, metals and mechanisms, which is the next part of the story in our margin improvement is really a 2019, 2020 story but a big part of our self-help as we get***

> ***that 200 basis points of improved margin on the consolidated side***.
>
> * * *
>
> ***We'll start to see some improvements in metals, even though that story will really be more developed in 2019 and 2020***.

127. During the Q&A, Stafeil reaffirmed that the Company was on track with margin expansion and improvement in SS&M/metals:

> **Ryan J. Brinkman:** The margin improvement. Since the spin from Johnson Controls, Adient has really consistently beat Street expectations relative to margin. Firstly, I'm just curious how the margin is tracked relative to your own sort of internal projections. And then secondly, do you think that the stronger than consensus margin, it just suggests a more sort of front-end loading of the eventual margin improvement than the Street imagined? Or do you think that it could, in fact, portend a larger overall opportunity such that maybe the out-year margin could surpass guidance?
>
> **Jeffrey M. Stafeil:** Good question, Ryan. The -- on the first piece of whether it's better or worse than expectations. I would say, if sales had been more cooperative, we probably – we would've expected to do a little bit better on margin. ***And -- but we're very pleased with what we've seen from an operational standpoint.*** I would say, as we look across the organization globally and look at the performance that people have achieved in taking out cost but also making sure that they are flexing their operating operations to demand, ***we've seen really good results there. So I'd say pretty much on expectation.***
>
> To your point about where we can go from here. ***If you look at we'll say, '19 to '20 and we start to get some of that backlog coming into the overall business, I do see opportunities for us on the margin standpoint. But it's going to be depending on a bit on sales***. I -- and I'd say ***the story we have in metals is still developing. I'd say that's on path. But 2019 and 2020 are big years there***.
>
> So ***I would still use 200 basis points on your models***. Hopefully, we'll end up being able to beat that. And if sales come in a little bit better and things like aircraft or some of our adjacent market opportunities come in, obviously, we'll look to be what we have put out there.

128. Defendants' statements concerning margin expansion and the "big bump" in metals margins contained in ¶¶125-127 were materially false and misleading for the reasons described in ¶93.

### 9. Royal Bank of Canada Global Industrials Conference – September 14, 2017

129. On September 14, 2017, Adient presented at the Royal Bank of Canada Capital Markets Global Industrials Conference. In response to a question on margin expansion, Mark Oswald, Adient's Vice President, Investor Relations reaffirmed that SS&M/metals was improving:

> **Joseph Spak:** Since you sort of – the conversation sort of went a little bit there to the margins and the self-help. Look, I think you've done a great job sort of post-spin with the margin trajectory. My opinion, arguably, and I guess I'd be curious for your comments, but it seems like you're even a little – probably a little bit ahead of schedule on some of the SG&A savings. So, one, how do we think about sort of the cadence of the rest of the SG&A savings? And then beyond that, what are sort of further pluses, minuses, puts and takes to the margin? I mean, does it become a little bit more volume dependent because of the utilization stuff you mentioned?
>
> **Mark Oswald**: Yes. Great, great question. So again, just to kind of reset everybody. When we launched and we became the independent company, we said there were going to be really 3 buckets which we're going to focus in terms of getting the net 200 basis points of margin improvement. ***The first one being SG&A, and we said that would be 150 basis points in '17 and '18. We'll be finishing '17, and we've indicated that we'll be about 2/3 of the way through in '17. So I'd expect as we progress through '18, we'll get the other 50 basis points there. So, again, more work to do there, but we feel confident that we'll get that***.
>
> ***The other piece is really the metals performance, and that's a '19, '20 time period, and we'll get that 150 basis points.*** And that 300 basis points of overall improvement is going to be offset by about 100 basis points of what I'd call growth investment, ***and that's investment that we'll be spending on in terms of supporting the new business backlog and the new business wins***

> ***that we've had '16 and '17 year to date,*** certain of the West Coast strategies, the aircraft seating, et cetera.
>
> So I think when you think about cadence, especially when you go from '17 to '18, yes, definitely more SG&A savings. ***We'll have more investment spending that we're spending there and then it will put us on a trajectory for that overall 200 basis points as we move from '19 into '20.***

130. These comments drove up the price of Adient shares by $3.86, or about 5%, to close at $80.26 on September 15, 2017.

131. Adient's statements concerning the 200 basis point margin expansion contained in ¶129 were materially false and misleading for the reasons described in ¶93.

### 10. Materialization of the Risk and Continued Materially False and Misleading Statements and Omissions

132. Text which is **<u>bolded and underlined</u>** indicates the materialization of previously undisclosed risks. Text highlighted in ***bold and italics*** continues to indicate statements alleged to be materially false and misleading.

#### (a) Fourth Quarter and Full Year Fiscal 2017 Results – November 2, 2017 (*First Partial Disclosure*)

133. On November 2, 2017, before the market opened, Adient reported fourth quarter fiscal 2017 financial results that were roughly in line with expectations, although with softer margins, for the fourth quarter and year ended September 30, 2017. The Company reported:

> • Adient's Q4 results solidify a strong FY17; positive momentum reflected in FY18 outlook;
>
> • Q4 GAAP net income and EPS diluted increased to $344M and $3.67, respectively; Q4 adjusted-EPS diluted up 9 % to $2.34;
>
> • Q4 Adjusted-EBIT expanded to $296M (margin of 7.4 %);
>
> • Cash and cash equivalents of $709M at Sept. 30, 2017; and
>
> • Consistent with Adient's mid-term plan, increased revenue, earnings and cash flow are expected in FY18.

134. That same day, before the market opened, the Company hosted a conference call. In connection with the discussion of those results, McDonald revealed that: "**We did experience some launch challenges in the quarter that we expect to continue on here in the beginning of 2018**." McDonald further explained:

> [W]e're also looking to grow our structures business. And here, we're having -- **we have a couple of big structures program that were launched here in the fourth quarter that are causing us some problems. And these would be problems associated with either late design changes, manufacturing issues, supply chain interruptions caused by the Mexico hurricane -- sorry, the Mexican earthquake and hurricane and are just creating pretty big launched inefficiencies and problems in our manufacturing operations**.
>
> In the fourth quarter, these totaled about $19 million, of which $13 million of that was premium freight, so we had the air freight product to our customer to minimize the impact of our problems on their assembly. **Unfortunately for us, these launch challenges are going to continue into the first quarter or 2 of 2018, as we cycled through our launch curve and we get some of these issues behind us**. . . . Turning to Slide 10. I mean, I just would -- at the bottom here, I would like to talk about some of the actions that we're taking -- I'm sorry, talk about some of the actions that we're taking here to address our challenges. First of all, we reassigned about 100 resources from elsewhere in Adient to work on some of our key issues and key launches here. We've also gone through and started taking a look at the launches that we have coming up in front of us here in 2018. So that we can get in front of any issues and start working with our customers to better manage some of these late changes in terms of the design of the products, so that we can avoid get having these difficulties, as we head into production. And then lastly, just a comment on the current operating environment. I think if you look at some of the positive things that we're seeing, ***we continue to see higher seating content per vehicle, which is driving our revenue up***.

135. Despite disclosing that launch challenges were expected to continue into the beginning of 2018, McDonald falsely assured investors that the product launch headwinds were more directly related to one time occurrences such as hurricanes, flooding (in Houston), earthquakes (in Mexico City), rising freight costs, and not to recurring operational issues.

Moreover, Defendants represented that the Company was already ahead of these challenges and was "***solidly on track***" for delivering on the Company's "midterm financial commitment" and was "***well on our way to achieve 200 basis points of margin expansion that we've committed to achieve.***" Stafeil also falsely reassured investors: "[and i]mportant to note, ***the progression to our 200 basis point improvement in margins remains on track***." McDonald stated:

> We've always said ***the restructuring part of the metals turnaround in the '19 and '20*** story ***with very good sight of visibility, and the head count and the losses that those facilities have, we're highly confident we're going to put behind us***.
>
> *  *  *
>
> [I]n conclusion here, as you can see from our financial results for the year, ***I think we've made great progress in terms of demonstrating our commitment and our ability to expand our margins. We're aligned with our guidance.*** SG&A this year has been the primary driver, and ***we expect to see some more progress on that last year as our headcount initiatives take hold.***
>
> And on metals. We're going to work through some short-term issues. ***We think we're going to be back on track in the middle of '18 and beyond*** for us to get the improvements that we quite rightly expect from that business.
>
> *  *  *
>
> [W]e had a great year 1. We really very feel good about the foundation that we've laid here to deliver our midterm commitment and ***we're solidly on track***.

136. Stafeil also reassured investors: "[and i]mportant to note, ***the progression to our 200 basis point improvement in margins remains on track***."

137. McDonald reiterated that the Company's ability to improve its margin was not market dependent at all, and therefore not negatively affected by rising commodity/steel prices: "***But right now, just like [when] we were going into '17, our ability to improve the margins in our business is entirely within our own control.***"

138. This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, caused Adient's stock price to fall from a close on November 1, 2017 of $84.93 per share to a close of $81.08 per share on November 2, 2017, a decline of $3.85 per share, or 4.5 percent.

139. On November 2, 2017, Colin Langan of UBS issued an analyst report on Adient entitled "*Adient PLC - Bump in the Road, But Still On Course.*" In his report, Langan reported the following:

> **Launch inefficiencies create a one-time headwind**
>
> ADNT traded down 4.5% as Q4 margins missed and 2018 EPS guidance came in ~2% below consensus (see FR). The Q4 margin miss & weak guidance were due to launch inefficiencies in mechanisms (~$20mn Q4 headwind). The launch issues were discovered late in Q4. **The fix is already underway**; however, it will still impact Q1 (net EBIT down ~$60m y/y). Despite the Q1 impact, full year margins are still expected to be ~flat. Assuming Q2 is ~flat, H2 EBIT margins need to be a very strong ~8.8% (vs. 7.7% in 2017) to hit their full year target. Therefore the long term margin expansion story, though delayed, is still on track. ADNT remains our top pick as launch issues are already priced-in.
>
> **PIVOTAL QUESTIONS Q: Is there significant upside to margins?**
>
> Yes. ADNT is forecasting 200bps of core EBIT margin expansion from 2016 to 2020.

140. On November 3, 2017, Ryan Brinkman of J.P. Morgan issued an analyst report on Adient entitled, "*Lower Estimates & Price Target on Slower Glide Path for Margin Expansion, Given Launch Cost and Commodity Headwinds*." In his report, Brinkman reported the following:

> Adient reported F4Q results that were roughly in line with expectation, although comprised of slightly better revenue and slightly softer margin. However, **the trend of softer margin appeared to be driven by headwinds from premium freight costs to support launches** and by a lag in the recovery from

> automakers of higher steel prices, both of headwinds seem likely to accelerate into F1Q18 before beginning to moderate. Led by these challenges, management issued FY18 guidance which underwhelmed investor expectations primarily on margin for the **consolidated Seating business, a key driver of earnings growth for the company. . . .**
>
> * * *
>
> **See slower margin progression for the consolidated Seating business relative to before, led by challenges in the turnaround of the Metals group.** We expect the challenges in relation to premium freight costs in order to keep up with a higher than usual pace of launches in the Metals group, and the recovery of higher commodity costs with a 2-quarter lag, to prove temporary in nature. **Adient is likely to cycle past the primary portion of the headwinds by the end of 1H18**.

141. On November 22, 2017, Defendants filed Adient's Annual Report on Form 10-K for the fiscal year ended September 30, 2017. McDonald and Stafeil certified that Adient's disclosure controls and procedures were effective.

142. With respect to accounting for goodwill and other long-lived assets, the 10-K reported:

> Goodwill reflects the cost of an acquisition in excess of the fair values assigned to identifiable net assets acquired. Adient reviews goodwill for impairment during the fourth fiscal quarter or more frequently if events or changes in circumstances indicate the asset might be impaired.
>
> * * *
>
> Adient reviews long-lived assets, including property, plant and equipment and other intangible assets with definite lives, for impairment whenever events or changes in circumstances indicate that the asset's carrying amount may not be recoverable . . . . At September 30, 2017 . . . Adient concluded it did not have any other triggering events requiring assessment of impairment of its long-lived assets.

143. With respect to deferred tax assets, the 10-K reported:

> At September 30, 2017, Adient had available net operating loss carryforwards of approximately $1,407 million which are available to reduce future tax liabilities. Net operating loss carryforwards of $809 million will expire at various dates between 2018 and 2037, with the remainder having an indefinite carryforward period, and $468 million are offset by a valuation allowance. Adient reviews the realizability of its deferred tax assets on a quarterly basis, or whenever events or changes in circumstances indicate that a review is required. . . . As a result of Adient's fiscal 2017 analysis of the realizability of its worldwide deferred tax assets, and after considering tax planning initiatives and other positive and negative evidence, Adient determined that no material changes to valuation allowances were required.

144. In the 2017 10-K, Adient also identified the following relevant risk factors:

> ***Adient's business success depends on attracting and retaining qualified personnel.***
>
> Adient's ability to sustain and grow its business requires it to hire, retain and develop a highly skilled and diverse management team and workforce. Failure to ensure that Adient has the leadership capacity with the necessary skill set and experience ***could*** impede Adient's ability to deliver its growth objectives and execute its strategic plan. Organizational and reporting changes as a result of any future leadership transition and corporate initiatives could result in increased turnover. Additionally, any unplanned turnover or inability to attract and retain key employees could have a negative effect on Adient's results of operations.
>
> * * *
>
> ***Adient's profitability and results of operations may be adversely affected by program launch difficulties.***
>
> The launch of new business is a complex process, the success of which depends on a wide range of factors, including the production readiness of Adient's and its suppliers' manufacturing facilities and manufacturing processes, as well as factors related to tooling, equipment, employees, initial product quality and other factors. Adient's failure to successfully launch material new or takeover business ***could*** have an adverse effect on Adient's profitability and results of operations
>
> * * *

> ***A variety of other factors could adversely affect Adient's results of operations.***
>
> Any of the following could materially and adversely impact Adient's results of operations: the loss of, or changes in, automobile supply contracts, sourcing strategies or customer claims with Adient's major customers or suppliers; start-up expenses associated with new vehicle programs or delays or cancellations of such programs; underutilization of Adient's manufacturing facilities, which are generally located near, and devoted to, a particular customer's facility; inability to recover engineering and tooling costs; market and financial consequences of any recalls that may be required on products that Adient has supplied or sold into the automotive aftermarket; delays or difficulties in new product development and integration; quantity and complexity of new program launches, which are subject to Adient's customers' timing, performance, design and quality standards; interruption of supply of certain single-source components; the potential introduction of similar or superior technologies; changing nature and prevalence of Adient's joint ventures and relationships with its strategic business partners; and global overcapacity and vehicle platform proliferation.

145. Defendants' statements concerning 200-basis-point improvement in margins remaining ***"on track***" and Adient's ability to control its margin improvement, contained in ¶¶134-137, were materially false and misleading when made in that Defendants failed to disclose:

(a) material known adverse facts and trends in Adient's core SS&M/Metals business including: (i) severe operational challenges and inefficiencies, (ii) increased costs and delays due, in part, to failure to follow Company policies (¶203), (iii) insufficient qualified personnel to timely launch Adient's programs, and (iv) other launch-related problems which were not weather or market related and which significantly increased customer chargebacks, decreased profitability on Adient's automotive seating contracts, and made a 200 basis point margin expansion unachievable;

(b) that the severe launch issues threatened ongoing relationships with Adient's customers, increased the risk of contract cancellations and reduced the likelihood of Adient winning new customer contracts;

(c) that instead of being a key driver of growth and margin improvement, SS&M was a "cash drain" on the Company; and

(d) that Adient's product launch "headwinds" were caused by recurring operational issues in SS&M and were not due to natural disasters and "late design changes" by customers.

146. Similarly, Adient's risk disclosures (¶144) were false and misleading and violated Item 303 because they failed to disclose the known trends and uncertainties described in ¶145. For example, Adient specifically listed "Failure to ensure that Adient has the leadership capacity with the necessary skill set and experience **could impede** Adient's ability to deliver its growth objectives and execute its strategic plan" and "Adient's failure to successfully launch material new or takeover business **could have** an adverse effect on Adient's profitability and results of operations" as "**potential risks**" when they already knew, but failed to disclose, among other things, that due to massive layoffs before the Class Period, Adient did not have sufficient qualified personnel, including engineering and manufacturing personnel, to properly staff the various launches and that top executives at Adient ignored the repeated warnings of lower level employees with operational experience who raised "red flags" about the SS&M/Metals business and the program launches.

**(b) Barclays Global Automotive Conference – November 15, 2017**

147. On November 15, 2017, Adient presented at the Barclays Global Automotive Conference. During this conference, Stafeil again assured investors:

> [A]nd as we look at our investment thesis, our metals business, most highly engineered. We're the biggest in the space. We have a competitive advantage and, it is a pull for bringing in sourcing work to Adient to use our metals business.
>
> All that being said, through a variety of things and some historical challenges with capital allocation to the business and some acquisitions, which were timed sort of at a time when Johnson Controls subsequently pivoted away from automotive investments. So all that and sort of the backdrop ***where we said we can take this business and improve it by 100 to 200 basis points. Still feel very confident that we can do that***.

148. In response to a question from Brian Arthur Johnson of Barclays concerning whether Adient could deliver in light of past launch issues in metals, Stafeil stated:

> I think your question is really addressing is, recently, we had some setbacks in some of those launches. We always expect some elements of launch curve challenge. That's just part of our industry. The first 5,000 you make of something, you do worse than the next 5,000. And then you get better the next 5,000. . . . So building up that capacity, building up your launch capability, building up your -- reducing your cycle time, getting your machine utilization up is a process. **We were hit by some surprises, quite frankly. And a lot of it was block and tackling. And because of the volume we have to produce of these things, because of -- when you do fall behind, it can cause big problems, we deliver parts just in time. So when you do, we don't inventory a lot of these. So these -- the backup it causes to our production and launch readiness is severe. And in this particular case, we've been having to airfreight significant amounts. We've been having to spend extra overall in launching people. And all of that has been something that recently hit us. It becomes expensive. And that's what we guided in our 2018**.
>
> ***I will say we have been seeing positive trends***. We are watching our daily premium freight. We are watching our jobs per hour, our machine utilization. ***All that is improving and it is trending in the right direction. So I think we have a lot of comfort around there*** . . . .

* * *

> We changed the management team. We changed a lot of the leadership. And the folks that, especially recently I'm spending tons of time with, but have spent a lot of time with over the course of the last 18 months or so. I do think they are making the right steps. We've put in a lot of things that are different than what we've done before.

149. Stafeil's statements expressing confidence in Adient's ability to improve its business by 100 to 200 basis points, and the positive trends he was seeing in the business, contained in ¶¶147-148 were materially false and misleading for the reasons described in ¶145.

#### (c) Deutsche Bank Global Auto Industry Conference – January 17, 2018 (*Second Partial Disclosure*)

150. On January 17, 2018, Adient presented at the Deutsche Bank Global Auto Industry Conference. The Company posted the slide deck for the Deutsche Bank Global Auto Industry Conference presentation *after market close* <u>the day before</u>, on January 16, 2018. Among other things, the slide deck reported:

> >**<u>Headwinds impacting Seat Structures & Mechanisms (SS&M) have intensified</u>**
>
> * * *
>
> SS&M headwinds
>
> >Despite many successes in FY17 (SG&A progression, strength of China operations, reigniting ADNT's growth engine) **<u>near-term results are being significantly impacted by SS&M</u>**
>
> >**<u>Previously identified headwinds impacting SS&M have intensified since Adient's fourth quarter earnings call</u>**, specifically:
>
> –Commodity prices and availability
>
> –**<u>Launch inefficiencies</u>**
>
> >Management is acting with a sense of urgency to mitigate the headwinds; actions taken to-date include changes in personnel and oversight for the SS&M business

> –SS&M now reporting to Adient's CFO
>
> * * *
>
> >**<u>First quarter fiscal 2018 results are expected to be significantly impacted by SS&M</u>**:
>
> –SS&M primary contributor to Q1 operating results being down by an estimated $120M year-on-year
>
> * * *
>
> **<u>Identified headwinds are deep and more severe vs previous guidance</u>**
>
> * * *
>
> >***Despite severe headwinds in early FY18, we still believe this business will be profitable after the turnaround is complete and anticipate positive momentum will progress through the year***

151. Certain analysts accessed the slide deck after market close on January 16 and issued research notes dated January 16, 2018 addressing the negative information contained in the slide deck. *See, e.g,* ¶¶160-161.

152. This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down. When the market opened on January 17, 2018, Adient's stock price had fallen from a close on January 16, 2018 of $82.18 per share to an open on January 17, 2018 of $74.03 per share, **a drop of approximately 10%**.

153. On January 17, 2018, during the trading day, while presenting at a Deutsche Bank Global Auto Industry Conference, McDonald went through the slide deck posted the night before. McDonald reiterated that launch inefficiencies in SS&M were more problematic than the Company had previously disclosed:

> First of all, being upfront, **<u>we're really struggling in terms of our Seat Structures & Mechanisms business</u>**. **<u>We obviously guided to – we knew coming in this quarter, we're going to have some</u>**

> **challenges. Those intensified. And so obviously, we're pretty disappointed in terms of how that part of our business performed this quarter**.
>
> * * *
>
> We committed to a 200 basis points of margin expansion, which was really driven by SG&A savings, improving the margins in our Seat Structures & Mechanisms business and partially offset by investments that we need to make to continue to grow our business. So that was kind of our investment thesis.
>
> And as we went into this quarter, I'd sort of talked about the intensifying headwinds that we had. **For sure, we're struggling especially in our mechanisms business,** and that would mainly be recliners and to some -- a lesser extent tracks. In terms of not just the price of commodities.... **and just in the quarter, especially in our mechanisms business, we're really like hand to mouth in terms of where we're going to find the next coil. So a combination of that [sic], together with launch inefficiencies that turned out to be much more problematic than we anticipated going into the quarter**.

154. Stafeil echoed McDonald's sentiments:

> As we look at the current state of this business, and **we certainly, as Bruce talked about, have experienced headwinds and certainly more severe than the previous guidance**. And often cases, we're -- as in auto suppliers, we're looking at forward projections. Sales shortfalls or sales differences are easy to project from a profitability standpoint. **But in regard to this business, we actually experienced some severe launch issues in a just-in-time business. And you'll see in our results that when you start to have problems meeting some of your launch curves, you end up throwing money at the problem or certainly to avoid customer shutdowns and to avoid customer interruptions. That's certainly what we experienced in this past quarter.**
>
> * * *
>
> The launch inefficiencies I mentioned a moment ago, the launch complexity. Certainly, as we approach the number of launches **we had, I'd say, mistimed or certainly misestimated the ability to run at rate on these things, and as we were unable to run at rate, we were facing premium freight**. We were – you're facing premium launch costs, et cetera. And some of the reasons we've articulated here. But some of the equipment that we had ordered to

> produce this wasn't able to run at the machine utilization that we intended or had been advertised to us in certain cases where we ran into issues of being able to produce. **<u>We had to get outside suppliers to produce for us</u>**. And then all of that was some -- in addition, there were some steel supply issues that exacerbated the issues.
>
> * * *
>
> So if you look at it, we wanted to give a little bit of color on some of the issues that we have faced from a launch standpoint. That's obviously a relatively small part of our business but a big part of the challenges we face here today. And our issues can be summarized into about half a dozen facilities, mostly concentrated in North America. We give examples of 2 here. . . . **<u>We started to have to outsource stamping to other suppliers, and that process certainly added costs to us. We were paying relatively exorbitant prices for those outsourced stamping and certainly exorbitant excess premium freight and other inefficiencies</u>**. . . . As we look at Q2, we're essentially close to breakeven. We start to see this plant coming into the black in the back half of the year. But has been a significant issue. There's been a significant amount of resources in the company, expended to correct these issues but certainly had impact on our first quarter and a little bit of impact into our second quarter as well. The other facility that drove a significant amount of the underperformance in our business was a facility we have in Clanton. This is all related to one launch where we had, had a profitable plant going into -- even for the full year 2017, this product launched in September, we were not able to hit the run-at rate initially and incurred significant amounts of excess costs, also incurred significant amount of quality challenges that required us to add quite a bit of containment-type costs . . . . But again, these are some of the examples for some of these launch issues have contributed to the earnings we highlighted in our release last evening.

155. Despite revealing problems in the SS&M business, Defendants continued to mislead the market by falsely reassuring investors that the 200 basis point margin expansion was still achievable and that the launch issues were on "***the other side of the mountain. I would say we're not all the way down it, for sure. But we are in a situation where the premium price and other things are falling out of our system and we're seeing recovery***."

156. Stafeil also falsely reaffirmed the margin expansion, stating: "[C]onsidering the amount of capital, considering the amount of innovation, considering the amount of importance of . . . the product portfolio to the customer and to the overall seat, very reasonable, ***I'd say, long-term view. We still think it's a reasonable long-term view***." With respect to the 200 basis point margin expansion, Stafeil falsely reiterated: "And that's 200 basis points from our LTM June 2016 EBIT margin. ***So that goal is still there***. The makeup and the mix, we'll talk more about in that second quarter earnings call." Stafeil also stated:

> From a summary standpoint on Seat Structures & Mechanisms, this is a highly engineered component. It is a very large component relative to some other seating suppliers of our total mix. The performance, obviously, we've had in that business has thus had a pretty large impact on our margin in the quarter. ***But as we look forward and despite those headwinds, we still do see that turnaround***. ***We still see the components of those turnarounds being relevant***. They still -- ***we still believe they will bring the business to profitability. And we anticipate positive momentum as we move through the year***.

157. McDonald also stated:

> If you think about the margin expansion opportunities, the 100 to 200 basis points for Adient overall from Seat Structures & Mechanisms, about 1/3 of that was driven by the closure of some unprofitable plants, which are scheduled and remain on track for 2019; then secondly, the introduction and growth of our metals operations in China, which are highly profitable. And Jeff will sort of take you through that later on. ***But one, I'd say the 1/3 of our program which relates to those 2 initiatives is solidly on track***.
>
> * * *
>
> ***[W]e're certainly not backing away from our commitment to improve our margins by 200 basis points. That is something that we, I would say, can fairly sacrosanct***.

158. This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein drove the price of Adient shares down $5.10 per share, **or 6.2%,** on January 17, 2018.

159. Defendants' statements concerning the 200 basis point margin expansion still being "sacrosanct" and "solidly on track" and the business turnaround overcoming the headwinds the Company faced in the prior two quarters, contained in ¶¶150, 155-157, were materially false and misleading and failed to disclose:

(a) material known adverse facts and trends in Adient's core SS&M/Metals business including: (i) severe operational challenges and inefficiencies, (ii) increased costs and delays due, in part, to failure to follow Company policies (¶203), (iii) insufficient qualified personnel to timely launch Adient's programs, and (iv) other launch-related problems which were not weather or market related and which significantly increased customer chargebacks, decreased profitability on Adient's automotive seating contracts, and made a 200 basis point margin expansion unachievable;

(b) that the severe launch issues threatened ongoing relationships with Adient's customers, increased the risk of contract cancellations and reduced the likelihood of Adient winning new customer contracts; and

(c) that instead of being a key driver of growth and margin improvement, SS&M was a "cash drain" on the Company.

160. On January 16, 2018, after the market closed and after Adient posted online its slide deck for its Detroit Auto Show presentation, Joseph Spak, of RBC Capital Markets, LLC, issued an analyst report on Adient entitled, "*ADNT - Negative update from Detroit.*" In his report, Spak reported the following:

> ADNT is scheduled to present at the Detroit Auto Show tomorrow at 2:15pm ET, but their slide deck was posted today after-market close.
>
> **We expect the stock to be weak on the update.**

> The main driver will likely be that the previously identified headwinds impacting their metals business have intensified since ADNT's F4Q17 call driven by commodity prices and availability (steel alone is now $35mm higher and there could be additional risk) and launch inefficiencies. As a result, the company expects F1Q18 operating results to be down ~$120mm y/y (consensus down -$50mm). Further, overall margins are likely to take a modest step backwards in FY18 (prior guidance called for ~7.6% at the midpoint, already lower than 7.7% in FY17). Fully revised FY18 and mid-term plan will be given with F1Q18 earnings on January 29th. Management is taking action to mitigate headwinds (metals now reports directly to CFO) and other cost savings actions.

161. On January 16, 2018, after the market closed and after Adient posted online its slide deck for its Detroit Auto Show presentation, Emmanuel Rosner of Guggenheim Partners issued an analyst report titled, "*ADNT - FY18 Guidance Update*." In his report, Rosner reported the following:

> **Key Message**: Ahead of its presentation at the Detroit Auto Show tomorrow, Adient disclosed it is in the process of revising down its FY18 financial outlook AND mid-term targets, due to further deterioration in its Metals business, confirming the self-help story appears very much off track, in our view.
>
> Management attributes this to the continued appreciation in key commodities (steel) and ongoing launch inefficiencies. . . . we believe there is material risk to consensus estimates . . . . While the stock is already down 5% in the aftermarket, we could see further selling pressure as investors question the self-help thesis.
>
> **FY18 guidance update**
>
> • Management is in the process of revising down its current FY18 outlook due to further deterioration in its Metals business (Seat structures & mechanisms) and plans to provide an update with earnings later this month. Specifically, it now sees F1Q18 adj Ebit down $120m YoY vs. prior down $60m, attributing the decline to 1) commodity prices continuing to rise especially steel 2) ongoing launch inefficiencies (premium freight, additional labor, etc…).
>
> • With the negative Metals impact now being 2x worse than prior expectations, this implies 1Q adj Ebit/EPS coming in around

> $165m/$1.00 vs. our latest published $238m/$1.72 estimate and consensus $244m/$1.81.

162. On January 17, 2018, David H. Lim of Wells Fargo issued an analyst report titled "*ADNT: SS&M Headwinds Continue - Not Good.*" In his report, Lim reported the following:

> THOUGHTS. Having a "transition" year this early in ADNT's life was unexpected (especially as SS&M's negative impact was doubled for FQ1). In our view, the whole SS&M situation is head-scratching (given the importance of execution from a brand-new company…not enough engineers?). Delivery will be critical to rebuild credibility, in our view. We expect the shares to be under pressure today.
>
> SEATING STRUCTURES AND MECHANISMS (SS&M) UPDATE. Previously announced headwinds (commodity prices/availability and launch inefficiencies [launch complexity, demand outpacing supply-leaning on outsourcing]) in SS&M have intensified.
>
> * * *
>
> The yr/yr SS&M headwind should drive a FCF outflow of $250MM-$300MM in FQ1. Mgmt highlighted that a review is underway to determine the impact to FY18 outlook and the midterm plan (update will be provided on January 29).

#### (d) First Quarter Fiscal 2018 Results – January 29, 2018 (*Third Partial Disclosure*)

163. On January 29, 2018, before the market opened, Adient reported its financial results for the first quarter of fiscal 2018 ended December 31, 2017. The Company reported:

> • <u>**Adient's Q1 results impacted by headwinds in Seat Structures & Mechanisms (SS&M) business**</u>;
>
> • Q1 GAAP net income and EPS diluted of $(216)M and $(2.32), respectively; Q1 adjusted-EPS diluted of $1.06;
>
> • Q1 Adjusted-EBIT of $163M (margin of 3.9 %);
>
> • Cash and cash equivalents of $390M at Dec. 31, 2017; and . . .
>
> • FY2018 outlook revised to reflect SS&M headwinds and Q1 performance

164. The same day, before the market opened, the Company hosted a conference call to discuss its quarterly results. In connection with the discussion of those results, McDonald revealed that launch inefficiencies in SS&M were more problematic than in the fourth quarter of fiscal 2017 and that the 200 basis points of margin expansion, while still achievable, would require improvements and cost efficiencies in other segments.

165. McDonald revealed:

> As we mentioned a few weeks ago at the Deutsche Bank auto conference, **the challenges and headwinds impacting our Seat Structures & Mechanisms business intensified during the first quarter and had a significant impact on our financial results.**
>
> * * *
>
> **[T]he Seat Structures & Mechanisms business is currently experiencing headwinds much more severe than the guidance that we provided back in November. Although we identified some of the headwinds and challenges last quarter, specifically commodity prices, launch inefficiencies, steel supply constraint and the cost of customer interruptions, the severity and the impact of these headwinds have intensified**.

166. Stafeil stated:

> **[T]he headwinds within Seat Structures & Mechanisms had a significant impact on our results**. . . .Given Q1's performance, we've heard and read a lot of commentary about the achievability of the 200 basis point margin improvement target. You can see our progress towards that goal on slide 13. Our Seat Structures & Mechanisms business stands out on the page as our negative outlier performance with 120 basis points reduction from our starting point. No doubt the headwinds impacting this business have significantly offset the approximate 143 basis points of improvement we've achieved in SG&A and makes achieving our goal that much tougher.
>
> * * *
>
> **As previously mentioned, the headwinds related to launch inefficiencies and commodities drove the business to a significant loss, about $55 million in Q4 of 2017 for the**

> **consolidated operation. The losses in our most recent quarter became more severe as the headwinds intensified**.

167. In responding to a question concerning whether the problems in SS&M were temporary or would persist, McDonald falsely represented that the Company was comfortable that the launch related problems were and would be "***behind us***" in 2018 and he "***certainly feel[s] good about avoiding a re-occurrence in '19.***" McDonald falsely reiterated confidence in the improvement in the SS&M business in the following exchange:

> **Colin Langan, UBS Analyst**
>
> Let me just start off. It sounded like the metals issues initially were somewhat onetime in nature, things like expedited freight, your outsourcing components to get them produced. And now the forecast, as the slide shows, has headwinds going through all the way to the second half of the year. What has changed in the business? Is there something structural now? And should we expect these to persist into 2019 and 2020? I mean, it sounded like a lot of your initial issue was more onetime in nature related to a particular plant.
>
> **Bruce McDonald, Chairman and Chief Executive Officer**
>
> Yes. Colin, it's Bruce here. So I think a couple of things that I'd just note. It takes some time to work through the containment costs that we have. So once we experience a difficulty, there's a number of milestones the customers make us -- quite rightly, make us demonstrate before we can sort of peel those resources away. I think we've tried to be realistic here . . . .
>
> As it relates to your comments about '19 or sort of going into '19, clearly, ***we're pretty comfortable that the launch-related problems that we have are – we're going to get behind us***. With the resources that we're putting in place, we certainly feel good about avoiding a reoccurrence in '19. And so if you think about -- especially when you look at the hits that we've taken in Q1 and Q2, ***we ought to have significant year-over-year improvements in the first half of next year. . . . I think we'll get that issue behind us here in 2018***. . . . But I think we feel that we can get this business certainly back to the run rate that we had going into this year in a few quarters from now.

168. Defendants also falsely reassured investors that the 200 basis point margin expansion was still achievable and "***we're not walking away from our commitment.***" Specifically, McDonald stated:

> With regard to our midterm plan, ***we certainly are not backing away from our commitment to deliver 200 basis point*** of consolidated adjusted EBIT margin improvement by the end of 2020. With that said, ***we're currently examining the composition of this 200 basis points. So, for example, if SS&M, our Seat Structures & Mechanisms business is incapable of delivering the 100 to 200 basis points of improvement by 2020***, we'll look to execute other parts of – other things within the rest of our organization to offset the shortfall.
>
> * * *
>
> ***I mean we're not walking away from our commitment.*** What we want to do here is, over the next quarter or so, rebuild the metals plan up. And there's things – like you saw in Jeff's chart, things like operational improvement, which we've made across the organization.

Indeed, slide 13 from the Company's presentation materials states: "Despite temporary headwinds in SS&M significantly offsetting savings in SG&A, the company continues to expect 200 bps of margin improvement by the end of FY2020."

169. The news of continuing problems in SS&M, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $5.53, or about 7.6%, to close at $66.77 per share on January 29, 2018.

170. Defendants' statements reaffirming the commitment to deliver a 200 basis point margin expansion contained in ¶¶167-168 were materially false and misleading and failed to disclose:

(a) material known adverse facts and trends in Adient's core SS&M/Metals business including: (i) severe operational challenges and inefficiencies, (ii) increased costs and

delays due, in part, to failure to follow Company policies (¶203), (iii) insufficient qualified personnel to timely launch Adient's programs, and (iv) other launch-related problems which were not weather or market related and which significantly increased customer chargebacks, decreased profitability on Adient's automotive seating contracts, and made a 200 basis point margin expansion unachievable;

(b) that the severe launch issues threatened ongoing relationships with Adient's customers, increased the risk of contract cancellations and reduced the likelihood of Adient winning new customer contracts; and

(c) that instead of being a key driver of growth and margin improvement, SS&M was a "cash drain" on the Company.

171. On January 29, 2018, Colin Langan of UBS issued an analyst report on Adient entitled: *"Adient PLC - Will this be the final guidance cut."* In his report, Langan reported the following:

> **2018 guidance revision worse than expected, but we think this is the end**
>
> ADNT lowered adj. EBIT guidance by $305m reflecting the ~$60m Q1 deterioration & continued SS&M issues through the rest of the year. At the midpoint guidance implies EPS of ~$7.75, ~17% lower than consensus. We view the new guidance as conservative as it reflects a large SS&M drag through year end as well as ~50bps of deterioration in the core despite prior SG&A cuts (see Figure 1). Surprised by Q1 launch issues, we believe management is guiding conservatively in order to avoid more negative surprises and regain credibility. . . .
>
> **Still targeting 200bp margin expansion by 2020**
>
> Guidance implies ~3.5% EBIT margins in 2018; however, the mid-term target implies 6.5% by 2020. We see margin expansion as delayed near-term, but unchanged longterm. ADNT's margins lag peers by ~180bps, yet its margin profile should be higher given its higher vertical integration. SS&M will likely underperform the initial target of 100-200bps margin expansion, but ADNT has

> indicated that more SG&A upside and lower reinvestment will contribute enough to overcome metals problems by 2020.

172. On January 29, 2018, Ryan Brinkman of J.P. Morgan also issued an analyst report on Adient entitled, "*Adient - See Solid Negative Reaction to Larger than Expected F1Q18 Earnings Miss and Lowered FY18 Outlook*." In his report, Brinkman reported the following:

> Adient reported F4Q results that were significantly softer than consensus expectations as well as our lower-end estimates (after having cut near-term expectations considerably at the time of the Detroit Auto Show) and which we take as more of a proxy for investors. Revenue of $4.204 mn was better than JPM of $4,165 mn but softer than consensus of $4,235 mn. The problems, though, are on the cost side, with adjusted EBIT tracking just $163 mn vs. JPM $172 mn and consensus $201 mn, **given the aforementioned execution issues relative to product launches in the metals business and commodity headwinds**.
>
> * * *
>
> Adient trimmed FY18 guidance beyond our lowered outlook, and particularly reined in free cash flow, **likely as the firm allocates incremental resources toward fixing problems in its Seat Structures & Mechanisms ("metals") business**. Adient reiterated FY18 guidance for revenue in the range of $17.0 bn to $17.2 bn (vs. JPM of $17.02 and consensus of $16.96 bn) . . .

173. On January 30, 2018, Defendants filed Adient's Quarterly Report on Form 10-Q for the first fiscal quarter ended December 31, 2017 ("Q1'18 10-Q"). McDonald and Stafeil certified this report. The Q1'18 10-Q (filed the day after the January 29th disclosure) reaffirmed that the launch issues were the driving force behind the bad results. Specifically the Q1'18 10-Q reported the following:

> Significant aspects of Adient's financial results for the first quarter of fiscal 2018 include the following:
>
> • Adient recorded net sales of $4,204 million for the first quarter of fiscal 2018, representing an increase of $178 million when compared to the first quarter of fiscal 2017. The increase is primarily due to the impact of the Futuris acquisition and the consolidation of a China affiliate and foreign currency, partially

> offset by lower volumes in North America and other Asian countries.
>
> • Gross profit was $202 million, or 5% of net sales, for the first quarter of fiscal 2018 compared to $350 million , or 9% of net sales, for the first quarter of fiscal 2017. Profitability, along with gross profit as a percentage of net sales, was lower primarily due to significant launch inefficiencies, premium freight, higher commodity prices, steel supply constraints and cost of customer interruptions related to structures and mechanisms production within the Seating business and lower volumes, partially offset by the impact of the Futuris acquisition and the consolidation of a China affiliate.
>
> * * *
>
> Adjusted EBIT decreased for the first quarter of fiscal 2018 by $115 million due to significant launch inefficiencies, premium freight, higher commodity prices, steel supply constraints and cost of customer interruptions related to structures and mechanisms production within the Seating business ($100 million), growth investments related to increased engineering resources, program managers and launch activities to support new business wins ($33 million), lower volumes in certain regions ($39 million) and an increase in other operating costs ($25 million), partially offset by lower administrative expenses ($44 million), the impact of acquisitions including Futuris and the consolidation of a China affiliate ($23 million), higher equity income ($12 million) and the favorable impact of foreign currency translation ($3 million).

174. With respect to restructuring and impairment costs, Defendants stated:

> In fiscal 2018, Adient committed to a restructuring plan ("2018 Plan") within the Seating segment for $13 million that was offset by underspend in the fiscal 2016 Plan. The restructuring actions relate to cost reduction initiatives and consist primarily of workforce reductions. The restructuring actions are expected to be substantially completed by fiscal 2019.
>
> * * *
>
> Adient's management closely monitors its overall cost structure and continually analyzes each of its businesses for opportunities to consolidate current operations, improve operating efficiencies and locate facilities in low cost countries in close proximity to customers. This ongoing analysis includes a review of its manufacturing, engineering, purchasing and administrative

> functions, as well as the overall global footprint for all its businesses.

### (e) Second Quarter Fiscal 2018 Results – May 3, 2018 (*Fourth Partial Disclosure*)

175. On May 3, 2018, before the market opened, Adient reported second quarter fiscal 2018 financial results for the quarter ended March 31, 2018 in a Form 8-K filing with the SEC. The Company reported:

> • **Q2 GAAP net income and EPS diluted of $(168)M and $(1 .80), respectively; GAAP results reflect a net $279M non-cash goodwill impairment charge related to ADNT's SS&M segment**;
>
> • Q2 Adjusted-EBIT and Adjusted-EBITDA of $252M and $363M, respectively;
>
> • Q2 Adjusted-EPS diluted of $1.85; and
>
> • Cash and cash equivalents of $353M at March 31, 2018.

176. That same day, before the market opened, the Company hosted a conference call to discuss its quarterly results. In connection with the discussion of those results, Adient announced a comprehensive strategic restructuring of its business and management structure, separating out SS&M as a new operating segment. As a result of separating SS&M into a new segment, the Company took a $299 million goodwill impairment charge which negatively impacted the Company's GAAP results for the quarter. The Company also announced that as a result of a comprehensive assessment of SS&M by a third-party consulting firm, the SS&M segment was undergoing fundamental changes including a massive shrinking of the business and its quoting activity and outsourcing non-core processes.

177. Defendants also revealed, for the first time, that the 200 basis points of margin expansion goal that Adient had set to achieve by 2020, which was reaffirmed by Defendants on January 29th, was "clearly overly optimistic" and no longer achievable:

> Although the team has been laser focused on stabilizing the SS&M business and positive progress was made in the most recent quarter versus last quarter, we clearly review – we clearly view these results as disappointing. **In addition to having significant impact on our financial results so far this year, we've also concluded, after completing a comprehensive strategic assessment of the SS&M business, that the 200 basis points of margin expansion that Adient has set a goal to achieve by 2020 is no longer going to be achievable**.
>
> * * *
>
> **Even though we are expected to reverse the $300 million setback that we have had so far in Seat Structures & Mechanisms by 2020, like I said earlier, we don't see ourselves getting to $600 million improvement, which is what we need to do to get the 200 basis points of margin expansion.**
>
> * * *
>
> **I know we've had a number of questions around what went wrong. The simple answer is a number of actions were put in place -- put into motion based on anticipated market factors' planning assumptions at that time. Many of these assumptions, including the pursuit of growth and the ability to manage the change in this business, with the benefit of hindsight were clearly overly optimistic. . . .**
>
> * * *
>
> **Bottom line. Despite the company's effort to mitigate these challenges, the intensified macro headwinds are placing downward pressure on earnings, resulting in a very challenging environment, especially when combined with some of our operating challenges**.

178. Stafeil also explained why the Company was retreating from the 200 basis point margin expansion it reaffirmed on January 29, 2018.

> [Th]e challenge for us on meeting the 200 basis points of margin expansion without equity income was SS&M we saw being really flat. We didn't see -- we needed the SS&M business to sort of make up some of the slack. We think that business can be better, more efficient in a lot of things. **So while we see some improvement opportunity from our 2016 starting points, we just don't think we can get all the way to the 200 basis points**

> **and that's why we turned back and said, this was -- as we reassessed all parts of our business that we felt that this 200 basis point goal was not reasonable in the midterm**.

179. Despite revealing headwinds in the SS&M business, which made the 200 basis point margin expansion unachievable, Defendants continued to mislead the market by falsely reassuring investors that a strategic review of the SS&M division and new management in SS&M was rapidly stabilizing the business and driving near-term improvements:

> ***[I]f you look at Seat Structures & Mechanisms, we expect a combination of improved operating performance and lower capital expenditures to drive significantly higher cash generation***. We know there is a lot of focus on our Seat Structures & Mechanisms business.
>
> * * *
>
> On Slide 7, you can see a number of actions we've taken to already stabilize the business, and we've talked about some of these in our last call. But basically, we put a whole new leadership team in place in this business. We've implemented new reporting structure to drive end-to-end accountability. We've reinforced our launch team and driven a renewed commitment to improving our business processes here. We've executed action plans to mitigate our steel supply risks. We sent tiger teams to our most unprofitable plants to complement our plant leadership and drive rapid cost down action. And lastly, we've completed a comprehensive review of our targeted business list and put in place clear boundaries centered on more selective participation, prioritization around strategic fit and profitability on our new business.
>
> * * *
>
> [***W]e are pretty encouraged with the improvement that we have made here quarter-over-quarter from Q1 in terms of Seat Structures & Mechanisms***. I think we have outlined a number of tenets that we're focused on to create value in Seat Structures & Mechanisms. And I think these building blocks if you sort of think back, it's transforming our Seat Structures & Mechanisms not only recapturing the lost profits since the spin, but moving the segment smaller – beyond 2020, but a smaller, less capital intensive and much more profitable and cash generative. . . .***We do have a backlog that we've built up, and we expect to see top line growth, again, here in '19 and beyond.*** And then lastly, we are -- once we

> start to trend the capital in terms we have Seat Structures & Mechanisms as we get some of the cost of becoming Adient as restructuring trends back to sort of this $100 million normative-type level, we do expect to see a significant step-up in free cash flow generation beyond 2018. So we're pretty -- obviously, a lot of our time is spent on the challenges that we have today, ***but we're pretty encouraged and excited that we're getting through those, we have significantly -- with significant opportunities ahead.***

180. Stafeil also falsely reiterated that the Company had "***seen nice improvements***" in its SS&M business and that the SS&M team had made "***good progress***."

> As Bruce discussed earlier, ***we are seeing significantly -- significant monthly improvements, but as we've explained, the safety critical nature of the SS&M business requires most improvements and changes to happen incrementally. But the team is making good progress***.

181. Byron S. Foster, Adient's Executive Vice President and head of the SS&M segment since January 2018, echoed Stafeil's sentiments:

> So we've, I think, shared with the group here that we struggle through a number of critical launches. ***We now have most of those issues behind us. We have good line of sight of the upcoming launches and the ones that we would deem kind of high risk and those are the ones we're focused on, have the right resources on to make sure that those launches go off as planned*** . . . . So as those launches come in more stable, that's 1 line item that we will see improvements in. . . .We've now got the steel supply issue fixed. So we'll have better, more consistent flow of raw material into our mechanisms plant that's going to drive in-plant improvements and better machine utilization, longer runs and ultimately, again, attack the premium freight topic. Engineering cost is another area where we'll see improvements and lower cost, again, as a lot of these launches get behind us and as we have a more targeted approach in terms of new business acquisition that was possible come down as well. So that was – we're beginning to see those and we're seeing that in the results Q2 versus Q1. And as we look forward into the second half of the year, we expect those improvements to continue.

182. Despite the goodwill impairment charge, Adient maintained its prior full year fiscal 2018 guidance including guidance for revenue and adjusted EBIT and assured investors

that further asset impairments were not required. In fact, Adient projected that SS&M earnings (Adjusted EBITDA – *a different metric than Adient used in 1Q18*) would increase in the second half of fiscal 2018. As described below, Adient had an improper purpose underlying its continued optimistic estimates for SS&M. By projecting a turnaround of the SS&M business, Adient could justify its claim that further asset impairments were unnecessary. However, Defendants did not have a reasonable basis for the revised estimates for SS&M for the second half of fiscal 2018.

183. This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $6.14 per share, or about 10%, to close at $55.84 on May 3, 2018.

184. Defendants' statements concerning the turnaround underway, progress and improvement in the SS&M business, and backlog in SS&M business, contained in ¶¶179-181, were materially false and misleading and failed to disclose:

(a) material known adverse facts and trends in Adient's core SS&M/Metals business including: (i) severe operational challenges and inefficiencies, (ii) increased costs and delays due, in part, to failure to follow Company policies (¶203), (iii) insufficient qualified personnel to timely launch Adient's programs, and (iv) other launch-related problems which were not weather or market related and which significantly increased customer chargebacks, decreased profitability on Adient's automotive seating contracts, and made a 200 basis point margin expansion unachievable;

(b) that the severe launch issues threatened ongoing relationships with Adient's customers, increased the risk of contract cancellations and reduced the likelihood of Adient winning new customer contracts;

(c) that instead of being a key driver of growth and margin improvement, SS&M was a "cash drain" on the Company; and

(d) starting in the second quarter of fiscal 2018, that the same events and conditions that triggered an impairment charge to goodwill warranted additional impairment recognition, including impairment related to long-lived assets such as property, plant, and equipment and deferred tax assets.

185. Following the May 3, 2018 announcement, securities analysts from Barclays inferred, on May 7, 2018, that "Fortunately, SS&M headwinds have bottomed, and good steps are being taken to reverse course."

186. On May 4, 2018, Emmanuel Rosner of Guggenheim Partners issued an analyst report on Adient, entitled, "*ADNT - Expectations Reset, But No Valuation Support*." In his report, Rosner reported the following:

> **No quick fix for Metals**. After taking several months to review potential options, management indicated it remains committed to the Metals business which provides it with complete seat capability requested by several major OEM customers. . . . Adient plans to shrink the size of Metals, by reducing its Tier-2 sales, and aggressively maximize operational efficiency (e.g., out-source non-core processes, higher plant utilization, restructuring). **Nearer term, Adient believes it has now stabilized margins and that performance will improve rapidly, allowing it to recover the $300m earnings setback in Metals since the spin by 2020**. **We are encouraged by Adient's traction in Metals shown in 2Q results**, and expect more details around future strategy at Adient's sell-side dinner next week (on 5/8).

187. On May 3, 2018, David H. Lim of Wells Fargo issued a research report on Adient entitled, "*ADNT: FQ2 Below Expectations Mid-Term Margin Growth Target Is Off The Table*." In his report, Lim stated the following:

> **Summary.** Although revenues came in better, ADNT reported is disappointing FQ2 earnings (below consensus). . . . Mgmt thinks it can still achieve 50-100bps of consolidated margin improvement

> by FY20 (from LTM June 2016 levels). With low expectations, execution (SS&M recovery) and delivery will be key to getting the shares moving (and rebuild mgmt's credibility).
>
> * * *
>
> **SS&M buckets of improvement**:
>
> o Launch stability: Mgmt mentioned there is a better line of sight with upcoming launches. Stability should drive improvements in premium freight. ADNT spent over $40MM in premium freight in 1H.
>
> o Steel supply: Supply issues have been resolved and there is a more consistent flow of raw materials.
>
> o Engineering cost: Should improve as launches are executed. A targeted approach to new business should help.

188. On May 3, 2018, Armintas Sinkevicius of Morgan Stanley issued an analyst report on Adient entitled, "*Adient PLC - Dropping Margin Expansion, Multi-Year Journey to Improve Metals*." In his report, Sinkevicius reported the following:

> Here is what we were looking for this quarter:
>
> Q / Q Improvement in the Metals Business: -$34M Adjusted EBITDA in FY 2Q18 v.-$82M in FY 1Q18
>
> **Update on the Metals Business: Expect to deliver significant improvement in FY 2H18, and return to pre-spin level of profitability by FY 2020**, but requires major change beyond FY 2020. The changes include restructuring opportunities (smaller, less tier 2 business), emphasis on profitability / improved cash generation, and commercial discipline.

189. On May 4, 2018, Ryan Brinkman of J.P. Morgan issued an analyst report on Adient entitled, "*Adient - 2Q Only Slightly Softer than Street But Shares Fall 10% on Backing Away from 2020 Margin Target*." In his report, Brinkman reported the following:

> While Adient's F2Q18 results were only slightly softer than the Street and full year guidance was reiterated, ADNT shares declined -9.9% Thursday vs. S&P -0.2% after the firm backed away from its previous outlook for margin to improve strongly through 2020, citing lingering challenges in its Seat Structures & Mechanisms

> business. We feel the reason for the sharp negative reaction is that the 2020 margin targets, from our conversations, once formed a critical crux of the bull thesis and because these targets were only recently maintained despite the nearer-term challenges.
>
> * * *
>
> **Adient management is backing away from its medium-term margin expansion targets (which once formed a critical crux of the bull thesis) after recently softer operating performance and execution difficultie**s. Adient declared that the prior 2020 mid-term plan of +200 bps of consolidated margin improvement is no longer feasible and that both near-term and long-term actions will be necessary to drive needed improvements to the business. Notably, while results outside of the troubled Seat Structures & Mechanisms (SS&M) business continue to track largely as planned, the ~$300 mn earnings setback between June 2016 and 2018 in SS&M will prohibit Adient from achieving its 2020 margin target.

190. On May 7, 2018, Defendants filed Adient's Quarterly Report on Form 10-Q for the second fiscal quarter ended March 31, 2018. McDonald and Stafeil certified this report.

191. With respect to restructuring and impairment costs, Adient disclosed that the 2Q18 goodwill impairment charge was a triggering event for GAAP purposes that required Adient to review the recoverability of other long-lived assets. Adient reported that it had performed such an analysis, but no further impairments were identified.[21] The 10-Q stated:

> Adient evaluates its goodwill and intangible assets for impairment on an annual basis, or as facts and circumstances warrant. As a result of the change in reportable segments during the second quarter of fiscal 2018, Adient conducted goodwill impairment analyses of the newly allocated goodwill balances under the new reportable segment structure. Adient performs impairment reviews for its reporting units, which have been determined to be Adient's reportable segments, using a fair value method based on management's judgments and assumptions or third party valuations. . . . The estimated future cash flows reflect management's latest assumptions of the financial projections based on current and anticipated competitive landscape and product

[21] 5/7/18 Form 10-Q, p.12.

> profitability based on historical trends. . . . As a result of the analyses, Adient determined that goodwill associated with the SS&M reportable segment was fully impaired. Consequently, a pre-tax goodwill impairment charge of $299 million was recognized in the three months ended March 31, 2018 in the consolidated statements of income (loss) within the restructuring and impairment costs line item. The goodwill impairment charge represented a triggering event for additional impairment considerations of other long lived assets, including an analysis of the recoverability of long lived assets as of March 31, 2018. ***No further impairments were identified.***

192. On its deferred tax assets, the Company reported:

> **Valuation Allowances**
>
> ***Adient reviews the realizability of its deferred tax assets on a quarterly basis, or whenever events or changes in circumstances indicate that a review is required***. In determining the requirement for a valuation allowance, the historical and projected financial results of the legal entity or combined group recording the net deferred tax asset are considered, along with any other positive or negative evidence.

193. Adient's statements concerning no further impairments identified in the Company's analysis of the recoverability of long lived assets and deferred tax assets as of March 31, 2018, contained in ¶¶191-192, were materially false and misleading for the reasons set forth in ¶184.

**(f) Wells Fargo Industrials Conference – May 9, 2018**

194. On May 9, 2018, McDonald and Byron Foster presented at the Wells Fargo Industrials Conference. At the conference, Foster discussed the restructuring of the SS&M business, stating, in part: "***we're well on our way. We're starting to see nice improvements. We saw it in the results, Q2 versus Q1, and we're expecting to continue to see an improving trend here in the second half of the year***."

195. Adient's statements concerning the SS&M trend improving in the second half of the year contained in ¶194 were materially false and misleading for the reasons described in ¶184.

**(g) Lowered Guidance And Abrupt Ouster Of CEO McDonald – June 11, 2018 (*Fifth Partial Disclosure)***

196. On June 11, 2018, before the market opened, Adient disclosed that McDonald was "retiring" from his role as Chairman and CEO effective immediately and that the Company's Board of Directors had appointed Adient Director Frederick A. ("Fritz") Henderson interim Chief Executive Officer. According to the announcement: "Bruce and the Board agree that now is the right time for a new leader with a fresh perspective to drive value in the next phase of Adient's life as a public company. Fritz brings the right leadership skills and operational experience to step in and immediately accelerate our transformation, providing the time to conduct an expeditious and thoughtful search for a new CEO."

197. On June 11, 2018, the Company also slashed earnings guidance outlook for fiscal 2018 stating:

> Today, Adient also announced that it is revising its outlook for the full fiscal year 2018. Despite an anticipated increase in FY2018 revenue to approximately $17.5B, **operating performance is running behind plan and thus the company's outlook for Adjusted EBITDA is now expected to be approximately $1,250M. Continued challenges impacting the Seat Structures & Mechanisms segment drove approximately half of the shortfall versus previous expectations while weakness in the company's Seating segment and Interiors drove the remainder**. The primary drivers impacting Seating related to lower than expected operational conversion, primarily in North America, and to a lesser extent, economics and the negative impact of foreign exchange. As a result of the lower earnings, increased cash restructuring, and a negative working capital trend, free cash flow for the fiscal year is expected to be approximately $0 to $(100)M.

198. Interim CEO Henderson stated:

> While our market position remains strong and our China joint ventures continue to perform at high levels, we recognize that **we are not executing at the levels we are capable of in our consolidated Seat Structures and Mechanisms and Seating segments, and that shortfall has been reflected in our financial results and valuation**. My immediate focus is on better operational execution to drive meaningful improvements in profitability and free cash flow. We know what needs to be done and we will be approaching the work ahead of us with urgency.

199. This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $8.88 per share, or about 15.6%, to close at $48.10 on June 11, 2018.

200. On June 11, 2018 Colin Langan of UBS issued an analyst report on Adient entitled, "*Adient PLC - Turnaround Expert Takes the Helm.*" In his report, Langan reported the following:

> **ADNT announces former GM CEO Fritz Henderson as interim CEO to drive turnaround**
>
> After a series of guidance cuts and several operational issues in its seating structures and mechanisms (SS&M) business, the move should quickly help improve management credibility. Henderson assumed the helm as interim CEO at GM during the bailout period and was generally viewed positively for his role in the turnaround. Unfortunately this news comes with another guidance cut. ADNT cut EBITDA guidance ~12% from $1.425bn (midpoint) to $1.25bn. We expect the stock to trade down on the guidance cut, but view the news positively long term as new management may accelerate the turnaround.
>
> **Why the Cut and how to fix SS&M?**
>
> The company noted that the guidance cut was half-driven by SS&M, which drove the multi-year guidance cut earlier in the year. Previously, management had stated that contracts not priced for added complexity are driving the pressure. . . .We believe that the outlook for 2020 margins may have upside if ADNT can re-negotiate some of the mispriced contracts. Trading at only 5x our

> 2019 EPS, investors only need to believe margins can recover to levels prior to the launch issues.

201. On June 12, 2018, Ryan Brinkman of J.P. Morgan issued a report on Adient entitled, "*Adient - Cut Estimates & PT Again as Execution Issues Linger Longer; However, See Talented Leader in Interim CEO Fritz Henderson*." In his report, Brinkman reported the following:

> Adient yesterday announced yet another material guide down in outlook, prompting a change in leadership at the top, with CEO Bruce McDonald stepping down and Frederick "Fritz" Henderson stepping in (from the Board) to take his place as Interim CEO.
>
> * * *
>
> **Why we downgraded ADNT shares to Underweight in January 2018**: We were concerned that turning around the firm's Seat, Structures, & Mechanisms (SS&M) business had the potential to take greater amounts of time and resources than investors assumed, stating then, "It is right for the preservation of long-term earnings power that management prioritize on-time and high quality delivery over improving margin, but these efforts (which include the hiring of hundreds of additional workers, the costly outsourcing of work to companies which are in some instances competitors, and the incurring of premium freight charges) also undercut one of the primary reasons for holding the stock (namely, that while revenue growth would not be forthcoming near-term, at least earnings can continue to improve because of cost reductions)." In fact, subsequent to our downgrade, the firm backed away from its 2020 margin targets in conjunction with the reporting of 1Q18 results.

#### (h) Third Quarter Fiscal 2018 Results – July 26, 2018

202. On July 26, 2018, before the market opened, Adient reported third quarter fiscal 2018 financial results for the quarter ended June 30, 2018 in a Form 8-K filing with the SEC. The Company reported

> • Q3 GAAP net income and EPS diluted of $54 million and $0.58, respectively;

> • Q3 Adjusted-EBIT and Adjusted-EBITDA of $206 million and $319 million, respectively;
>
> • Q3 Adjusted-EPS diluted of $1.45; and
>
> • Q3 free cash flow of $252 million; the launch and initial sale of an accounts receivable financing facility provided an approximate $94 million benefit to free cash flow.

203. That same day, before the market opened, the Company hosted a conference call to discuss its quarterly results. In connection with the discussion of those results, the Company noted that third quarter results were significantly impacted by operational headwinds in both Seating and Seat Structures & Mechanisms. Interim CEO Henderson also conceded that strong processes existed at Adient, but were not being adhered to:

> We have good processes. <u>**Processes existed for quite some time, but they're not always followed, not always followed either in their entirety or important parts of it. And in virtually all the cases where we've had flawed launches, we haven't followed the processes**</u>. Where there have been parts of it that have been late or have not executed the way we expect. And so we've got to get back to executing our processes.

204. While Adient's financial results continued to be negatively affected by operational challenges, Henderson falsely assured investors that the Company made "***positive sequential progress within Seat Structures & Mechanisms segment . . . . we're encouraged to see the progress sequentially, we know this is work in process***." Henderson continued:

> ***We've seen positive improvement in our next-generation mechanisms production output. We've seen our production stabilize for the rear-seat structures for the Ford Expedition and the Lincoln Navigator programs, which we talked about earlier this year*. . . . Progress is being tracked at the highest levels of the organization, it has been for quite some time at the CEO level and with the board. So the focus on Seat Structures & Mechanisms continues within the company and it's very important for us**. ***We do expect the trend of improvement to continue in the fourth quarter and throughout 2019.***

* * *

> We're moving with a sense of urgency to accelerate the pace of improvements. Actions have been taken to stabilize Seat Structures & Mechanisms, it's getting traction. ***As I said, we do expect continued improvement in the fourth quarter*** and for the fiscal '19.

205. Stafeil concurred, stating: "The team recognizes we have a lot of work ahead of us. However, ***these results demonstrate stabilization, turnaround, actions, implemented earlier and are gaining traction. We expect the positive trend to continue into the fourth quarter and into 2019***." The Company maintained its full year fiscal guidance for revenue of $17.5 billion.

206. Despite Adient's characterization of an improving SS&M business, in fact, SS&M significantly under-performed the outlook provided less than 90-days earlier. Indeed, rather than deliver earnings as projected, SS&M remained in a loss position in the third quarter of fiscal 2018. Moreover, confirming its inability to reliably project SS&M's performance, Adient dropped the "Outlook" from its earnings presentation:[22]

***<u>2Q18 Earnings Presentation</u>***




***<u>3Q18 Earnings Presentation</u>***




207. In reality, Adient's business continued to be confronted by the same headwinds that culminated in impairment charges to long-lived assets and deferred tax assets in the fourth quarter of fiscal 2018. Namely, Adient continued to experience profitability challenges attributable to launch inefficiencies and other deteriorating conditions in SS&M.

---

[22] 2Q18 Earnings Presentation, p.7 and 3Q18 Earnings Presentation, p.6.

208. The persistence of these negative conditions should have caused Adient to recognize that its projections for SS&M's earnings lacked a reasonable basis. The recurrences of losses when Adient had claimed earnings would emerge necessitated a reasonable assessment of whether other SS&M assets were impaired. These conditions, including plans to dramatically shrink Adient's SS&M business, constituted triggering events that necessitated that Adient review for impairment. (ASC 360-10-35-21). Instead, Adient continued to refuse to timely address, in 3Q18, the purported value of SS&M's long-lived assets and deferred tax assets.

209. Defendants' statements concerning stabilization and turnaround in SS&M, contained in ¶¶204-205, were materially false and misleading and failed to disclose:

(a) material known adverse facts and trends in Adient's core SS&M/Metals business including: (i) severe operational challenges and inefficiencies, (ii) increased costs and delays due, in part, to failure to follow Company policies (¶203), (iii) insufficient qualified personnel to timely launch Adient's programs, and (iv) other launch-related problems which were not weather or market related and which significantly increased customer chargebacks, decreased profitability on Adient's automotive seating contracts, and made a 200 basis point margin expansion unachievable;

(b) that the severe launch issues threatened ongoing relationships with Adient's customers, increased the risk of contract cancellations and reduced the likelihood of Adient winning new customer contracts;

(c) that instead of being a key driver of growth and margin improvement, SS&M was a "cash drain" on the Company; and

(d) starting in the second quarter of fiscal 2018, that the same events and conditions that triggered an impairment charge to goodwill warranted additional impairment

recognition, including impairment related to long-lived assets such as property, plant, and equipment and deferred tax assets.

210. On July 26, 2018, Colin Langan of UBS issued an analyst report on Adient, entitled, "*Adient PLC - Fritz appears up to the task.*" In his report, Langan reported the following:

> **Stock reaction likely a vote of confidence for Fritz**
>
> ADNT reported EPS of $1.45 vs cons of $1.60 (see FR) this morning. Given that the company guided ~6 weeks ago, the reaffirmed FY guide should be of little surprise. As we highlighted in our preview, we believe that investors' attention is currently on the performance of interim CEO Henderson. Following his appointment, incoming investors' questions have focused on whether Henderson has the operational background to fix issues at ADNT. On the call, Henderson outlined his approach, which highlighted his "urgent" approach to overhaul execution. His plans call for "external operational expertise" and the departure of EVP Mitchell signifies that Henderson is willing to revamp the team as needed. Less importantly, but illustrative of the approach, the company is in process of selling assets, taking on low-rate debt, and reducing non-essential capex. We believe the stock reaction despite the EPS miss is a strong indication of investor's vote of confidence in Henderson's approach.

211. On July 30, 2018, Defendants filed Adient's Quarterly Report on Form 10-Q for the third fiscal quarter ended June 30, 2018. Interim CEO Henderson and CFO Stafeil certified this report.

212. With respect to restructuring and impairment costs, Defendants stated:

> ***Restructuring and Impairment Costs***
>
> The increase in restructuring and impairment costs in the third quarter of 2018 when compared to the same period in 2017 is primarily related to an asset impairment charge of $52 million related to assets held for sale. The increase in restructuring and impairment costs in the first nine months of fiscal 2018 as compared to the same period in the previous year is primarily due to the $299 million goodwill impairment charge associated with the SS&M segment.

* * *

> ***Restructuring and Impairment Costs***
>
> Adient committed to a restructuring plan in fiscal 2018 to drive cost efficiencies and to balance our global production against demand and recorded $43 million of restructuring costs in the consolidated statement of income that was offset by underspend in prior years by $22 million. The restructuring actions related to cost reduction initiatives in the Seating and SS&M segments. The costs consist primarily of workforce reductions and plant closures. The restructuring actions are expected to be substantially complete in fiscal 2019. The restructuring plan reserve balance of $32 million at June 30, 2018 is expected to be paid in cash.

**(i) Appointment of New CEO – September 13, 2018**

213. On September 13, 2018, Adient announced that its Board of Directors had appointed Douglas G. Del Grosso as President and CEO of the Company, effective October 1, 2018. Del Grosso would also join Adient's Board of Directors at that time. Also effective October 1, 2018, Fritz Henderson would step down as interim CEO and become non-executive chairman of the Company's Board of Directors.

**(j) Preannouncement Of Fourth Quarter Fiscal 2018 Results – October 19, 2018**

214. On October 19, 2018, before the market opened, Adient reported that its forthcoming 4Q18 earnings announcement would report revenue and free cash flow in-line with prior guidance. Notwithstanding these results, Adient also reported that it expected to record an impairment charge related to its long-lived assets and a valuation allowance against deferred tax assets due to ongoing challenges within SS&M. Adient did not, however, disclose the range of these charges. On a preliminary basis, the Company reported:

> • Full year 2018 revenue of approximately $17.4B, in-line with prior guidance of approximately $17.5B;
>
> • Full year 2018 Adjusted-EBITDA of approximately $1.2B vs. prior guidance of approximately $1.25B; and

> • Full year 2018 free cash flow (defined as operating cash flow less capital expenditures and excluding the impact of the accounts receivable financing facility initiated in Q3) of approximately $0, in-line with prior guidance of between $0 and $(100)M.
>
> "While sales and free cash flow were delivered in-line with our commitments, challenges within our Seat Structures and Mechanisms (SS&M) segment, and to a lesser extent, within our Interiors segment (YFAI), were the primary factors behind our earnings shortfall," said Fritz Henderson, chairman of the company's Board of Directors. . . . In addition, the company expects its Q4 fiscal 2018 GAAP results to be impacted by certain material one-time, non-cash charges associated with asset impairments (within the SS&M and Interiors segments) and the recording of valuation allowances against certain deferred tax assets.

215. Although these results were below consensus expectations, according to analysts they were "seemingly above lowered investor expectations," as there was then a positive reaction to the news.[23]

216. On October 19, 2018, Adient's stock price closed at $30.19 per share, up from a close on October 18, 2018 of $29.72 per share in above average trading volume.

### (k) Fourth Quarter Results – November 9, 2018 (*Sixth Partial Disclosure*)

217. On November 9, 2018, before the market opened, Adient filed a report on Form 8-K announcing Adient's fourth quarter fiscal 2018 financial results. The Company announced, in pertinent part:

> • **<u>GAAP results impacted by one-time, non-cash charges</u>**
>
> • Q4 GAAP net loss and EPS diluted of $(1.355)M and $(14.51) respectively; Q4 Adjusted-EPS diluted of $1.30
>
> • Q4 Adjusted-EBIT and Adjusted-EBITDA of $149M and $251M, respectively

---

[23] "*Adient F4Q18 Results in Line with Pre-announcement, But Expect Negative Reaction to Dividend Cut & Qualitative Comments on FY19",* Nov. 9, 2018 (J.P. Morgan, Ryan Brickman).

> • Q4 free cash flow of $307M; the expansion of an accounts receivable financing facility initiated in Q3 provided an approximate $48M benefit to free cash flow

218. Adient also announced it was "**suspend[ing] the company's quarterly cash dividend beginning in Q2 fiscal 2019 to increase financial flexibility and increase focus on debt reduction**" and confirmed that launch issues and increased commodity costs in SS&M were the primary factors behind year-over-year declines. The press release also stated: "**The challenges faced in 2018 will continue to have a significant impact in fiscal 2019**." The Company also announced a variety of charges totaling $1.5 billion that significantly impacted Adient's fourth quarter 2018 GAAP results, the biggest of which was an asset impairment of $787 million pre-tax driven by Adient's ongoing performance issues in SS&M, an impairment for deferred tax assets, and an impairment charge of $358 million for Adient's Yanfeng Automotive interiors joint venture.

219. That same day, before the market opened, the Company hosted a conference call to discuss Adient's fourth quarter results. The Company acknowledged that "fourth quarter results were significantly impacted by continued headwinds" and, as a result of those "continued headwinds," a reduction to the projected cash flow from the SS&M business had necessitated an after-tax impairment charge of $718 million to property, plant, and equipment ("PPE"). Adient also reported that valuation allowances would be required to reduce the previously reported value of deferred tax assets attributable to the downturn of the SS&M business, but did not specify the magnitude of the valuation allowances.

220. In connection with the discussion of the non-cash charges that significantly impacted the Company's Q4 GAAP results, Stafeil stated:

> **The biggest driver were asset impairments. The impairments were driven by Adient's ongoing performance issues that are expected to persist to some degree into the foreseeable future.**

> **For SS&M, our analysis resulted in an impairment charge to write-down long-lived assets that were in use as of September 30, 2018, to the values reflected by their cash flow. . . . The net loss impact in Q4 was $718 million for this impairment**. . . . The business performance issues related to our difficult launches prevented us from conveying -- converting the increased sale into profit. . . . as we've seen throughout the year, the operational challenges we are facing had a significant impact in the bottom line as adjusted net income and EPS were down approximately 40% year-over-year, at $527 million and $5.62 per share, respectively.
>
> * * *
>
> **Weaknesses across our Seating and SS&M primarily attributed to negative business performance, combined with continued downward macro pressures from commodity cost and FX drove the majority of the year-on-year decline**. **Compared with our guidance provided last quarter, headwinds within SS&M and Interiors were more than expected and represent the reason for our shortfall.** Important to note the performance for our unconsolidated Seating and SS&M business remained strong as equity income was up about $2 million compared to the same period last year.

221. On the poor SS&M segment performance, Stafeil reported:

> Starting with Seating . . . . Adjusted EBITDA decreased to $301 million, down $102 million compared to the same period a year ago. The primary drivers between the periods include: First, the positive benefits associated with the Futuris acquisition and increased volume contributed approximately $23 million. **However, these improvements were more than offset by a variety of factors, most significantly, the business incurred just over $80 million in business performance headwinds during the quarter, many of which were launch related**.
>
> * * *
>
> One point I'd like to highlight at the bottom of the slide is our quarterly Seating performance. Note that the first half results approximated 2017 performance, **but the back half has experienced significant declines that have increased quarter-over-quarter**.
>
> * * *

> Turning to Slide 14, and our SS&M segment performance. For the quarter, adjusted EBITDA was negative $34 million, or $38 million lower than Q4 2017. **The primary drivers between Q4 this year and last year's fourth quarter include: The impact of negative business performance, which was primarily driven by Adient's heavy and complex launch load; the launch inefficiencies** similar to what we discussed for the Seating segment, **burdened up SS&M with approximately $25 million of operational headwinds. Pricing and material performance essentially offset each other as shown on the bridge, however, the burden associated with launches prevented the operations from achieving the required level efficiencies to make the business equation whole.** Macro factors such as FX and commodity costs also weighed in the quarter.

222. New CEO Del Grosso also revealed that the Company was struggling with the speed of corrective action and how fast they could implement change. Del Grosso also conceded that, "we haven't been exactly spot-on with guidance. . ."And Stafeil admitted: "some of the expectations that the [SS&M] group have on the performance of it, were a bit optimistic or proved to be a bit optimistic, based on the experience that they had."

223. On the issue of the dividend, Stafeil referenced the Company's poor performance in SS&M as the most important factor is suspending the dividend:

> [**T]he board looked at the dividend. It's obviously not an easy thing to make that decision. Felt that it was prudent, given the performance, given the current market we think we're entering into, suspended**. We don't -- while we don't have a specific marker when we'd reinstate it, but clearly, one of the criteria is to get our footing back operationally. As Doug executes his plan, as we have -- we would expect to turnaround this business. We still have -- the business fundamentals are still there. The cash flow fundamentals of what the Seating business, we believe, represents are still there for this to be a cash-making, quite profitable enterprise as we move forward and get past some of these current issues that have plagued us. And as we complete that cycle, we definitely will revisit the dividend question.

224. In reaction to these shocking disclosures, which were a materialization of the risks concealed by the Class Period misrepresentations and omissions alleged herein, Adient's stock

price plummeted from $28.83 on November 8, 2018 to $21.52 on November 9, 2018, a loss of $7.31 per share, or 25.4 percent, on usually high trading volume of 7.5 million shares.

225. On November 9, 2018, Richard Kwas of Wells Fargo Securities issued an analyst report on Adient entitled, "*ADNT: Lot To Do In 2019--Lowering Estimates*." In his report, Kwas reported the following:

> **Takeaways from Call**
>
> **F'19 thought pieces**. 1) Seating operations will be challenged (F1H will be down materially yr/yr). 2) Business performance issues will continue in SS&M, but should improve as the year progresses. 3) Interiors will be challenged. 4) Costs will be higher (labor, freight, tariffs). No views offered on broader volume trends.
>
> * * *
>
> **Comments on underlying operations**. Launch issues have continued. CEO Del Grosso paying special attention to launches and processes. **He noted the company deviated from its traditional processes in order to achieve business wins**. OEM customer commercial recovery discussions have taken longer than expected. **If returns on book of business is unsustainable, the company plans to propose VAVE (Value Analysis, Value Engineering), demand recovery payments, or propose exiting the business.** The discussions are with a small set of customers. CEO Del Grosso noted metals and mechanisms business should be a lot better given the company's scale. He is spending significant time on it.

226. On November 9, 2018, Ryan Brinkman of J.P. Morgan issued an analyst report on Adient entitled, "*Adient F4Q18 Results in Line with Pre-announcement, But Expect Negative Reaction to Dividend Cut & Qualitative Comments on FY19*." In his report, Brinkman reported the following:

> Adient reported F4Q revenue and EBITDA that were in line with the figures pre-announced on October 19, which at that time were below consensus expectations but seemingly above lowered investor expectations, as there was then a positive reaction in the shares. . . . While earnings seem largely in line with the results pre-announced on October 19, **the firm today is suspending its**

> **dividend and provides qualitative commentary in the slide deck accompanying today's earnings call to the effect that, "Unfortunately the challenges faced in 2018 will continue to have a significant impact on 2019 results." As such, we expect a negative reaction**.
>
> • **Elevated freight costs, operational waste, and pricing headwinds in excess of purchase savings strongly impacted margin**. EBITDA margin declined -370 bps y/y, largely as a result of significant headwinds from freight and operational waste (-$48 mn y/y), operating performance (-$39 mn), and pricing headwinds in excess of purchase savings (i.e., net material margin performance, of -$21 mn).

### C. The Goodwill Impairment Charge Recorded in the Second Quarter of Fiscal 2018 Was a Triggering Event that Required Testing of Other Assets

#### 1. Adient Assured Investors that SS&M's Reported Long-Lived Assets Had Survived Recoverability Analyses

227. Adient's SS&M segment reportedly possessed total assets with a value of $2.1 billion as of September 30, 2017.[24] As described below, a significant percentage of the segment's assets were in the form of long-lived assets, specifically, property, plant, and equipment.

228. Adient reported property, plant, and equipment at cost and depreciated the assets over their estimated useful lives.[25] GAAP requires Adient to review the carrying value of its long-lived assets, including property, plant, and equipment for impairment if events or changes in circumstances indicate that the carrying value may not be recoverable. (ASC 360-10-35-21).

229. GAAP identifies triggering events that require testing of the reported value of long-lived assets to validate the ongoing recoverability of such assets. The test is simple: Is the expected cash flow from the use or disposition of the asset less than the reported value of the asset? (ASC 360-10-35-17). If the expected cash flow is less than the reported value of the long-

---

[24] 2018 10-K, p.103.

[25] 2018 10-K, p.64.

lived asset, GAAP requires that a loss be recorded to recognize such a decrease in value. *(Id.)* For example, if a production plant has a carrying value of $10 million, but a revised operating plan is implemented that calls for a reduction in production at the plant, the carrying value should be tested to assess whether the expected value of production exceeds $10 million. This was the exact situation in Adient's SS&M business when, in the second quarter of fiscal 2018, Adient reported that it would significantly shrink the size of that business.

230. In both its fourth quarter of fiscal 2017 and first quarter of fiscal 2018 earnings calls, Adient reported "near-term headwinds" that threatened its business performance.[26] Indeed, for purposes of reporting earnings for the first quarter of fiscal 2018, Adient anticipated that SS&M earnings (adjusted EBIT) would remain negative throughout the remainder of fiscal 2018.[27]

231. The problems confronting Adient's SS&M business persisted in the second quarter of fiscal 2018. For example, during the May 3, 2018 earnings call, Adient reported "…the headwinds within SS&M combined with weakness in Interiors…had a significant impact on our results." Moreover, Stafeil stated: "[W]e continue to face operational and execution challenges, primarily in our Seat Structures & Mechanisms business."

232. As described herein, Adient recorded a $299 million impairment charge to the reported value of goodwill in its SS&M segment in the second quarter of 2018. Also, at that time, Adient reported:

> The goodwill impairment charge represented a triggering event for additional impairment considerations of other long-lived assets, including an analysis of the recoverability of long-lived assets as of March 31, 2018. **No further impairments were identified.**

---

[26] 4Q17 Earnings Presentation, p.10; 1Q18 Earnings Presentation, p.8.
[27] 1Q18 Earnings Presentation, p.16.

233. Consequently, Adient provided assurances to investors that goodwill was the only asset that required an impairment charge as of the second quarter of fiscal 2018. In other words, Adient provided assurances that the reported value of long-lived assets was fully recoverable.

**2. Adient's Assurances Regarding the Recoverability of Reported Long-Lived Assets Were Based on False Representations of a Forthcoming SS&M Turnaround**

234. Adient's basis to avoid additional impairment charges in the second quarter of fiscal 2018 was a purported "significant improvement" expected in its SS&M business. In contrast to its outlook of losses in Q2 '18 – Q4 '18, on May 3, 2018, in connection with the announcement of its financial result for Q2 '18, Adient claimed that SS&M would recover from then-current losses to generate earnings in each of the two remaining quarters of fiscal 2018.[28] Adient adopted this improbable forecast even as it acknowledged the SS&M business was a "very difficult business to forecast at the moment."[29]

235. Adient's projection of significant improvement in SS&M occurred at the same time Adient management acknowledged that "what went wrong" to require the SS&M business to record a goodwill impairment charge was reliance on overly optimistic assumptions: "[W]e've had a number of questions around what went wrong. The simple answer is a number of actions were put in place -- put into motion based on anticipated market factors' planning assumptions at that time. Many of these assumptions, including the pursuit of growth and the ability to manage the change in this business, with the benefit of hindsight were clearly overly optimistic."[30] Instead of correcting this identified issue whereby management relied on aggressive, but

---

[28] 2Q18 Earnings Presentation, p.7.
[29] 5/3/18 Earnings Tr., p. 8.
[30] 5/3/18 Earnings Tr., p. 4.

undeliverable, profitability forecasts, Adient doubled-down by promising improved profits on the immediate horizon in SS&M.

236. Investor concern was assuaged by the fact that Adient maintained its full year fiscal 2018 guidance including guidance for revenue and adjusted EBIT.[31] For example, following the May 3, 2018 announcement, securities analysts stated that, "Fortunately, SS&M headwinds have bottomed, and good steps are being taken to reverse course."[32]

### 3. The Fourth Quarter of Fiscal 2018 Impairment Charges Were Premised on the Same Logic Underlying the Second Quarter of Fiscal 2018 Impairment Charges

237. On November 9, 2018, Adient announced earnings for the fourth quarter of fiscal 2018. Adient acknowledged that, "fourth quarter results were significantly impacted by continued headwinds." In fact, these headwinds had never dissipated. As was reasonably expected by at least the second quarter of fiscal 2018, those "continued headwinds" caused a reduction to Adient's projected cash flow from the SS&M business and a corresponding impairment charge to property, plant, and equipment.

238. The $787 million long-lived assets impairment charge recorded in the fourth quarter of fiscal 2018 erased more than one-third of SS&M's total assets and wiped out one-third of Adient's total property, plant, and equipment.[33] Substantially all of the charge (98%) related to SS&M property, plant and equipment in North America and Europe.[34]

239. As in the second quarter of fiscal 2018, Adient characterized the impairment charge as an item that was "onetime in nature" that "skewed trends in our core operating

[31] JP Morgan, 5/4/18.
[32] Barclays, 5/7/18.
[33] 2018 10-K, pp.103-104.
[34] 2018 10-K, pp.92 and 99.

performance."[35] Despite Adient's claim that the long-lived asset impairment charges were "onetime in nature," Stafeil acknowledged that the SS&M charges were "driven by . . . ongoing performance issues that are expected to persist . . . into the foreseeable future." [36]

240. In fact, Stafeil attributed the "business performance issues" to additional "difficult launches." In Stafeil's words, "the burden associated with launches prevented the operations from achieving the required level efficiencies to make the business equation whole." In other words, the launch issues that had plagued Adient throughout the Class Period (and even before the Class Period) were repeated, unsurprisingly, in the fourth quarter of fiscal 2018.

241. Stafeil also pointed to macro-economic factors underlying the fourth quarter of fiscal 2018 performance, including rising freight costs, increased steel prices and the impact of tariffs. These same factors, however, were well known to Adient in the second quarter of fiscal 2018, when Adient purportedly tested, but failed to identify, any further asset impairments.

242. For example, when Adient reported that SS&M experienced negative EBITDA of $34 million for the second quarter of fiscal 2018 results, Stafeil identified the driver of these results as "a significant drop in operating performance of approximately $61 million."[37] Specifically, Stafeil identified launch inefficiencies from premium freight and commodity inflation. Stafeil also stated, "Unfortunately, there are a number of downward pressures that have intensified over the course of the quarter, specifically commodities, both steel and foam-related chemicals, rising freight cost and uncertainty related to trade."[38] Ultimately, Stafeil acknowledged, "Bottom line. Despite the company's effort to mitigate these challenges, the

---

[35] 11/9/18 Earnings Tr., p. 3.
[36] *Id.,* p. 4; 4Q18 Earnings Presentation, p.8.
[37] 5/3/18 Earnings Tr., p 8.
[38] 5/3/18 Earnings Tr., p. 9.

intensified macro headwinds are placing downward pressure on earnings, resulting in a very challenging environment, especially when combined with some of our operating challenges."

243. However, the factors culminating in the impairment charge in the fourth quarter of fiscal 2018 were already present at least by the second quarter of fiscal 2018 when Adient reported that it had tested for such impairment charges, but affirmatively reported to investors that further charges were not necessary. Instead, what really happened in the second quarter of fiscal 2018 was that Defendants devised an "improved" (but highly unlikely) forecast for Adient's SS&M business to falsely reassure investors that growth was expected in its SS&M business. If Adient had, in one-period, recorded impairment charges not only to goodwill, but also to long-lived assets and deferred tax assets, it would have been evident to investors that growth was not on the horizon for SS&M. But, as seen only six months later, the hoped-for turnaround forecast for SS&M used in the second quarter of fiscal 2018 was nothing more than a mirage.

244. Stafeil confirmed this reality during the fourth quarter of fiscal 2018 earnings call when he concluded, "it's clear the challenges faced in 2018, both company-specific and macro, will continue to impact our results in 2019."[39] Moreover, Stafeil acknowledged the ongoing use of optimistic projections, "some of the expectations that the group have on the performance of [SS&M], were a bit optimistic or proved to be a bit optimistic, based on the experience that they had. So I'd say it was more launch-related and season of launches as they went into some fairly difficult ones, primarily in Europe this time."[40]

---

[39] 11/9/18 Earnings Tr., p. 7.

[40] 11/9/18 Earnings Tr., p. 12.

245. Indeed, the $34 million loss reported by SS&M for the fourth quarter of fiscal 2018 closely mirrored the loss outlook for that quarter reported by management to investors following the first quarter of fiscal 2018. Consequently, Adient's revisionary forecast used in the second quarter of fiscal 2018 had only one purpose: forestall the incurrence of further impairments. In adopting that forecast for purposes of assessing whether further impairment charges were necessary in the second quarter of fiscal 2018, Adient failed to apply a fundamental tenant of GAAP. Specifically, GAAP requires the use of reasonable assumptions to estimate expected cash flow. (ASC 360-10-35-30).

246. Critically, the fourth quarter fiscal 2018 long-lived asset charge was the outcome of the exact same impairment test that Adient purported to use in the second quarter of fiscal 2018.[41] The result of the impairment charge was that Adient wrote-down the value of SS&M long-lived assets to "the values reflected by their cash flow." However, that write-down should have been disclosed to investors by at least the second quarter of fiscal 2018.

**4. Adient Also Falsely Assured Investors that Reported Deferred Tax Assets Had Survived Recoverability Analyses in the Second Quarter of Fiscal 2018**

247. Adient reported deferred tax assets[42] of $1.0 billion as of September 30, 2017.[43]

248. GAAP provides "a basic requirement to reduce the measurement of deferred tax assets not expected to be realized." (ASC 740-10-30-16). Specifically, a valuation allowance is required when it is more likely than not that some portion of the deferred tax assets will not be realized. (ASC 740-10-30-4). GAAP further specifies that all available evidence, both positive

---

[41] 2018 10-K, p.48.

[42] A deferred tax asset is an asset on a company's balance sheet that may be used to reduce its taxable income.

[43] 2018 10-K, p. 95.

and negative, shall be considered to evaluate whether a valuation allowance for deferred tax assets is needed. (ASC 740-10-30-17).

249. GAAP identifies instances where negative evidence exists that strongly supports the recognition of a deferred tax valuation allowance. (ASC 740-10-30-21). Examples of negative evidence include: 1) cumulative losses in recent years and 2) unsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years. (*Id.*)

250. Adient claimed to review the realizability of its deferred tax assets at least quarterly. Adient did not, however, record a valuation allowance related to the performance of its SS&M business in the second quarter of fiscal 2018.[44]

251. A principal consideration in Adient's evaluation of the need for a valuation allowance was the projected performance of its SS&M business. Thus, here again, the temporary upward revision of the forecast for SS&M in the second quarter of fiscal 2018 allowed Adient to avoid related valuation allowances at that time.

252. It is generally accepted that a history of losses provides objective evidence of the need for a valuation allowance that defeats the subjective evidence of a hoped-for turnaround. For example, Adient's outside auditor, PricewaterhouseCoopers ("PwC"), observed in its 2018 income tax accounting guidance that: "A projection of future taxable income is inherently subjective and therefore carries less weight than the objective evidence presented by cumulative losses in recent years. As such, projected future taxable income, absent a history of strong core

---

[44] 10-Q dated 5/7/18, p.22.

earnings, generally will not be sufficient to overcome negative evidence that includes cumulative losses in recent years."[45]

253. Ultimately, on November 9, 2018, Adient disclosed that valuation allowances would be required to reduce the previously reported value of deferred tax assets. During the fourth quarter of fiscal 2018 earnings call, Stafeil further acknowledged that the deferred tax asset impairment was based on a "history of earnings in certain geographic regions and forecasts of future earnings." Specifically, as a result of Adient's poor earnings history and an absence of an expected turnaround, "the company would be unlikely to realize the benefit of certain deferred tax assets, thus, resulting in the recording of valuation allowances."

254. These factors were persuasive evidence of the deteriorating conditions in the SS&M business at that time and are exactly the type of objective evidence identified in GAAP and PwC's accounting guidance that Defendants should have followed in the second quarter of fiscal 2018.

255. On November 29, 2018, Adient disclosed that the valuation allowances against its deferred tax assets in Germany, Hungary, Mexico, Poland, Romania, and the U.S. were attributable to the adverse performance of the SS&M business and resulting long-lived asset impairment.[46] The valuation allowances recorded in these jurisdictions totaled $604 million.[47]

256. As with the delayed impairment charges to long-lived assets, Adient failed to record these valuation allowances in the second quarter of fiscal 2018 only by creating a false forecast for its SS&M business. The valuation allowances recorded in the fourth quarter of fiscal 2018 simply reflected the realities of the SS&M business already apparent two quarters earlier.

---

[45] PwC "Income Taxes" §5.7.1.
[46] 2018 10-K, p.37.
[47] *Id.*

**D. Adient Violated Item 303(a)(1)-(3) of Regulation S-K by Failing to Disclose Known Trends and Uncertainties**

257. Adient's annual and quarterly reports filed with the SEC are subject to the disclosure requirements of, among other things, Item 303 of Regulation S-K which requires companies to disclose in their annual and quarterly SEC filings, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

258. Similarly, the regulation requires companies to disclose events that the registrant knows will "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. § 229.303(a)(3)(i)&(ii).

259. On May 18, 1989, the SEC issued an interpretive release concerning registrants' disclosure obligations under Item 303 (the "1989 Release"). The 1989 Release states:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

260. The purpose of the MD&A discussion, according to the SEC, is to provide investors information "necessary to an understanding of a [company's] financial condition,

changes in financial condition and results of operations." In particular, there are three principal objectives of the MD&A: (i) to provide an explanation of a company's financial statements that enables investors to see the company through management's eyes; (ii) to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (iii) to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can judge the extent to which past performance predicts future performance.

261. In violation of Item 303, Adient's SEC filings during the Class Period[48] failed to disclose known trends that were reasonably likely to—and did—have a material impact on Adient's financial results including material known adverse facts and trends in Adient's core SS&M/Metals business, including that the SS&M/Metals business was facing severe operational challenges including increased costs and delays due, in part, to failure to follow Company polices and too much emphasis on growth, insufficient qualified personnel, operational inefficiencies, and other launch problems, which significantly increased customer chargebacks and decreased profitability on Adient's automotive seating contracts and made a 200 basis point margin expansion unachievable.

262. In light of the above, Item 303 required Adient to disclose in its SEC filings, among other things, material facts concerning the negative trends that were ongoing in the SS&M business, the extent of Adient's (increasing) exposure in the SS&M market, and the manner and extent to which these negative trends were expected to negatively impact Adient's

[48] Adient's SEC filings during the Class Period include its: (i) Form 10-K, filed November 29, 2016; (ii) Form 10-Q, filed February 8, 2017; (iii) Form 10-Q, filed May 1, 2017; (iv) Form 10-Q, filed July 31, 2017; (v) Form 10-K, filed November 22, 2017; (vi) Form 10-Q, filed January 30, 2018; (vii) Form 10-Q, filed May 7, 2018; and (viii) Form 10-Q, filed July 30, 2018.

financial results and cash position. Adient violated Item 303 throughout the Class Period by failing to provide investors with any meaningful disclosures concerning the negative developments in its SS&M business and the risks or uncertainties created by such trends.

**E. False SOX Certifications**

263. Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants McDonald and Stafeil signed certifications appearing in Adient's mandatory periodic filings with the SEC throughout the Class Period, stating that they had evaluated Adient's internal controls and disclosed in Adient's Class Period SEC filing all issues that were "reasonably likely to materially affect [Adient's] internal control over financial reporting." Defendants McDonald and Stafeil signed these certifications in connection with Adient's:

(a) Form 10-K, filed November 29, 2016;

(b) Form 10-Q, filed February 8, 2017;

(c) Form 10-Q, filed May 1, 2017;

(d) Form 10-Q, filed July 31, 2017;

(e) Form 10-K, filed November 22, 2017;

(f) Form 10-Q, filed January 30, 2018;

(g) Form 10-Q, filed May 7, 2018; and

(h) Form 10-Q, filed July 30, 2018.[49]

264. Specifically, Defendants McDonald and Stafeil falsely certified for each report listed above that they:

> (c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and

---

[49] Frederick Henderson certified the Form 10-Q filed July 30, 2018 as McDonald was no longer Adient's CEO.

> procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting[.]

## VI. POST-CLASS PERIOD EVENTS

265. On November 29, 2018, Adient filed its Annual Report on Form 10-K for the fourth fiscal quarter and year ended September 30, 2018 ("2018 10-K"). The 2018 10-K provided the first disclosure to investors of the size of the SS&M business relative to the Company's total assets. **The magnitude of the impairment was enormous**. On a pre-tax basis, the 4Q18 impairment totaled $787 million.[50] The impairment related to assets in use in North America and Europe. Of this total, $768 million related to plant, property, and equipment ("PPE") and the remaining $19 million related to impaired customer relationships. All of the impairment was recorded in the SS&M segment.[51] The 4Q18 impairment charges to PPE were driven by a reduction in expected utilization. While SS&M's total assets were reportedly $2.1 billion as of September 30, 2017 (end of fiscal 2017), after the impairment charges, SS&M's total assets were only $1.4 billion as of September 30, 2018 (end of fiscal 2018).[52] **Thus, the 4Q18 impairment charges wiped out over one third of SS&M's total assets. Additionally, the impairment charge wiped out approximately one third of Adient's total long-lived assets.**[53] Adient also disclosed that the valuation allowances against its deferred tax assets in

---

[50] 2018 10-K, p.92.
[51] 2018 10-K, p.99.
[52] 2018 10-K, p.103.
[53] 2018 10-K, p.104.

Germany, Hungary, Mexico, Poland, Romania, and the U.S. were each adversely impacted by the SS&M performance issues and resulting long-lived asset impairment.[54] The valuation allowances recorded in these jurisdictions totaled $604 million.

266. Adient described its fiscal 2018 results and the impairments taken in the quarter as follows:

> Net loss attributable to Adient was $1,685 million for fiscal 2018, compared to $877 million of net income attributable to Adient for fiscal 2017. The net loss for fiscal 2018 is primarily attributable to overall lower profitability within Seating, SS&M and at YFAI along with $881 million of current year net-of-tax impairment charges in the SS&M business ($602 million related to long-lived assets and $279 million related to goodwill) . . . .
>
> * * *
>
> Fiscal 2018 restructuring costs and impairment charges includes a $1,086 million of non-cash pre-tax charges in the SS&M business ($787 million relates to long-lived assets and $299 million relates to goodwill), a $358 million non-cash pre-tax impairment charge of the YFAI investment, a $49 million non-cash pre-tax impairment charge related to assets held for sale and a $46 million qualified restructuring charge. . . . One-time tax expense items in fiscal 2018 primarily relate to establishing valuation allowances of $555 million and the impact of U.S. tax reform of $210 million.
>
> * * *
>
> In fiscal 2018, Adient concluded it had triggering events requiring assessment of impairment for the SS&M long-lived assets. As a result, Adient reviewed the long-lived assets for impairment and recorded a $787 million impairment charge within restructuring and impairment costs on the consolidated statements of income (loss). The impairment charge related to long-lived assets that were in use in North America and Europe asset groups as of September 30, 2018 in support of current programs. The impairment was measured, depending on the asset, either under an income approach utilizing forecasted discounted cash flows or a market approach utilizing appraisal techniques to determine fair values of

[54] 2018 10-K, p.37.

> the impaired assets. These methods are consistent with the methods Adient employed in prior periods to value other long-lived assets.
>
> * * *
>
> ***Restructuring and Impairment Costs***
>
> Restructuring and impairment charges during fiscal 2018 are attributable to a $787 million long-lived asset impairment charge and a $299 million goodwill impairment charge within SS&M, a $49 million assets held for sale impairment charge and a $46 million restructuring charge.
>
> * * *
>
> As a result of Adient's fiscal 2018 analysis of the realizability of its worldwide deferred tax assets, and after considering tax planning initiatives and other positive and negative evidence (including the SS&M long-lived asset impairment recorded in the fourth quarter of fiscal 2018), Adient determined that it was more likely than not that deferred tax assets within the following jurisdictions would not be realized and recorded net valuation allowances as income tax expense in the fourth quarter of fiscal 2018: Belgium ( $12 million ), Canada ( $6 million ), Germany ( $175 million ), Hungary ( $14 million ), Mexico ( $117 million ), Poland ( $8 million ), Romania ( $9 million ), and the U.S. ( $281 million ). Germany, Hungary, Mexico, Poland, Romania, and the U.S. cumulative loss positions **were all adversely impacted by the SS&M performance issues and resulting long-lived asset impairment**.

267. On January 16, 2019, Adient presented at the Deutsche Bank Global Auto Industry Conference. New CEO Del Grosso admitted that in 2018, “execution and launch management and commercial recovery . . . really deteriorated our performance.” These issues included excess labor, overtime, premium freight, disruption with customers and charge backs with the customers which decreased profitability on contracts. Del Grosso also announced that the Company was trying to change the “mindset” at Adient, including changing short-term incentive compensation, away from growth and to profitability and cash generation.

268. On February 7, 2019, before the market opened, Adient filed a report on Form 8-K announcing the Company's fiscal first-quarter 2019 financial results. Adient earned $0.31 per share, pro forma, versus Wall Street's expectation of $0.48. Q1 19 sales of $4.16 billion fell just short of the Street consensus of $4.17 billion. As for the remainder of fiscal 2019, Adient gave new guidance, estimating that full-year sales would come in between $16.5 billion to $16.7 billion. According to analysts, this suggested that sales would weaken further as the year progressed, ending up approximately 5% below 2018 levels, and adjusted EBITD was expected to "decline vs. FY18." CEO Del Grosso conceded: "2019 will continue to experience the negative impact of launch related headwinds in both Seating and SS&M" and "**[t]he performance headwinds are rooted in significant operational challenges, primarily launch related, reduced focus on core business, too much emphasis on growth, which also has contributed to undisciplined commercial decisions**." Del Grosso also admitted: "Although the segment is important to our overall business. . . **[f]or too long, the segment has been a cash drain on the company**." The Company also reiterated that the scale-down of the SS&M segment would take at least another year to complete. On this news, the Company's stock fell from $21.33 per share on February 6 to $17.98 per share, or a drop of $3.35 per share, ***or 15.7%.***

## VII. ADDITIONAL SCIENTER ALLEGATIONS

269. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt or access to information reflecting the true facts

regarding Adient, their control over, or receipt, or modification of Adient's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

270. Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least, the reckless disregard, of Adient personnel at the highest levels of the Company.

271. The following allegations all support a strong inference of scienter:

(a) McDonald's Class Period stock sales were highly suspicious in timing and amount;

(b) Margin growth in the SS&M business was extremely important to the Company's success post spin-off and Defendants spoke frequently about how this growth would fuel the Company's margin expansion plans;

(c) Statements by former Adient employees corroborate that Defendants knew or were reckless in not knowing that the Company's margin growth was not achievable given the persistent and deteriorating issues in the SS&M business;

(d) McDonald's abrupt ouster as CEO near the end of the Class Period;

(e) The Company admitted that senior management, including the Individual Defendants, closely tracked the problems with the SS&M business and were at least reckless in setting guidance for the Company; and

(f) The fact that the Individual Defendants' compensation was closely tied to the Company's top-line growth.

### A. Insider Stock Sales by CEO McDonald During The Class Period Were Highly Unusual And Suspicious In Timing and Amount

272. McDonald engaged in stock sales during the Class Period that were suspicious in timing and amount. As a result of these Class Period trades, McDonald profited from the artificial inflation embedded in the trading price of Adient stock caused by Defendants' false and misleading statements and omissions to investors during the Class Period.

273. McDonald's sales of Adient stock were highly unusual and suspicious as measured by: (i) the proceeds from Adient stock sales; and (ii) the timing of those sales. Such sales therefore raise a strong inference of scienter.

274. To evaluate the insider selling activity, Lead Plaintiff used the publicly-available trading data that the Individual Defendants are required to report to the SEC on Form 4. Plaintiff analyzed the trading by the Individual Defendants during the Class Period and during the equal-length period immediately preceding the Class Period beginning March 22, 2015 and ending October 30, 2016 (the "Control Period"). The Forms 4 filed during the Class Period and Control Period are hereby incorporated by reference, and a summary of the relevant sales of Adient stock during the Class Period are set forth below.

275. Because Adient spun off from Johnson Controls on the first day of the Class Period, Lead Plaintiff compared McDonald's trading in Adient stock during the Class Period with his trading in Johnson Controls stock during the Control Period. ***McDonald has no reported sales in Johnson Controls stock during the Control Period***.

276. To analyze McDonald's stock sales, Lead Plaintiff calculated the total sales together with the cash proceeds from such sales, during the Control and Class Periods. Those totals were then compared to identify whether sales during the Class Period were consistent with sales during the Control Period. McDonald's specific trading dates also were evaluated

compared to the disclosure dates. These analyses reveal that McDonald's Class Period stock sales were large, unusual, and highly suspicious in timing.

**McDonald's Stock Sales During the Class Period**

| Filer Name | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|
| McDonald (R Bruce) | 4,607 | Sale | $68.67 | $316,362.69 | 22-Aug-17 |
| McDonald (R Bruce) | 30,690 | Sale | $77.85 | $2,389,216.50 | 27-Nov-17 |
| McDonald (R Bruce) | 15,708 | Sale | $78.17 | $1,227,894.36 | 28-Nov-17 |
| McDonald (R Bruce) | 700 | Sale | $80.26 | $56,182.00 | 28-Nov-17 |
| McDonald (R Bruce) | 20,659 | Sale | $79.61 | $1,644,662.99 | 28-Nov-17 |
| **Total Sales** | **72,364** | | | **$5,634,318.54** | |

### 1. The Proceeds from Adient Stock Sales During the Class Period by the CEO and General Counsel Were Highly Suspicious In Amount

277. The proceeds from Adient shares sold during the Class Period by McDonald were large. Defendant McDonald sold 72,364 shares of Adient stock during the Class Period for proceeds of **$5,634,318.54**.

### 2. The Timing of McDonald's Stock Sales Was Highly Suspicious

278. McDonald's Class Period sales of Adient stock were suspiciously timed in that he sold a substantial number of shares after learning of materially non-public information about the launch problems at SS&M, but before the public disclosure of the full extent of those problems in and restructuring of the SS&M segment.

279. Specifically, McDonald unloaded an unusual quantity of Adient stock between the first partial disclosure (November 2, 2017) and the second partial disclosure (January 17, 2018).

(a) On November 2, 2017, the Company announced its financial results for Q4 '17 and disclosed that it had experienced "launch challenges" in its SS&M business. Despite disclosing that the launch challenges were expected to continue into the beginning of 2018,

McDonald falsely assured investors that the launch challenges were directly related to one time occurrences such as hurricanes, flooding (in Houston), earthquakes (in Mexico City), and last minute customer change orders. Moreover, Defendants falsely represented that Adient was already ahead of these challenges and was "***solidly on track***" for delivering on the Company's "midterm financial commitment" and was "***well on our way to achieve 200 basis points of margin expansion that we've committed to achieve.***" This news caused Adient's stock price to fall approximately 4.5% to close at $81.08 per share on November 2, 2017.

(i) On November 27, 2017 and November 28, 2017, approximately twenty-five days after the Company's Q4'17 earnings were reported and management announced that: "***increased revenue, earnings and cash flow are expected in FY18***," McDonald sold Adient stock for a combined $5.3 million in proceeds. At the time these transactions took place, Adient's shares were trading between $77 and $79 per share.

(b) On January 17, 2018, approximately 12 days before Adient reported Q1'18 earnings, it revealed additional headwinds in its SS&M business at a Deutsche Bank Auto Industry Conference. Because of these challenges, management lowered expectations for Q1'18. Weeks later, on January 29, 2018, the Company reported earnings for the Q1'18 ended December 31, 2017. It was during this call that management first lowered its 2018 full-year guidance due to continued headwinds in its SS&M business segment.

### 3. The Presence of 10b5-1 Trading Plans Does Not Absolve McDonald of Liability

280. Rule 10b5-1, 17 C.F.R. § 240.10b5-1 provides that a person will be deemed to have traded "on the basis of" material nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade. To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims

for trades made pursuant to a binding agreement or plan ("10b5-1 Plans" or "Plans"). *See Selective Disclosure and Insider Trading,* 65 Fed. Reg. 51,716, 51,727-28 (Aug. 24, 2000). Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability **only** if it is entered into by an insider "**[b]efore becoming aware**" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

281. Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomson Reuters, *Corporate Counsel's Guide to Insider Trading & Reporting,* Ch. 12:26 (2018). Conversely, the adoption and/or modification of these Plans while in possession of material non-public information is highly suspicious and supports a strong inference of scienter.

282. Further, although some of McDonald's stock sales may have been made pursuant to 10b5-1 Plans, the circumstances of those sales are sufficiently suspicious to overwhelm any exculpatory inference that might otherwise have been available to pre-planned sales based on such Plans. Indeed, even if McDonald had entered into 10b5-1 Plans prior to the Class Period and traded within those same plans throughout the Class Period, such plans are under heavy SEC scrutiny in light of a *Wall Street Journal* investigation that found that insiders who were trading pursuant to 10b5-1 Plans were still trading at opportune times and reaping better-than-expected results. According to a November 28, 2012 *Wall Street Journal* article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 Plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

283. Accordingly, McDonald's trading behavior during the Class Period raises a strong inference of suspicious and unusual trading activity and his trading plan does not provide him with a safe harbor.

### B. Margin Growth In The SS&M Business Was Extremely Important To The Company's Success Post Spin-Off and Defendants Spoke of it Frequently

284. During the Class Period, Adient's Seating Segment (of which SS&M was a part of until May 3, 2018) generated almost all of the Company's revenue.

285. Prior to and during the Class Period, Defendants boasted that the 200 basis point margin expansion would be achieved, in large part, from improvement and growth specifically in the SS&M/Metals segment. Indeed, Defendants represented to investors that SS&M/Metals would be the "***biggest driver***" of margin growth.

286. For example, on September 15, 2016, Defendants stated:

> • the Company's "metals operations . . . drives a significant amount of margin expansion opportunity for us";
>
> • "the metals improvement opportunity, that will benefit this";
>
> • "we see really a 1% to 2% opportunity to increase Adient's total margin with tackling some of the issues in that metals business."

287. That same day, EVP Byron Foster stated: "we'll continue to see great improvement in this business and continue to drive our leading position in the industry in the metals and mechanisms business."

288. On November 8, 2016, McDonald stated: "[W]e're very comfortable with the plan that we have to improve metals." That same day, Stafeil stated: "[W]e do see a big improvement in metals" and "We've mentioned we have some mega launches going on in the metals business. That's going to be the biggest driver. That will start to really impact our results, in 2017 a little bit but in 2018 and 2019 more specifically."

289. On January 11, 2017, Stafeil stated: "We will benefit from our margin drive, our reduction in SG&A, our improvement of the metals business" and McDonald boasted: "we will see steady improvements from metals over the next couple of years."

290. On April 28, 2017, McDonald stated: "A lot of that financial performance of our metals business has been tied up in introducing a couple of really big programs. And as that business continues to improve -- and in the quarter it did better than it had last year -- we are starting to see the accretive margin impact of launching those next-generation products into the market."

291. On July 27, 2017, Stafeil stated: "the metals business is continuing to execute towards the 2019 margin expansion target."

292. On August 8, 2017, McDonald stated: "We start to see a big bump up in our margins as real metals performance."

293. Given the multitude of statements concerning improvement and margin growth in the SS&M/Metals segment during the Class Period, as well as the size and importance of the SS&M segment to the Company, generally, it is unreasonable to think that the Individual Defendants, both of whom were also responsible for generating, tracking, or reporting revenue by segment, would be unaware of the financial significance and performance of the SS&M segment.

294. Given the critical importance of improvement in the SS&M segment to Adient's overall business and projected growth, the problems detailed herein could not have occurred without the Individual Defendants' knowledge and approval.

### C. Statements By Former Adient Employees Corroborate That Defendants Knew Or Were Reckless In Not Knowing That The Company's Margin Growth Was Not Achievable Given The Persistent and Deteriorating Issues In The SS&M Business

295. The CWs make clear that Defendants' false and misleading statements were not simply a mistake or mismanagement; but rather that the Defendants knew or recklessly disregarded that the Company's 200 basis point margin expansion was not achievable due to serious operational and launch issues in its SS&M segment that existed at the beginning of the Class Period and persisted throughout the Class Period.

296. Indeed, the CWs confirm that:

> • Due to lack of staffing (limited hiring and layoffs) before the Class Period, Adient did not have sufficient qualified personnel to successfully launch its programs in 2017. ¶¶ 49-83. This included a lack of resources specifically related to engineering and manufacturing. ¶¶72-78.
>
> • The lack of qualified personnel was a persistent topic in weekly/bi-weekly Program Review Meetings where new launches and the lack of qualified personnel to work on the various launches was discussed. Program Review Meetings were regularly attended by the program managers and sometimes attended by more senior executives including Paul Lambert and Byron Foster (¶¶72-78), Adient Executive Vice Presidents ("EVPs") who reported to CEO McDonald.
>
> • CEO McDonald and EVP Eric Mitchell were informed during Profit Plan Reviews and Budget Review Meetings that Adient needed to properly staff the various programs in order to have successful launches. But McDonald and Mitchell would not approve additions to Adient's headcount. Similar headcount issues were discussed at Operational Meetings attended by Mitchell (McDonald's direct report). ¶¶49-63.
>
> • The top executives at Adient, including the majority of executives at the VP and EVP level, had limited or no operational or manufacturing experience and failed to act on the repeated warnings of lower level employees with operational experience who raised "red flags" about the Metals business and the upcoming launches. ¶¶49-63.

• Adient was not achieving the vertical integrations, desired conversion rates, reduced manufacturing costs, and increased efficiencies and uptimes needed (at the plant level) necessary to achieve the 200 basis point margin expansion. ¶¶49-63.

• In November 2016, internal data indicated that Adient had launch challenges in North America and Europe. ¶¶64-71.

• Adient's problems at the plant level forced the Company to use expensive means to move parts around the country faster. Increased costs included outside consultants and sub-suppliers, premium freight costs (to fly parts between Adient plants and to customers), and additional expediting costs. ¶¶49-63; 72-78.

• Because Adient could not meet its deadlines within the first few months of launch, problems went from bad to worse quickly. ¶¶49-63.

• Delays at the plant level could not be ameliorated and, in fact, got worse during the Class Period. ¶¶84-88.

• Throughout 2017, there were escalating concerns about costs and its impact in SS&M/Metals. ¶¶64-71; 79-83. Executive Management received reports which detailed launch programs, cost overruns and delays. ¶¶72-78.

• These increased costs also were presented to executive management (including CEO McDonald, CFO Jeff Stafeil and EVPs Mitchell and Foster) during monthly Operational Review Meetings which CW-2 attended. ¶¶64-71.

• Project launch issues also were discussed in ad-hoc "Red Flag Meetings." ¶¶72-78.

• The problems in the Metals group that were disclosed by the Company beginning in late 2017 were problems that were percolating for years and did not happen "all of sudden" or overnight. ¶¶79-83.

### D. McDonald's Abrupt Ouster as CEO Near The End Of The Class Period Provides Strong Evidence Of Scienter

297. On June 11, 2018, *without any succession plan in place,* Adient abruptly disclosed that Defendant McDonald had "retired" from his role as Chairman and CEO effective immediately. According to the announcement: "Bruce and the Board agree that now is the right

time for a new leader with a fresh perspective to drive value in the next phase of Adient's life as a public company. " That same day, the Company also slashed earnings guidance look for fiscal 2018 stating: "Continued challenges impacting the Seat Structures & Mechanisms segment drove approximately half of the shortfall versus previous expectations while weakness in the company's Seating segment and Interiors drove the remainder." This news drove the price of Adient shares down $8.88, or about 15.6%, to close at $48.10 that day.

298. On June 11, 2018, Colin Langan of UBS issued an analyst report on Adient entitled, "*Adient PLC - Turnaround Expert Takes the Helm*." In his report, Langan reported the following:

> **ADNT announces former GM CEO Fritz Henderson as interim CEO to drive turnaround**
>
> After a series of guidance cuts and several operational issues in its seating structures and mechanisms (SS&M) business, the move should quickly help improve management credibility. Henderson assumed the helm as interim CEO at GM during the bailout period and was generally viewed positively for his role in the turnaround. Unfortunately this news comes with another guidance cut.

299. The abrupt nature of McDonald's departure, in connection with the Company's reduced guidance for the third fiscal quarter ended June 30, 2018, provides additional evidence of scienter.

### E. The Company Admitted that Senior Management, Including the Individual Defendants, Closely Tracked the Problems in the SS&M Segment And Were At Least Reckless in Setting Guidance for the Company

300. On July 26, 2018, in connection with the ouster of CEO McDonald and Adient's cut of its earnings guidance for fiscal 2018, interim CEO Henderson admitted that launch problems were due, in part, to the failure to follow internal Company policies:

> We have good processes. Processes existed for quite some time, but they're not always followed, not always followed either in their entirety or important parts of it. And in virtually all the cases

> where we've had flawed launches, we haven't followed the processes.

301. In connection with the announcement of the Company's third quarter fiscal 2018 results on July 26, 2018, interim CEO Henderson admitted that: "**Progress is being tracked at the highest levels of the organization, it has been for quite some time at the CEO level and with the board. So the focus on Seat Structures & Mechanisms continues within the company and it's very important for us**." This is an admission that Adient's Board of Directors and senior management, including McDonald, tracked problems at SS&M.

302. On November 9, 2018, new CEO Doug Del Grosso admitted that, "**we haven't been exactly spot-on with guidance**. . ." and Stafeil admitted "**some of the expectations that the [SS&M] group have on the performance of it, we're a bit optimistic or proved to be a bit optimistic**, **based on the experience that they had**." This is an admission that Defendants knew or were reckless in setting guidance for the Company.

303. On January 16, 2019, CEO Del Grosso admitted that in 2018, "execution and launch management and commercial recovery . . . really deteriorated our performance," in part, due to a "mindset" at Adient focused too heavily on top-line growth.

### F. The Fact That the Individual Defendants' Compensation Was Closely Tied To The Company's Topline Growth Provides Strong Evidence Of Scienter

304. McDonald and Stafeil also timed the disclosure of the deteriorating condition of and impairments required in the SS&M business to take full advantage of the Company's incentive compensation structure which was "***contingent on the achievement of predetermined performance goals***" to earn exorbitant cash bonuses and other perquisites for fiscal 2017 (10/1/16 – 9/30/17) before the fraud was fully disclosed.

305. The 2017 10-K described Adient's incentive compensation plan at the time to include the following:

> ***Stock-Based Compensation***
>
> Adient provides certain key employees equity awards in the form of performance share units (PSUs) and restricted stock units (RSUs) under the Adient plc 2016 Omnibus Incentive Plan (the Plan) and provides directors with share awards under the Adient plc 2016 Director Share Plan. These plans were adopted in conjunction with the separation.
>
> * * *
>
> ***Performance Share Awards***
>
> The Plan permits the grant of PSU awards. The number of PSUs granted is equal to the PSU award value divided by the closing price of a Adient ordinary share at the grant date. ***The PSUs are generally contingent on the achievement of predetermined performance goals over a three-year performance period as well as on the award holder's continuous employment until the vesting date***.
>
> * * *
>
> ***Stock Appreciation Rights* [*SARs*]**
>
> SARs vest under the same terms and conditions as stock option awards; however, they are settled in cash for the difference between the market price on the date of exercise and the exercise price. As a result, SARs are recorded in Adient's consolidated statements of financial position as a liability until the date of exercise. The fair value of each SAR award is estimated using a similar method described for stock options. The fair value of each SAR award is recalculated at the end of each reporting period and the liability and expense are adjusted based on the new fair value.

306. For fiscal 2017: (a) **McDonald earned $24.3 million including more than $17 million in stock awards and an $4.8 million cash bonus**; and (b) **Stafeil earned $5.6 million including $3.2 million in stock awards and a $1.4 million cash bonus**. Indeed, the value of McDonald's Stock Award and Bonus in fiscal 2017 were more than 60% higher than in fiscal 2016.

307. On January 16, 2019, new CEO Del Grosso announced that the Company was changing its short-term incentive compensation away from growth to profitability and cash generation likely due to the disincentives caused by the program during the Class Period.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

308. During the Class Period, as detailed herein, Adient and the Individual Defendants engaged in a course of conduct that artificially inflated or artificially maintained the price of Adient's securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired Adient's securities during the Class Period.

309. The misstatements and omissions regarding Adient's SS&M business concealed risks related to the seriously deteriorating condition of that segment and it was foreseeable that the value of Adient's securities would be adversely affected when the concealed risks materialized.

310. When the hidden risks materialized and became known to the market, the price of Adient's securities declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases and acquisitions of Adient's securities at artificially inflated prices during the Class Period, Plaintiff and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws). The price decline in Adient's securities was a foreseeable and direct result of the nature and extent of the materially false and misleading statements and omissions. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and the Class.

311. The concealed risks materialized through a series of disclosures beginning on November 2, 2017, before the market opened, with the release of the Company's fourth quarter results ended September 30, 2017 and concluding on November 9, 2018 with the announcement

of the Company's fourth quarter fiscal 2018 results in which Defendants announced Adient was suspending its dividend and confirmed that issues in SS&M were continuing to strongly impact the Company's margins in 2018 and would continue into 2019. The Company also announced a variety of impairments, the largest related to asset writedowns in SS&M.

(a) ***November 2, 2017 – First Partial Disclosure***

(i) The release of the Company's financial results for the fourth quarter and fiscal year ended September 30, 2017, *before the market opened,* was a partial disclosure in which the Company revealed that Adient had experienced launch challenges in the fourth quarter including purported weather-related issues, supply chain interruptions, and late design changes that were expect to continue in the beginning of 2018.

(ii) This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, caused Adient's stock price to fall from a close on November 1, 2017 of $84.93 per share to a close of $81.08 per share on November 2, 2017, a decline of $3.85 per share, **or 4.5%**. However, the Company's stock price remained artificially inflated after this announcement as Defendants failed to disclose the deteriorating condition in the SS&M segment.

(b) ***January 17, 2018 – Second Partial Disclosure***

(i) On January 17, 2018, Adient presented at the Deutsche Bank Global Auto Industry Conference. The Company posted the slide deck for the Deutsche Bank Global Auto Industry Conference presentation after market close the day before, on January 16, 2018. Among other things, the slide deck reported, "Headwinds impacting Seat Structures & Mechanisms (SS&M) have intensified" and "Previously identified headwinds impacting SS&M have intensified since Adient's fourth quarter earnings call... "

(ii) This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $5.10 per share, **or 6.2%**, on January 17, 2018. However, the Company's stock price remained artificially inflated after this partial disclosure.

(c) ***January 29, 2018 – Third Partial Disclosure***

(i) On January 29, 2018, *before the market opened*, during the earnings call for Adient's first quarter fiscal 2018 results, McDonald revealed that launch inefficiencies in SS&M were more problematic than in the fourth quarter of fiscal 2017, and that the 200 basis points of margin expansion, while still achievable, would require improvements and cost efficiencies in other segments.

(ii) The news of continuing problems in SS&M, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $5.53 per share, **or approximately 7.6%**, to close at $66.77 per share on January 29, 2018. However, the Company's stock price remained artificially inflated after this partial disclosure.

(d) ***May 3, 2018 – Fourth Partial Disclosure***

(i) On May 3, 2018, *before the market opened*, Adient reported second quarter fiscal 2018 financial results for the quarter ended March 31, 2018 in which Adient recorded a $299 million goodwill impairment charge related to the Company's SS&M segment. In connection with the discussion of the Company's results, McDonald revealed, for the first time, that the 200 basis points of margin expansion that Adient had set to achieve by 2020 was no longer achievable.

(ii) This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $6.14 per share, **or about 10%**, to close at $55.84 on May 3, 2018. However, the Company's stock price remained artificially inflated after this partial disclosure.

(e) ***June 11, 2018 – Fifth Partial Disclosure***

(i) On June 11, 2018, *before the market opened,* Adient revealed: (i) the abrupt ouster of CEO McDonald from his role as Chairman and CEO effective immediately; (ii) reduced earnings guidance for fiscal 2018, stating: "[c]ontinued challenges impacting the Seat Structures & Mechanisms segment drove approximately half of the shortfall versus previous expectations. . ."

(ii) This news, which was at least in part a materialization of the risk concealed by the Class Period misrepresentations and omissions alleged herein, drove the price of Adient shares down $8.88 per share, **or about 15.6%**, to close at $48.10 per share on June 11, 2018. However, the Company's stock price remained artificially inflated after this partial disclosure.

(f) ***November 9, 2018 – Sixth Partial Disclosure***

(i) The release of the Company's financial results for the fourth quarter ended September 30, 2018 on November 9, 2018, *before the market opened*, was a materialization of the risk in which the Company announced: (i) a variety of charges which significantly impacted Adient's Q4 GAAP results, the biggest of which was an asset impairment of $787 million driven by Adient's persistent performance issues in SS&M; (ii) that issues in SS&M would continue to significantly impact the Company's margins in 2018 and 2019; and (iii) it was suspending its cash dividend.

(ii) In reaction to these shocking disclosures, which were a materialization of the risks concealed by the Class Period misrepresentations and omissions alleged herein, Adient's stock price plummeted from $28.83 per share on November 8, 2018 to $21.52 per share on November 9, 2018, a loss of $7.31 per share, ***or 25.4%,*** on usually high trading volume of 7.5 million shares.

## IX. CLASS ACTION ALLEGATIONS

312. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Adient during the period from October 31, 2016 to November 8, 2018, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Adient during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Adient's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

313. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Adient's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Adient or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

314. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(d) whether the price of the Company's securities was artificially inflated; and

(e) the extent of damage sustained by Class members and the appropriate measure of damages.

315. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

316. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

317. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

318. Lead Plaintiff alleges that throughout the Class Period, Defendants omitted to disclose material information of which Defendants were aware or were reckless in not knowing. Such statements artificially inflated or artificially maintained the price of Adient publicly traded securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described in section V, it was important that Defendants not mislead investors or withhold material information. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Adient and its SS&M business, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

319. Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiff and other members of the Class purchased Adient's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

320. At all relevant times, the market for Adient shares was an efficient market for the following reasons:

(a) Adient shares met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Adient filed periodic public reports with the SEC and the NYSE;

(c) Adient regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Adient was followed by several securities analysts employed by major brokerage firm(s) including JP Morgan, UBS, Barclays, RBC Capital Markets, Wells Fargo, and Buckingham Research, which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace;

(e) As a result of the foregoing, the market for Adient's securities promptly digested current information regarding Adient from publicly available sources and reflected such information in Adient's securities price(s). Under these circumstances, all persons and entities who purchased or otherwise acquired Adient's securities during the Class Period suffered similar injury through their purchase of Adient at artificially inflated prices and the presumption of reliance applies.

## XI. NO SAFE HARBOR

321. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

322. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

323. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Adient who knew that the statement was false when made.

## XII. CONTROL PERSON ALLEGATIONS

324. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

325. During the Class Period, Defendants' statements were materially false and misleading when made in that Defendants failed to disclose:

(a) material known adverse facts and trends in Adient's core SS&M/Metals business including: (i) severe operational challenges and inefficiencies, (ii) increased costs and delays due, in part, to failure to follow Company policies, (iii) insufficient qualified personnel to timely launch Adient's programs, and (iv) other launch-related problems which were not weather or market related and which significantly increased customer chargebacks, decreased profitability on Adient's automotive seating contracts, and made a 200 basis point margin expansion unachievable;

(b) that the severe launch issues threatened ongoing relationships with Adient's customers, increased the risk of contract cancellations and reduced the likelihood of Adient winning new customer contracts;

(c) that instead of being a key driver of growth and margin improvement, SS&M was a "cash drain" on the Company; and

(d) starting in the second quarter of fiscal 2018, that the same events and conditions that triggered an impairment charge to goodwill warranted additional impairment recognition, including impairment related to long-lived assets such as property, plant, and equipment and deferred tax assets.

326. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to

prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

327. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Adient's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

328. As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company’s operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

329. Both of the Individual Defendants are liable as primary participants in a wrongful scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Adient’s securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omission) regarding the Company’s projected margin expansion and growth in the SS&M segment. The scheme: (i) deceived the

investing public regarding Adient's operations and the true value of Adient's securities; and (ii) caused Plaintiff and other members of the Class to purchase or otherwise acquire Adient’s securities at artificially inflated prices, which fell as the concealed risks concerning Adient’s business ultimately became known to the market.

330. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Adient, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XIII. CAUSES OF ACTION

### COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

331. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

332. This Count is asserted against Adient and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

333. During the Class Period, Adient and the Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

334. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and artificially maintain the market price of Adient's securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Adient's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

335. Pursuant to the above plan, scheme, conspiracy and course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, each of the Defendants made statements in quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Adient's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented risks at Adient's business, including the serious problems within the Company's SS&M segment.

336. As described above, Adient and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

337. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Adient. As officers and/or directors of a publicly held company, the Individual Defendants had a

duty to disseminate timely, accurate, and truthful information with respect to Adient's businesses, operations, financial condition and prospects.

338. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Adient's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Adient's business and financial condition that were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Adient's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Adient and the Individual Defendants, and were damaged thereby.

339. During the Class Period, Adient's securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Adient and the Individual Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Adient's securities at prices artificially inflated or artificially maintained by Defendants' wrongful conduct.

340. Had Lead Plaintiff and the other members of the Class known the concealed risks, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases or acquisitions by Lead Plaintiff and the Class, the true value of Adient's securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of Adient's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

341. By reason of the conduct alleged herein, Adient and the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

342. As a direct and proximate result of the wrongful conduct of Adient and the Individual Defendants, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**Violation of § 20(a) of the Exchange Act**
**(Against McDonald and Stafeil)**

343. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

344. During the Class Period, the Individual Defendants participated in the operation and management of Adient, and conducted and participated, directly and indirectly, in the conduct of Adient's business affairs. Because of their senior positions, they knew the adverse non-public information about Adient's business, including the serious problems plaguing the Company's SS&M division.

345. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Adient's financial condition and results of operations, and to promptly correct any public statements issued by Adient which had become materially false or misleading.

346. Because of their positions of control and authority as senior officers of Adient, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public filings, and other statements that Adient made and disseminated in the marketplace during the Class Period concerning the Company's results of operations. In their

capacities as senior officers of Adient, the Individual Defendants had direct involvement in the day-to-day operations of the Company and reviewing and approving the Company's public statements. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Adient to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Adient within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged that artificially inflated or artificially maintained the market price of Adient's securities.

347. Each of the Individual Defendants, therefore, acted as a controlling person of Adient. By reason of their senior management positions and/or being directors of Adient, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Adient to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Adient and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

348. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Adient.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a) Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, certifying Lead Plaintiff as Class Representative pursuant to Federal Rule of Civil Procedure 23(c), and appointing Thornton Law Firm LLP and Levi & Korsinsky LLP as Co-Class Counsel pursuant to Rule 23(g);

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff's reasonable costs and expenses, including attorneys' fees, expert fees, and its other costs and expenses; and

(d) Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

**THORNTON LAW FIRM LLP**

*/s/ Guillaume Buell*
Guillaume Buell (GB-9337)
Madeline Korber (*pro hac vice* forthcoming)
1 Lincoln Street
Boston, MA 02111
Tel.: (617) 720-1333
Fax: (617) 720-2445
Email: gbuell@tenlaw.com
mkorber@tenlaw.com

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (EK-8989)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: ek@zlk.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (SH-1887)
Nancy A. Kulesa (NK-2015)
Stephanie A. Bartone (*admitted pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
Email: shopkins@zlk.com

nkulesa@zlk.com
sbartone@zlk.com

*Co-Lead Counsel for the Proposed Class*

**LABATON SUCHAROW LLP**
Jonathan Gardner
Christine M. Fox
Ross Kamhi
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
Email: jgardner@labaton.com
cfox@labaton.com
rkamhi@labaton.com

*Additional Counsel for Lead Plaintiff Bristol County*