```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:  4/2/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE ADIENT PLC SECURITIES
LITIGATION

No. 18-CV-9116 (RA)

OPINION & ORDER

CLASS ACTION

RONNIE ABRAMS, United States District Judge:

Lead Plaintiff Bristol County Retirement System and Additional Named Plaintiff Jackson County, Missouri Revised Pension Plan (collectively, "Plaintiffs") bring this federal securities class action against Adient plc ("Adient" or the "Company"), Adient's former CEO R. Bruce McDonald, and Adient's CFO Jeffrey M. Stafeil (collectively, "Defendants"[1]), alleging that, from October 17, 2016 to November 8, 2018, Defendants committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5.  Specifically, Plaintiffs allege that Defendants made false and misleading statements with respect to a particular segment of Adient's business, known as "Metals," and with respect to its projection that it would achieve 200 basis points of margin expansion by 2020 ("the projected margin expansion").  Before the Court is Defendants' motion to dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint.  For the reasons that follow, Defendants' motion to dismiss is granted.

---

[1] McDonald and Stafeil are collectively referred to as the "Individual Defendants."

# BACKGROUND

## I.      Factual Background

The following facts are drawn from Plaintiffs' Second Amended Consolidated Class Action Complaint (the "SAC"), Dkt. 55, and are assumed to be true for the purpose of this motion.  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

### A.  The Parties

Defendant Adient is an automative seating manufacturing company that is tax domiciled in Ireland and has its principal executive offices in Dublin.  SAC ¶¶ 2, 27.  Adient designs, engineers, and manufactures automative seating for all vehicle classes and major original equipment manufacturers.  *Id.* ¶¶ 3, 32.  On October 31, 2016, Adient spun off from Johnson Controls International plc ("JCI"), and began publicly trading its shares at that time.  *Id.* ¶ 2.  Adient's fiscal year runs from October 1 to September 30.  *Id.* ¶ 31.

Defendant McDonald served as Adient's CEO and Chairman of the Board until June 11, 2018, when he retired.  *Id.* ¶ 28.  Prior to the spinoff, McDonald was the Vice Chairman of JCI from 2014 to 2016, the CFO of JCI from 2005 to 2014, and Executive Vice President of JCI from 2006 to 2016.  *Id.*  Defendant Stafeil is—and at all relevant times was—Adient's Executive Vice President and CFO.  *Id.* ¶ 29.

Court-appointed Lead Plaintiff Bristol County Retirement System and Additional Named Plaintiff Jackson County, Missouri Revised Pension Plan represent all persons and entities who purchased or otherwise acquired Adient's publicly traded securities between October 31, 2016 and November 8, 2018 (the alleged "Class Period").  *Id.* ¶¶ 1, 25-26.

### B.  Spinoff from JCI

In July 2015, JCI announced that it would spin off its auto parts business to form a separate

public company, which was expected to debut in mid- to late-2016.  *Id.* ¶ 37.  Between July 2015, when JCI announced the spinoff, and October 2016, when the spinoff was complete, Adient announced plans to heavily invest in the automative seating business to "spur growth and improve margins."  *Id.* ¶ 38.  Adient's spinoff was effective October 31, 2016.  *Id.* ¶ 50.

### C. Adient's Projected Margin Expansion

During a September 15, 2016 investor meeting, leading up to the October 31, 2016 spinoff, Defendants announced that Adient was a "solid investment," *id.* ¶ 47, and, among other things, that Adient was positioned to achieve 200 basis points of margin expansion by 2020, as well as topline growth in 2018 and 2019, *see id.* ¶¶ 38-39, 48-49.  The basis for the projected margin expansion was explained as follows: 75 percent (or 150 basis points) would result from an immediate reduction in "Selling, General, and Administrative" ("SG&A") expenses, and 25 percent (or 50 basis points) would result from an improvement in the Metals division.  *See* Def. Mot. Ex. 3 at 6-7; *see also* SAC ¶ 116.  Adient also represented that its margin expansion would come "predominantly from growth in its core [Metals] business."  *Id.* ¶ 39.

### D. Adient's Metals Segment

For most of the Class Period, Adient's business was divided into two segments: (1) Seating and (2) Interiors.  *Id.* ¶ 33.  The Seating division included "Seat Structures & Mechanisms" ("SS&M"), which was also known as "Metals."  *Id.* ¶¶ 3, 33.[2]  The "seat structure" is "essentially the seat frame,"[3] i.e., the part of the seat that a passenger sits on in the vehicle.  *Id.* ¶ 32.  The seat "mechanisms" are the "recliners, tracks, and height adjusters."  *Id.*

In the second quarter of fiscal 2018, Adient restructured its reporting segments, and Metals

---

[2] In 2017, Adient renamed its Metals business "Seat Structures and Mechanisms."  *Id.* ¶ 32.

[3] According to the SAC, nearly half of Adient's annual revenues derive from the sale of metal components used in seat frames produced by the Metals segment.  *Id.* ¶¶ 3, 32.

became a "standalone reporting segment." *Id.* ¶ 33.  Thereafter, Adient's business was divided into three segments: (1) Seating, (2) Seat Structures & Mechanisms (i.e., Metals), and (3) Interiors.  *Id.*

### E.  Operational Issues in Metals

According to seven confidential witnesses (the "CWs"), all of whom are former Adient employees, Adient's Metals division had been experiencing problems for many years prior to the spinoff from JCI.  *See id.* ¶ 51-67.  Based on the CWs' statements, Plaintiffs allege that serious problems existed within the Metals segment prior to and throughout the Class Period, and that such issues were made known to McDonald, Stafeil, and other top Adient executives, but were not publicly disclosed.  *See id.* ¶¶ 68-79, 88-106.

#### 1.  Alleged Operational Issues

Plaintiffs allege that various operational issues existed within Metals throughout the Class Period.  These issues fall into the following general categories: (1) personnel and staffing issues, (2) issues with cutting SG&A expenses, (3) quality and execution issues with respect to its launch programs, and (4) increased costs and subsequent delays.  The Court addresses these issues in turn.

First, the CWs allege that Adient was inadequately staffed and, in particular, lacked sufficient qualified personnel for its program launches.  For instance, Adient allegedly "made deep cuts to its ranks in an effort to cut costs," which apparently left the Metals business "shorthanded and in disarray." *Id.* ¶ 40.  According to CW-2, Adient "terminated too many people with institutional knowledge" prior to the spinoff.  *Id.* ¶ 62.  CW-3 similarly reported that, prior to the spinoff, Adient terminated "a lot of people it ultimately needed for launching new programs," and that while Adient "was making substantial cuts in its workforce," it nonetheless "committed to a very high number of program launches." *Id.* ¶ 63.  CW-3 asserts that "reductions in personnel" in Metals "had a detrimental effect on Adient's launch programs," and that, beginning in mid-2015, there was a "huge

influx of new programs to be launched in 2017-2018, but not enough people to properly handle the launches." *Id.* ¶ 78.

Some of the CWs also allege that they internally raised their concerns about inadequate staffing. For instance, CW-2 alleges that he raised his concerns about "the fact that Adient's development program was highly understaffed" to Byron Foster, an Executive Vice President, and that Foster reported those concerns to McDonald. *Id.* ¶ 62. According to CW-1, Adient needed to hire additional employees for its program launches, but "neither McDonald nor [Eric Mitchell, an Executive Vice President] would approve the headcount increases." *Id.* ¶ 68. CW-3 also alleges that "decisions on resource allocation came from corporate." *Id.* ¶ 63.

At the same time, Adient's executive management, including McDonald and many others at the VP and EVP level, allegedly "lacked sufficient operational experience" of their own. *Id.* ¶ 40. According to the CWs, these top executives "had limited or no operational or manufacturing experience." *Id.* ¶ 71. According to CW-1, for instance, Adient (and JCI) apparently "did not have the right people with the right discipline to run the Metals business." *Id.* CW-1 also asserts that, generally, Adient lacked "the depth of operational leadership" and "fundamentally did not have the development teams . . . that were needed to launch the programs successfully." *Id.* ¶ 68. Plaintiffs also allege that Adient executives repeatedly "failed to act on warnings from employees with operational experience" who raised certain "red flags" about Metals and the Company's upcoming launches, as discussed more below. *See id.* ¶¶ 40, 71.

Second, Plaintiffs allege that McDonald "cut SG&A" in 2017, "which exacerbated product launch problems in the second half of 2017." *Id.* ¶ 68. In particular, Plaintiffs assert that McDonald made these cuts instead of "hir[ing] or subcontract[ing] with the requisite personnel who could assist with launch execution." *Id.* ¶ 43. Plaintiffs also allege that, as "problems worsened," Adient "shifted

personnel resources to launches experiencing the most severe problems," which caused further delays and increased costs on other projects.  *Id.*

Third, Plaintiffs assert that Adient experienced serious "execution issues" and "quality issues" in connection with its launches.  Specifically, by the time new programs started to launch in 2017, Adient apparently faced "a wide range of serious problems," such as "high cycle times," "poor machine utilization rates," and other "quality issues which resulted in containment costs and the implementation of additional contract milestones by certain customers once launch issues materialized."  *Id.* ¶ 41.

Fourth, Plaintiffs allege that Adient faced "massively increasing costs" during the Class Period.  *See id.* ¶¶ 80-87.  Such "increased extrinsic costs" included "exorbitant premium freight shipping" and "alternate supplier costs."  *Id.* ¶ 41.  For instance, CW-3 alleges that Adient's "resource problems at the plant level" forced the Company to "use expensive means to get parts faster," which caused Adient to incur expenses in the form of "consultants, premium freights, and additional expediting costs related to tool vendors."  *Id.* ¶ 83.  Adient's program launches allegedly "fell behind," which made it "exceedingly difficult" for Adient to "deliver parts to its customers on a just in time basis" and resulted in further backups.  *Id.* ¶ 42.  Such backups caused Adient's "production and launch readiness" to be "further compromised," which, in turn, made Adient unable to "fill its pipeline" and required Adient to "fly parts between its various plants, thus incurring premium freight charges of several tens of millions of dollars per month."  *Id.*  According to CW-2, Adient sometimes "expended millions of dollars over the period of an order just in premium freight costs."  *Id.* ¶ 82.  And in some cases, Adient was apparently required to "get outside suppliers to produce parts for them, adding further expense and reducing the profitability of its customer contracts."  *Id.* ¶ 42.

As to the premium freight costs, CW-2 alleges that costs were increasing particularly in the

Metals segment throughout 2017, and that the "increased use of premium freight costs related to new launch activity was a frequent occurrence at Adient." *Id.* ¶ 81.  CW-3 reports that, in general, "the frequent use of premium freight" was a "problem indicator" because "premium freight would be used to make up lost days." *Id.* ¶ 83.  CW-5 asserts that the premium freight shipping "came to a tipping point in 2017," especially with certain plants located in Mexico and Texas.  *Id.* ¶ 85.

As a result of the execution issues and increased extrinsic costs, Adient allegedly failed to hit its "efficiencies" or "scrap rates" in its product launches.  *Id.* ¶ 69.  The CWs thus contend that Adient could not have been "on track."  For instance, CW-1 asserts that Metals "could not have been 'on track' due to performance of engineering (late designed, test failures) during development and lack of commercial discipline to move the price on changes." *Id.*

Finally, the CWs allege that the problems in Metals, which Adient publicly disclosed starting in late 2017, were "percolating for years" and "did not happen 'all of sudden' or overnight." *Id.* ¶ 64. According to CW-4, for instance, "challenges with the Metals group's business were something that had been happening for a long time and culminated with the [original equipment manufacturers] . . . missing deliveries." *Id.*  CW-6 similarly asserts that "issues that caused problems in Metals in 2018" were "present from before the spinoff." *Id.* ¶ 65.  According to CW-7, "Metals had been unprofitable for many years, so the idea that Metals would turn around in two years was unrealistic." *Id.* ¶ 66. CW-7 also claims that, in 2016, Adient employees internally questioned "how Metals would be profitable after so many years of being unprofitable." *Id.*

### 2.  Defendants' Knowledge and/or Awareness of Issues

Plaintiffs allege that the operational issues in Metals detailed above were made known to McDonald, Stafeil, and other executives in various ways.

###### i.    Meetings

The CWs allege that top executives at Adient, including McDonald and Stafeil, participated in certain regular meetings during which the issues in Metals were discussed.  For instance, these executives participated in "monthly Operational Review Meetings," during which each business segment, including Metals, presented in-depth financial reviews to see how the business was tracking against the budget.  *Id.* ¶ 88.  During 2016, CW-7 participated in certain of these meetings and reported that the group that presented for Metals (the "Senior Metals Business Unit Leadership") "was regularly detailing challenges in Adient's Metals business and it was clear that the Metals division had fundamental issues that were ingrained in its business."  *Id.* ¶¶ 89-90.  CW-6 also participated in certain of these meetings, and reported that there was a "particular focus" on Metals "since that business was so critical to achieving the Company's financial targets and margin growth."  *Id.* ¶ 92.

The CWs also allege that top executives at Adient, including Mitchell and Paul Lambert, a former Vice President and General Manager of Metals (who left in approximately June 2018), *id.* ¶¶ 7, 65, participated in monthly "prep meetings" for the monthly Operational Review Meetings, *id.* ¶ 93.  According to CW-6, who "regularly participated" in the prep meetings, Metals was always a topic, and it was "very obvious to [him] that [the] metals business was not healthy."  *Id.* ¶ 93.  According to CW-1, Mitchell reported back to McDonald on the prep meetings.  *Id.* ¶ 95.

In connection with the prep meetings, CW-6 allegedly questioned "the numbers he was seeing" (i.e., the "data points") based on "documents handed out at the meetings."  *Id.* ¶ 96.  CW-6 alleges that the numbers, which related to the Metals business,[4] "'did not tie to the story' that Adient was telling the market."  *Id.*  Based on certain color-coded deliverables that were used in certain

---

[4] The only details included in the SAC about the "numbers" that CW-6 was "question[ing]" is that they were "based on the 'prescriptive process for manufacturers,' which assessed the level of efficiency at each plant."  *Id.* ¶ 96.

meetings,[5] CW-6 reported that "there was no clear roadmap in the Operational Review prep meetings on how to resolve the issues that they were seeing with the [Metals] business." *Id.* CW-6 asserts that he raised his concerns with his superiors starting in January 2017. *Id.* ¶ 97. Upon raising these concerns at a prep meeting, CW-6 claims that Lambert told him to "stay in [his] lane." *Id.* When CW-6 subsequently went to "discuss his concerns and Lambert's reaction to his pointed questions on Metals" with Stafeil, Stafeil allegedly told CW-6 that "he was not misinterpreting the data points." *Id.* The SAC also asserts, generally, that because CW-6 found the data points "so concerning," he "elevated his concerns to McDonald, Stafeil[,] and Mitchell." *Id.* ¶ 96.

The CWs detail various other meetings at which the problems with Metals were made known to Adient's top executives. For instance, McDonald and Mitchell allegedly held "Profit Plan Reviews" and "Budget Review Meetings" where "sales bookings and the need to properly staff the various launches" were discussed. *Id.* ¶ 98. According to CW-1, McDonald and Mitchell would not approve the additional staffing sought by the "Commercial Teams" and the "Launch Teams." *Id.* Additionally, CW-3 alleges that new launches and related problems and delays with Adient's launches were discussed at weekly and bi-weekly "Program Review Meetings," which were "regularly attended by the program managers" and, during their tenure, "sometimes" attended by Lambert and Foster, who ran Metals before and after Lambert.[6] *Id.* ¶ 100. CW-6 alleges that the "lack of headcount" was a "persistent topic" at the Program Review Meetings. *Id.*

The CWs further allege that issues with Metals and project launches were discussed in (1)

---

[5] CW-6 reported that Adient used color-coded deliverables, which were colored red, yellow, or green "based on key performance indicators, operational proficiencies, profit recovery, and key business objectives that needed to be fulfilled." *Id.* ¶ 96. According to CW-6, "deliverables in red meant they were not on track and there was no robust roadmap to achieve the objective, while deliverables in green meant they were on track with a robust roadmap." *Id.* Also, according to him, the issues in Metals "included too many deliverables in red." *Id.*

[6] According to CW-6, Foster "had run [Metals]" prior to the spinoff from JCI, and was subsequently "brought back in 2018" to run Metals after Lambert left in or around June 2018. *Id.* ¶ 65.

"SS&M/Metals Program Management Meetings," which occurred on "at least a monthly basis" and were "attended by Adient's senior executives," *id.* ¶ 101; (2) ad hoc "Red Flag Meetings," in which "anyone working on a project could red flag an issue . . . to get the attention of the Company's executives," *id.* ¶ 102; (3) "Product Strategy Meetings," *id.* ¶ 103; (4) "monthly forecasting review meetings and related processes that road mapped budgets and forecasts on a quarterly basis," *id.* ¶ 104; (4) weekly and biweekly forecast outlook meetings, in which "executives analyzed various financials and tried to figure out a plan if the Company expected a variance for the month," *id.* ¶ 105; and (5) "monthly or bi-monthly reviews regarding forecasting and cash collections," which were held by Stafeil, *id.* ¶ 105.[7]

### ii.    Reports

The CWs allege that Adient executives, including McDonald and Stafeil, had knowledge and awareness of the issues in Metals through various reports circulated within the Company or discussed at certain meetings.  For instance, CW-2 reported that, in connection with the monthly Operational Review Meetings, a "standard operational packet" was presented to Adient's executive management––including McDonald, Stafeil, Mitchell, and Foster—which included information about "increased costs."  *Id.* ¶ 91.  CW-6 reported that, in these meetings, "there were very detailed overviews (and presentation decks) detailing each business segment with a particular focus on [Metals]."  *Id.* ¶ 92.

As examples of additional reports, CW-1 alleges that he "received and reviewed various reports regarding sales, forecasts, and launches."  *Id.* ¶ 105.  CW-3 asserts that "program review dockets," which included "details of the lack of personnel to work on the various launches" were discussed at Program Review Meetings.  *Id.* ¶ 100.  CW-3 also asserts that launches were archived in

---

[7] CW-2 also asserts that McDonald was generally "aware of launch inefficiencies, cost overruns, engineering issues, and financial issues" through his "attendance at meetings" and "communications" with both Mitchell and Lambert.  *Id.* ¶ 82.

an internal program called "Gate Workbook," and that "reporting from Gate Workbook was circulated internally by email and reviewed at Program Review Meetings." *Id.* Further, CW-3 "believes" that Adient's executive management was receiving "reports [that] detailed launch programs, cost overruns and delays." *Id.*

### iii.   Internal Notification System

CW-1 and CW-5 both allege that Adient used an "internal notification system" called "No Surprises," which issued alerts for "operational issues," and that "No Surprise" notifications "were a frequent occurrence at Adient." *Id.* ¶ 106.  In particular, CW-5 claims that "he recalled seeing 'No Surprise' notifications for Adient's U.S. facilities on a weekly basis." *Id.* CW-1 asserts that Foster and Mitchell were "recipients of the 'No Surprise' notifications during the Class Period," and CW-5 further asserts that he "believed" that other executives at Adient, such as Kelly Bysouth (former Chief Supply Chain Officer), Jeff Wilkinson (current Supply Chain Director), and Jim Conklin (VP of Operations) also received "No Surprise" alerts. *Id.* ¶¶ 86, 106.

### iv.   People "Raising Flags"

Finally, the CWs allege in a relatively vague manner that, in 2016, there were "people raising the flags" about their concerns with Metals achieving the numbers needed to reach the projected margin expansion. *Id.* ¶ 99.  Such "flags" were apparently raised in regard to "the deteriorating [Metals] business and the Company's upcoming launches." *See, e.g.*, *id.* ¶¶ 40, 71.  The CWs also allege that, throughout 2017, there were "escalating concerns about costs and their impact" on Metals, *id.* ¶ 84, and that Adient was "not achieving the vertical integrations, desired conversion rates, reduced manufacturing costs, and increased efficiencies and uptimes needed (at the plant level) necessary to achieve the 200 basis point margin expansion," *see id.* ¶ 308.  The CWs allege that top executives at Adient, including the majority of executives at the VP and EVP level, failed to act on the repeated

warnings—"red flags"— raised by lower level employees with operational experience.  *See, e.g.*, *id.* ¶ 71.

## F. Adient's Disclosures

As detailed in the SAC, towards the second half of the Class Period, Defendants made a number of disclosures about the operational issues in Metals and how they affected the Company's projected margin expansion.  Specifically, Plaintiffs allege that, through six "partial disclosures," the "concealed risks" regarding Metals "materialized."  *See id.* ¶ 9.

First, during the quarterly earnings conference call on November 2, 2017, Defendants disclosed that Adient had experienced "launch challenges" in its Metals division that were expected to continue in the beginning of 2018, including "weather-related issues," "late design changes," "manufacturing issues," and "supply chain interruptions."  *Id.* ¶¶ 9, 328(a).  Second, on January 17, 2018, while presenting at the Deutsche Bank Global Auto Industry Conference, the Company disclosed that, "Headwinds impacting [Metals] have intensified" since the disclosures made on the November 2, 2017 call.  *Id.* ¶¶ 10, 328(b).  Third, on the next quarterly conference call on January 29, 2018, Defendants "again announced disappointing quarterly financial results[,] and pointed to 'headwinds much more severe' in the [Metals] business than previously disclosed," revealing that "launch inefficiencies" in Metals were "more problematic than in the fourth quarter of fiscal 2017."  *Id.* ¶¶ 11, 328(c).  On this call, Defendants also stated that "the 200 basis points of margin expansion, while still achievable, would require improvements and cost efficiencies in other segments."  *Id.* ¶ 328(c).  Fourth, during the subsequent quarterly conference call on May 3, 2018, Defendants admitted, for the first time, that the projected margin expansion was "no longer going to be achievable."  *Id.* ¶¶ 12, 328(d).  On this call, Defendants also announced that the Company was "restructuring its business units and intended to shrink the [Metals] business," and that it would record

a $299 million impairment charge. *Id.* ¶ 12. Fifth, on June 11, 2018, the day that McDonald's retirement was announced, Adient disclosed that it "slashed" its earnings guidance for fiscal 2018, and that "[c]ontinued challenges impacting the [Metals] segment drove approximately half of the shortfall versus previous expectations." *Id.* ¶¶ 14, 328(e). Finally, on November 9, 2018, the "previously undisclosed risks about Adient's [Metals] business were fully revealed" when the Company "abruptly announced it was suspending its quarterly cash dividend, confirmed that issues in its [Metals] business were still strongly impacting the Company's margins in 2018 and would continue to impact margins into 2019, and announced massive asset impairment charges." *Id.* ¶¶ 15, 328(f).

### G. Impairment Charges

#### A. Long-Lived Assets Impairment Charge

According to the SAC, a "significant percentage" of the Metals segment's assets were in the form of "long-lived assets," *id.* ¶ 249, that is, assets that Adient "expect[ed] to retain for at least one year or more than one accounting period," *id.* ¶ 44 n.12. Specifically, the Metals segment's long-lived assets were in the form of "property, plan, and equipment." *Id.* ¶ 249.

In the second quarter of fiscal 2018, Adient reported that it would significantly shrink the size of its Metals business. *Id.* ¶ 251. At that time, Adient also reported that it recorded a $299 million impairment charge to the reported value of goodwill in its Metals segment. *See id.* ¶ 254. Adient explained that the "goodwill impairment charge represented a triggering event for additional impairment considerations of other long-lived assets, including an analysis of the recoverability of long-lived assets as of March 31, 2018," and that "[n]o further impairments were identified." *Id.* According to the SAC, Defendants' statements "provided assurances to investors that goodwill was the only asset that required an impairment charge as of the second quarter of fiscal 2018," or, put

differently, that "the reported value of long-lived assets was fully recoverable." *Id.* ¶ 255. Plaintiffs allege, however, that Adient's assurances regarding the recoverability of reported long-lived assets were based on false representations of forthcoming improvements in Metals. *See id.* ¶¶ 256-258.

In the fourth quarter of 2018, Adient announced that, due to "continued headwinds" in Metals, it would record a $787 million long-lived assets impairment charge, which it characterized as "onetime in nature" and which Plaintiffs assert "erased more than one-third of [Metals'] total assets and wiped out one-third of Adient's total property, plant, and equipment." *Id.* ¶¶ 259-261. According to Plaintiffs, the same factors underlying the fourth quarter fiscal 2018 performance that necessitated another impairment charge were "well known to Adient in the second quarter of fiscal 2018, when Adient purportedly tested, but failed to identify, any further asset impairments." *Id.* ¶ 263. As a result of the fourth quarter impairment charge, Adient wrote-down the value of Metals long-lived assets. *Id.* ¶ 268.

### B.  Deferred Tax Assets Impairment Charge

Adient also "claimed to review the realizability of its deferred tax assets at least quarterly," but allegedly did not record a valuation allowance related to the performance of its Metals segment in the second quarter of fiscal 2018. *Id.* ¶ 272. Plaintiffs allege that since a "principal consideration in Adient's evaluation of the need for a valuation allowance" was the projected performance of its Metals business, Adient's "upward revision of the forecast" for Metals in the second quarter of fiscal 2018 "allowed Adient to avoid related valuation allowances at that time." *Id.* ¶ 273. In the fourth quarter of 2018, however, Adient announced that it would be "unlikely to realize the benefit of certain deferred tax assets," and that valuation allowances would be required "to reduce the previously reported value of deferred tax assets." *Id.* ¶ 275. Shortly thereafter, Adient disclosed that the valuation allowances against its deferred tax assets in various countries and the U.S. were attributable

to "the adverse performance" in the Metals business and the "resulting long-lived asset impairment." *Id.* ¶ 277.

### H. McDonald's Retirement

On June 11, 2018, Adient announced that McDonald was "retiring" from his role as Chairman and CEO of the Company, effective immediately.  *Id.* ¶ 218.  In a public statement, the Company explained: "Bruce and the Board agree that now is the right time for a new leader with a fresh perspective to drive value in the next phase of Adient's life as a public company." *Id.*  Adient also announced that Frederick ("Fritz") Henderson, a member of its Board of Directors, would take over as the interim CEO. *Id.*  Plaintiffs allege that McDonald's retirement occurred "abruptly," "*without any succession plan in place*." *Id.* ¶ 309 (emphasis in original).

On September 13, 2018, Adient announced that it had appointed Douglas Del Grosso as President and CEO of the Company, effective October 1, 2018. *Id.* ¶ 235.  As of October 1, 2018, Henderson would step down as interim CEO and become "non-executive chairman of the Company's Board of Directors." *Id.*

## II.     Procedural Background

On October 4, 2018, Plaintiff Julio Barreto filed this putative securities class action against Defendants Adient, McDonald, and Stafeil. Dkt. 1.  On December 21, 2018, the Court consolidated this action and a related action, *Charles Eric Hyder v. Adient plc et al.*, No. 18-cv-9630, into a consolidated class action and appointed Bristol County Retirement System as Lead Plaintiff. Dkt. 41. On February 19, 2019, Lead Plaintiff filed a consolidated amended class action complaint. Dkt. 49. On April 5, 2019, Defendants moved to dismiss the amended complaint for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6). Dkt. 50.  Pursuant to the Court's Individual Rules, on April 15, 2019, Lead Plaintiff informed Defendants of its intent to file a further amended

complaint.  *See* Dkt. 54.  On May 8, 2019, Plaintiffs filed the operative Second Amended Consolidated

Class Action Complaint, Dkt. 55, which Defendants moved to dismiss on June 7, 2019, *see* Dkt. 56.

Plaintiffs opposed that motion on July 8, 2019, Dkt. 60, and Defendants replied on July 24, 2019,

Dkt. 61.  Oral argument on the motion was held on December 9, 2019.  *See* Dkt. 66 ("Tr.").

## III.    The Second Amended Consolidated Class Action Complaint

Overall, Defendants' allegedly false and misleading statements can be grouped into two

categories: (1) statements about Adient's projected margin expansion and progress towards achieving

that expansion by 2020; and (2) statements about Adient's efforts to improve its Metals business.

Additionally, Plaintiffs allege that Defendants made false and misleading statements in connection

with: (1) Adient's impairment charges, (2) Item 303 of Regulation S-K, and (3) Adient's SOX

certifications.

### A.  False and Misleading Statements about the Projected Margin Expansion

Plaintiffs allege that, throughout the Class Period, Defendants made false and misleading

statements and omissions concerning the projected margin expansion.  For instance, McDonald and

Stafeil frequently spoke, in general, about Adient's goal of 200 basis points.  *See, e.g.*, SAC ¶ 124

("We've talked about a journey towards 200 basis points of margin improvement over the next couple

of years. . . . [A]ll this should manifest itself over the course of the midterm to a 200 basis point

improvement in our overall margin."); *id.* ¶ 128 ("We have a four-year goal here to get to 200 basis

points improvement, and we're off to a great start."); *see also id.* ¶¶ 117, 133 (similar statements about

the goal to achieve 200 basis points over the next few years).  Defendants also continued to make

assurances about achieving the projected margin expansion even as operational issues arose and were

disclosed beginning in late 2017.  *See, e.g.*, *id.* ¶ 190 ("Despite temporary headwinds in SS&M

significantly offsetting savings in SG&A, the company continues to expect 200 bps of margin

improvement by the end of FY2020."); *see also id.* ¶¶ 169, 178, 179 (similar statements about maintaining the 200 basis points target despite issues in Metals).  In particular, McDonald and Stafeil repeatedly assured investors that Adient was "on track" to reach its goal of 200 basis points by 2020. *See, e.g.*, *id.* ¶¶ 129, 136, 142, 143, 158.

According to Plaintiffs, Defendants' statements about Adient's progress towards its projected margin expansion were false and misleading because Defendants failed to disclose (1) certain "material known adverse facts and trends" in Adient's "core" Metals business, which Plaintiffs allege "made a 200 basis points margin expansion unachievable," (2) that "severe launch issues" had adverse effects on Adient's business and its relationships with its customers, (3) that "instead of being a key driver of growth and margin improvement," Adient's Metals segment was "a 'cash drain' on the Company," and/or (4) that "headwinds" in Adient's product launches were caused by "recurring operational issues" in Metals, and "not due to natural disasters and 'late design changes' by customers." *See id.* ¶¶ 115, 167, 181, 192.

### B. False and Misleading Statements about Improvements in Metals

Plaintiffs also allege that, throughout the Class Period, Defendants made false and misleading statements and omissions concerning Adient's Metals business and purported improvements in that business.  The alleged false statements about Metals overlap to a great degree with the alleged false statements about the projected margin expansion.  For instance, McDonald and Stafeil frequently spoke about how the projected margin expansion was based on, at least in part, improvements in the Company's Metals business—even though such improvements were not expected to be realized immediately.  *See, e.g.*, *id.* ¶ 116 ("Our guidance around margin expansion is really driven by 3 fundamental areas: one, improving our performance in our metals business; two, reducing our SG&A; and three, setting up a much leaner corporate overhead structure."); *id.* ¶ 124 ("We will benefit from

our margin drive, our reduction in SG&A, our improvement of the metals business . . . .  But all this should manifest itself over the course of the midterm to a 200 basis point improvement in our overall margin."); *see also id.* ¶¶ 118, 133, 151, 175 (similar statements related to Adient's goals to improve Metals and expand its margins).

McDonald and Stafeil also allegedly "boasted" about the current improvements they were already seeing in Metals, and how those improvements were contributing to the Company's growth and margin expansion plans.  *See, e.g., id.* ¶ 118 ("[W]e do see a big improvement in metals."); *id.* ¶ 119 ("[W]e're very comfortable with the plan that we have to improve metals.").  McDonald and Stafeil further assured investors that, while they were already seeing some progress in Metals, improvements would continue and become even more significant to the Company's financial results over the next few years.  *See, e.g., id.* ¶ 118 ("So, yes we have seen a little bit of improvement on the metals side, but we expect that improvement to ramp up as those new programs come to launch and some of the restructuring initiatives go into full effect."); *id.* ¶ 130 ("Metals turnaround is beneficial to this year, but it's really a 2018, 2019 story."); *see also id.* ¶¶ 124, 125, 129, 135, 136, 143, 147, 148, 149 (similar statements about expectations for the Metals business).

According to Plaintiffs, Defendants' statements about improvements in Metals were false and misleading for largely the same reasons that their statements about the projected margin expansion were false and misleading: because Defendants failed to disclose (1) certain "material known adverse facts and trends" in Adient's "core" Metals business, which Plaintiffs allege "made a 200 basis points margin expansion unachievable," (2) that "severe launch issues" had adverse effects on Adient's business and its relationships with its customers, (3) that "instead of being a key driver of growth and margin improvement," Adient's Metals segment was "a 'cash drain' on the Company," and/or (4) that "headwinds" in Adient's product launches were caused by "recurring operational issues" in Metals,

and "not due to natural disasters and 'late design changes' by customers."  *See id.* ¶¶ 115, 167, 181, 192.  Additionally, Defendants' statements concerning launches in the Metals business in particular were also allegedly false and misleading because Defendants failed to disclose "that Adient did not have the ability or capacity to timely launch those programs and fulfill the launch orders."  *See id.* ¶¶ 122, 132, 141.

Plaintiffs also allege that, even after Defendants disclosed in May 2018 that the projected margin expansion was no longer achievable, they continued to make false and misleading statements as they assured investors that Adient's Metals business would nonetheless improve.  In particular, Defendants made statements about how certain of the disclosed issues were "behind" them, and that they expected "continued improvement" and a "turnaround" in the Metals business.  *See, e.g.*, *id.* ¶ 203 ("So we've, I think, shared with the group here that we struggle through a number of critical launches. We now have most of those issues behind us."); *id.* ¶ 227 ("The team recognizes we have a lot of work ahead of us.  However, these results demonstrate stabilization, turnaround, actions, implemented earlier and are gaining traction.  We expect the positive trend to continue into the fourth quarter and into 2019."); *see also id.* ¶¶ 201, 202, 226 (similar statements about expected improvements in Metals).

According to Plaintiffs, these statements were false and misleading for the same reasons that the earlier statements about Metals were false and misleading, and because Defendants failed to disclose that "starting in the second quarter of fiscal 2018, . . . the same events and conditions that triggered an impairment charge to goodwill warranted additional impairment recognition, including impairments related to long-lived assets such as property, plant, and equipment and deferred tax assets."  *Id.* ¶¶ 206, 231.

### C. False and Misleading Statements Regarding Impairment Charges

In addition to Defendants' statements concerning the projected margin expansion and improvements in Metals, Plaintiffs also allege that Adient provided false and misleading assurances to investors in connection with the impairment charges it recorded in the second quarter of fiscal 2018. Specifically, Plaintiffs allege that the Company's fourth quarter fiscal 2018 long-lived asset impairment charge "was the outcome of the exact same impairment test that Adient purported to use in the second quarter of fiscal 2018." *Id.* ¶ 268. Thus, Plaintiffs contend, Adient's "affirmative[] report[] to investors that further charges were not necessary," as of the second quarter, was false and misleading. *Id.* ¶ 265. Plaintiffs assert that "what really happened in the second quarter of fiscal 2018" was that Defendants "devised an 'improved' (but highly unlikely) forecast for Adient's [Metals] business to falsely reassure investors that growth was expected in its [Metals] business." *Id.* If Adient had recorded impairment charges in one period not only to goodwill, but also to long-lived assets and deferred assets, Plaintiffs contend, "it would have been evident to investors that growth was not on the horizon" for Metals. *Id.* Plaintiffs also allege that the "write-down" Adient took as a result of the fourth quarter impairment charge "should have been disclosed to investors by at least the second quarter of fiscal 2018." *Id.* ¶ 268.

Plaintiffs also assert that Adient falsely assured investors that reported deferred tax assets had survived recoverability analyses in the second quarter of fiscal 2018. *See id.* ¶¶ 269-278. In particular, plaintiffs allege that, "[a]s with the delayed impairment charges to long-lived assets, Adient failed to record these valuation allowances in the second quarter of fiscal 2018 only by creating a false forecast for its [Metals] business." *Id.* ¶ 278.

### D. Item 303 Violations

Plaintiffs allege that Adient violated Item 303 of Regulation S-K by failing to disclose, in its

SEC filings during the Class Period, "known trends that were reasonably likely to—and did—have a material impact on Adient's financial results." *Id.* ¶ 283.  According to Plaintiffs, Adient failed to disclose the following "known trends": "material known adverse facts and trends in Adient's core [Metals] business, including that the [Metals] business was facing severe operational challenges," such as "increased costs and delays due, in part, to failure to follow Company policies and too much emphasis on growth," "insufficient qualified personnel," "operational inefficiencies," and "other launch problems," all of which "significantly increased customer chargebacks[,] . . . decreased profitability on Adient's automotive seating contracts[,] and made a 200 basis point margin expansion unachievable." *Id.*  Plaintiffs contend that Item 303 required Adient to disclose "material facts concerning the negative trends that were ongoing" in its Metals business, among other things, and that Adient violated Item 303 throughout the Class Period by "failing to provide investors with any meaningful disclosures concerning the negative developments in its [Metals] business and the risks or uncertainties created by such trends." *Id.* ¶¶ 283-284.

**E. SOX Certifications**

Finally, Plaintiffs allege that, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), McDonald and Stafeil signed certifications appearing in Adient's mandatory periodic filings with the SEC throughout the Class Period.  *Id.* ¶ 285.  Such certifications stated that McDonald and Stafeil had "evaluated Adient's internal controls and disclosed in Adient's Class Period SEC filings all issues that were 'reasonably likely to materially affect [Adient's] internal control over financial reporting.'" *Id.*  Specifically, Plaintiffs allege that, for each periodic filing, McDonald and Stafeil certified that they (1) "Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report [their] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation," and (2)

"Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting." *Id.* ¶ 286.  Plaintiffs assert that such certifications were false. *Id.*

## LEGAL STANDARD

### I.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether [the] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (citation omitted).  In answering this question, the Court must "accept[] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).  Moreover, on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87,

98 (2d Cir. 2007).

## II.    Motions to Dismiss Under Federal Rule of Civil Procedure 9(b) and the PSLRA

In addition to the requisite Rule 12(b)(6) pleading standards, the SAC is also subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).  *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting" the alleged fraud.  Fed. R. Civ. P. 9(b).  To do so successfully, "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

The PSLRA expands on Rule 9(b) and requires "that securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal quotation marks omitted)).  Nevertheless, "even with the heightened pleading standards of Rule 9(b) and the PSLRA, the Court '[does] not require the pleading of detailed evidentiary matter[s] in securities litigation.'"  *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 302 (S.D.N.Y. 2018) (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011)).

## DISCUSSION

Defendants generally raise three arguments as to why the SAC fails to state a claim for securities fraud under Section 10(b) and Rule 10b-5.  First, Defendants argue that the SAC fails to

allege that any statement was false or inaccurate at the time it was made.  Second, Defendants contend that all of the challenged statements were forward-looking statements that were accompanied by meaningful cautionary language, and are therefore protected under the PSLRA's safe harbor, or were inactionable statements of opinion.  Finally, Defendants argue that the SAC fails to plead that any Defendant acted with the requisite scienter.

## I.      Whether Plaintiffs Adequately Allege a Section 10(b) Claim

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff "must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Pac Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  Because Defendants only challenge the first and second factors in their motion, the Court addresses only those two factors in this Opinion.

### A.  The SAC Fails to Sufficiently Allege Any False or Misleading Statements or Omissions

As described above, Plaintiffs allege that Defendants made false and misleading statements throughout the Class Period with respect to Adient's projected margin expansion and with respect to certain improvements in Adient's Metals segment, the latter of which was supposed to contribute to the projected margin expansion.  Under Rule 10b-5, it is unlawful to (1) "make any untrue statement of a material fact," or (2) "omit to state a material fact necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5(b).  To support a finding of liability under Rule 10b-5, there must be "an actual *statement* [] [made] that is either untrue outright or misleading by virtue of what it omits to state."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (internal quotation marks omitted).  Thus, the "starting point for any 10b-5 case is the existence of material

misstatements or omissions of fact." *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 578 (S.D.N.Y. 2010).

For a statement to be actionable under Section 10(b), "the statement must be false, and the statement must be material.  Neither immaterial false statements nor material true statements are actionable." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd,* 604 F. App'x 62 (2d Cir. 2015) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  As to falsity, a claim for securities fraud premised on a misstatement "cannot occur unless an alleged material misstatement was false *at the time it was made*." *Id.*  Thus, "[a] statement believed to be true when made, but later shown to be false, is insufficient." *Id.*  Moreover, the Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a particular statement is false or misleading; rather, "they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.

As to materiality, "there must be a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction." *In re Lululemon*, 14 F. Supp. 3d at 572; *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010) ("A misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision.").  However, "whether a reasonable investor would find a particular misrepresentation or omission 'material' to an investment decision is usually a matter reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) (citation omitted).  Therefore, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citation omitted).

### 1.  Statements of Fact

Defendants argue that the SAC fails to allege that any statement concerning the projected margin expansion or improvements in Metals was false *at the time it was made*.  The Court agrees. The underlying premise of the allegations regarding both sets of statements is that Defendants failed to disclose certain operational issues that existed within the Metals business, which rendered Defendants' statements false and misleading.  *See, e.g.*, Pl. Opp'n, Dkt. 60, at 7-9.  Although the SAC sets forth various statements made by Defendants during the Class Period and alleges that the statements were false and misleading, simply stating that the statements are false is not enough. *Rombach*, 355 F.3d at 174.  Notwithstanding the fact that certain operational issues may have existed within Metals, Plaintiffs do not show "how and why" Defendants' statements about the Company's plan to achieve 200 basis points of margin expansion by 2020, its plan to improve its Metals business, or its progress towards either goal were false or misleading at the time the statements were made.  *See In re Lululemon*, 14 F. Supp. 3d at 571 (noting that, "without *contemporaneous* falsity, there can be no fraud").

For instance, Plaintiffs argue that Defendants "touted" the importance of "an improved Metals business" to the projected margin expansion, but that "[u]nbeknownst to investors . . . , Metals was overrun with persistent and worsening operational inefficiencies, meaning that this foundational aspect of the Company's margin expansion goal rested on tenuous grounds."  Pl. Opp'n at 7.  Plaintiffs seem to suggest that, due to the existence of operational issues in Metals, Adient's projected margin expansion was not achievable.  *See, e.g.*, *id.* at 2 (arguing that throughout the Class Period, "Adient's Metals segment was not *improving*: it was getting *worse* and it could not contribute to a 200 bps margin improvement by 2020").  Even assuming that all of the CWs' statements are true, however, the fact that Adient experienced various challenges in Metals does not demonstrate how the

Company's projected margin expansion was "unreasonable," "unrealistic," or "reckless" at the time it was announced or subsequently discussed. *See id.* at 9; Tr. at 40. Indeed, Plaintiffs conceded at oral argument that there is no allegation in the SAC that any CW ever convinced McDonald or Stafeil that the projected margin expansion was not achievable, or that McDonald or Stafeil (or anyone else at the Company) ever suggested as much. *See* Tr. at 25. Nor do allegations of the issues in Metals render Defendants' statements about their efforts to improve that business false or misleading.

Defendants repeatedly made it clear that improvements in the Metals business was just one component of the projected margin expansion. During the quarterly earnings conference call on November 8, 2016, for example, McDonald explained that Adient's "guidance around margin expansion" was "really driven by 3 fundamental areas: one, improving our performance in our metals business; two, reducing our SG&A; and three, setting up a much leaner corporate overhead structure." SAC ¶ 116; *see also, e.g.*, *id.* ¶¶ 124, 133, 175. Plaintiffs also conceded at oral argument that an improvement in Metals was just one of three factors of the projected margin expansion. *See* Tr. at 33. Thus, while an improvement in Metals may have been intended to help Adient reach its overall expansion goal, it was not the only component of that plan. And, even if it is true that Metals was not achieving certain specific improvements, such a finding does not lead to the conclusion that Adient's overall projected margin expansion or plan to improve Metals in general was "unreasonable" or "unrealistic"—let alone false—at the time statements about it were made. Furthermore, there appears to be no dispute that Adient achieved certain aspects of its projected margin expansion, such as the cuts to SG&A expenses, *see id.*; Pl. Opp'n at 13,[8] or that Adient achieved *some* improvements with respect to its Metals business, such as closing unprofitable plants and expanding its business in China,

---

[8] Plaintiffs' counsel argued that this assertion is a "red herring" because "this case is not about the fact that there were [SG&A] cuts and that they contributed in an isolated manner to an improvement in the [C]ompany's short-term profits." Tr. at 33. Nevertheless, Plaintiffs do not dispute that Adient achieved at least some of its projected margin expansion.

*see, e.g.*, SAC ¶ 179; Tr. at 6-7, 16.

Plaintiffs also assert that Defendants "continued to artificially inflate Adient's stock price by citing ongoing progress" towards its projected margin expansion, *see* Pl. Opp'n at 8, and that they "falsely represented" that the Company was "on track" with respect to the Metals business, *id.* at 1. According to CW-1, for instance, "Metals could not have been 'on track' due to performance of engineering (late designs test failures) during development and lack of commercial discipline to move the price on changes." SAC ¶ 69. Based on this contention, Plaintiffs argue in their opposition that "Metals could not have been 'on track'" during the Class Period because of certain operational issues, such as "late designs and test failures." *See* Pl. Opp'n at 3; *see also id.* at 13 ("Metals was not 'on track' due to myriad issues including, *inter alia*, performance of engineering (late designs, test failures) during development, lack of commercial discipline to move the price on changes, and severe staffing and resource issues.").

Plaintiffs seem to conflate Defendants' statements about progress towards the projected margin expansion, on the one hand, and progress in improving the Metals business, on the other. As Defendants correctly point out in their reply brief, and reiterated during oral argument, Defendants did not make statements about *Metals* being "on track"; rather, such statements were made in the context of the *projected margin expansion* being "on track." *See* Def. Reply, Dkt. 61, at 3 n.6; Tr. at 6. Plaintiffs' assertion that Defendants made false representations about Metals being "on track" thus mischaracterizes Defendants' actual statements.[9] Virtually all of the challenged statements in the

---

[9] The only challenged statements that potentially relate to *Metals* being "on track" are (1) McDonald's statement from the November 2, 2017 call, in which—in the context of disclosing certain operational issues—he stated "We're going to work through some short-term issues. We think we're going to be back on track in the middle of '18 and beyond for us to get the improvements that we quite rightly expect from that business," SAC ¶ 157, and (2) McDonald's statement on January 17, 2018, in which he stated, "If you think about the margin expansion opportunities, the 100 to 200 basis points for Adient overall from Seat Structures & Mechanisms, about 1/3 of that was driven by the closure of some unprofitable plants, which are scheduled and remain on track for 2019; then secondly, the introduction and growth of our metals operations in China, which are highly profitable. . . . I'd say the 1/3 of our program which relates to those 2 initiatives is

SAC about the Company being "on track" were made in the context of the overall projected margin expansion, and did not concern specific improvements in the Metals division.[10]   Again, even assuming that all of the CW statements are true, the fact that Metals was unprofitable or experiencing certain issues does not show how or why Defendants' statements were false at the time they were made.  Nor does it show that Metals "could not contribute to a 200 bps margin improvement by 2020," as Plaintiffs suggest.  Pl. Opp'n at 2.  It is entirely possible that, at the time these statements were made, Adient was "on track" to reach its projected margin expansion at some point in the future, regardless of any specific operational issues that may have existed in Metals at the time.  Plaintiffs have not alleged sufficient facts to demonstrate otherwise.

Aside from the statements about the Company's progress, even those statements that described the Company's present conditions are not adequately alleged to be false or misleading.  *See, e.g.*, SAC ¶ 159 ("But right now, just like [when] we were going into '17, our ability to improve the margins in our business is entirely within our own control."); *id.* ¶ 170 ("I will say we have been seeing positive trends.  We are watching our daily premium freight.  We are watching our jobs per hour, our machine utilization.  All that is improving and it is trending in the right direction.  So I think we have a lot of comfort around there."); *id.* ¶ 177 (explaining that the launch issues were on "the other side of the mountain," and stating "I would say we're not all the way down it, for sure.  But we

solidly on track," SAC ¶ 179.  The first statement is a forward-looking statement of opinion and is inactionable for the reasons discussed later in this Opinion.  As to the second, the SAC has not adequately alleged that it is false.  For instance, Plaintiffs have not alleged that Adient was not still on schedule to close unprofitable plants at the time McDonald made that statement, or that growth in the Metals business in China was not actually "highly profitable."

[10] *See, e.g.*, SAC ¶ 129 ("Clearly, the results [posted] today, combined with the performance achieved in Q4 of last year, demonstrate we're on track to delivering our short-term margin improvements."); *id.* ¶ 136 ("Regarding our goal to increase our margins by 200 basis points excluding equity income, we remain solidly on track."); *id.* ¶ 142 ("So we're 3 quarters way through a year here in fiscal 2017.  And I guess, my overall comment is I think we're solidly on track in terms of delivering the commitments that we've made to the investment community, both here in the short term, but also the trajectory on to deliver our midterm commitment."); *id.* ¶ 143 ("We included a chart showing our progress towards our goal to increase Adient's margin by 200 basis points, excluding equity income.  As you can see from the chart on the left-hand side of the slide, we're solidly on track and have made significant progress over the past 4 quarters."); *id.* ¶¶ 157-158 ("the progression to our 200 basis point improvement in margins remains on track").

are in a situation where the premium price and other things are falling out of our system and we're seeing recovery."). Plaintiffs do not sufficiently plead how or why such statements are false. Plaintiffs do not allege, for instance, that Adient's daily premium freight, "jobs per hour," or machine utilization were not improving at the time, or that Defendants did not believe that they were starting to resolve some of the launch issues and see some recovery.

For all of the reasons discussed above, the SAC fails to adequately allege any false or misleading statements of fact.

### 2. Omissions

Plaintiffs' allegations also fail under an omissions theory. A "pure omission" is only "actionable under the securities laws [] when the corporation is subject to a duty to disclose the omitted facts." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Nonetheless, "pure omissions," which are generally not actionable, differ from "half truths," or "statements that are misleading under the second prong of Rule 10b-5 by virtue of what they omit to disclose." *In re Vivendi*, 838 F.3d at 239-40. "The law is well settled [] that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds, Gabelli v. SEC*, 568 U.S. 442 (2013); *see also In re MBIA*, 700 F. Supp. 2d at 578 ("A statement can [] be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact.") (quoting *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 393 (S.D.N.Y. 2006)).

Plaintiffs argue that Defendants "failed to disclose material information that was contemporaneously available to them *at the time they made their statements*, showing that Metals was in fact struggling, not improving, and that its ability to contribute to Adient's margin expansion goal was unreasonable and unrealistic." Pl. Opp'n at 9. In particular, Plaintiffs argue that Defendants

"knew, or had access to facts demonstrating, that ongoing inefficiencies, launch problems, personnel/staffing problems, and other issues in Metals made their statements about Metals' improvement and the margin plan misleading." *Id.* at 8. The allegations in the SAC do not demonstrate that Defendants failed to disclose material facts as to the operational issues in Metals. Plaintiffs' conclusory allegations about issues in Metals, primarily based on the CWs' subjective views of how the Company should have managed such challenges, are not sufficient to demonstrate that any of the statements were inaccurate at the time they were made, or that any Defendant believed them to be so. To the contrary, Defendants publicly disclosed that, as issues arose in the Metals division, they began to "examin[e] the composition" of the projected margin expansion, and explained that if Metals is "incapable of delivering the 100 to 200 basis points of improvement by 2020," they would "look to execute . . . other things within the rest of [the Company] to offset the shortfall." SAC ¶ 190. As discussed more in the context of opinion statements, Plaintiffs do not sufficiently allege facts supporting their assertion that Defendants failed to disclose contradictory, material information that rendered their public statements false or misleading.

### 3. Statements of Opinion or Belief

In addition to objective statements or omissions of material fact, "subjective statements of opinion" may also give rise to liability under Section 10(b) in "two distinct ways." *See Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 23 (S.D.N.Y. 2016). First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief [he] professed' or 'the supporting fact[s] [he] supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund.*, 575 U.S. 175, 185-86 (2015)). However, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong." *Omnicare*, 575 U.S.

31

at 186.  As the Second Circuit "has firmly rejected [the] 'fraud by hindsight' approach" it is "not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Lopez*, 173 F. Supp. 3d at 24 (citations omitted).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194).  A reasonable investor "expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker's] possession at the time." *Omnicare*, 575 U.S. at 188-89.  To sufficiently allege that a statement of opinion was false or misleading through the omission of material information, a plaintiff "must identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Sanofi*, 816 F.3d at 209 (quoting *Omnicare*, 575 U.S. at 194).  The "core inquiry" is thus "whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"  *Id*. at 210 (quoting *Omnicare*, 575 U.S. at 189).  The Supreme Court, however, has "cautioned against an overly expansive reading of this standard, noting that '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,' and adding that '[a] reasonable investor does not expect that *every* fact known to [a speaker] supports its opinion statement.'"  *Id*. (quoting *Omnicare*, 575 U.S. at 189-90).  Therefore, "a statement of opinion 'is not necessarily misleading when [a speaker] knows, but fails to disclose, some fact cutting the other way.'" *Id*. (quoting *Omnicare*, 575 U.S. at 189).  "Moreover, whether an omission makes an expression of opinion misleading always depends on context. . . . So an omission that renders misleading a statement of opinion when viewed

in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame."

*Omnicare*, 575 U.S. at 190.

Here, many of the challenged statements in the SAC are statements of the Individual Defendants' beliefs and opinions. *See, e.g.*, SAC ¶ 113 ("We think we have a couple hundred basis points of margin expansion we can deliver . . . ."); *id.* ¶ 142 ("I think we're solidly on track in terms of delivering the commitments that we've made to the investment community."); *id.* ¶ 149 ("[W]e're very pleased with what we've seen from an operational standpoint."). As Plaintiffs explained at oral argument, their theory of liability as to these opinion statements is that Defendants allegedly failed to disclose "underlying facts that directly contradicted those statements," rendering those opinions misleading. Tr. at 35; *see also id.* at 36 ("So we're proceeding under the final prong for opinions. . . . We're asserting that it's the knowledge they had, or the material facts that they were in possession of, concerning the [M]etals issues that were not disclosed[.]"). But the SAC does not plausibly allege any specific material facts—omitted from Defendants' statements—that rendered the opinion statements false or misleading to a reasonable investor. To the contrary, challenges within the Metals business were known prior to Adient's spinoff from JCI, *see* Def. Mot., Dkt. 58, at 14; *see also, e.g.*, SAC ¶¶ 36, 112, 125, and at certain points throughout the Class Period, Defendants publicly acknowledged that Metals needed "fixing," and explained the steps the Company was taking to that end, *see, e.g.*, SAC ¶ 147. Defendants also disclosed specific operational issues in the Metals business as they arose, beginning in November 2017. *See, e.g., id.* ¶¶ 156, 170, 175, 176, 187, 188.[11]

The Court agrees with Defendants that, at most, the SAC "offers the subjective opinions of a few former Adient employees that the plan to improve Metals, the driver of only one-quarter of the

---

[11] In fact, as early as July 2017, Defendants' public statements recognized that Adient was experiencing certain "headwinds" in the Metals business. *See, e.g.*, SAC ¶ 142.

projected margin expansion, was improperly implemented." *See* Def. Mot. at 16; *see also, e.g.*, SAC ¶¶ 61, 66-75, 77-79. Such allegations are insufficient to support a Section 10(b) claim. *In re Lululemon Securities Litigation* is instructive on this point. There, the plaintiffs relied on statements from eleven CWs to support allegations "that defendants' statements were false and misleading under the following theory: every time defendants spoke publicly about the high quality of the company's products or the fact that the company performed quality control testing during the Class Period, such statements were false and misleading because they failed to also disclose other quality control issues and types of product testing that were not being performed." 14 F. Supp. 3d at 579. The court rejected that argument as unsupported by both the law and the CWs' allegations, explaining that "[n]otably, none of the CWs is alleged to be the 'maker' of any of the alleged misstatements, and it is the facts known to, and the intent of, the maker of the statements which is ultimately relevant when the Court considers the falsity of statements of belief or opinion." *Id.* at 580; *see also id.* ("Even accepting these allegations as true, as the Court must, they do not substitute for well-pleaded allegations of contemporaneous falsity—that the makers of the statements about product quality knew their statements were false or misleading *at the time they were made*."). Likewise, here, none of the CWs are alleged to have made any of the challenged statements, and the SAC does not adequately show that any Defendant falsely or unreasonably held the opinions they publicly discussed.

Additionally, many of the statements made during and after the first "partial disclosure" on November 2, 2017 are inactionable opinion statements as they consist of the Individual Defendants' predictions of future performance. *See In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). Plaintiffs allege that these statements were false and misleading because, although Defendants "selectively disclose[d] certain operational issues" that existed in Metals, they nonetheless "fail[ed] to disclose key facts related to others." Pl. Opp'n at 14. The Court again finds *In re Lululemon* to be

especially useful in this analysis.  In *Lululemon*, the court found that certain statements about the "quality" of the company's products were inactionable because they were not "guarantees of absolute quality at all times," but rather were "statements of goals or beliefs, along with explicit recognition of the possibility of product defects and the need for continued investment in these aspects of the business." *In re Lululemon*, 14 F. Supp. 3d at 578.  Similarly, here, the challenged statements about improvements in Metals and the Company's continued progress towards the projected margin expansion were "statements of goals or beliefs," and at the time that Defendants made such statements, they "explicit[ly] recogni[zed]" the challenges they faced to achieve their goals.

During the quarterly earnings conference call on January 29, 2018, for instance, McDonald stated that Adient was "not backing away from [its] commitment to deliver 200 basis point[s] of . . . margin improvement by the end of 2020," and that the Company was "currently examining the composition of this 200 basis points."  SAC ¶ 190.  In doing so, the Company acknowledged certain issues in the Metals business and explained to investors that "for example, if . . . our [Metals] business is incapable of delivering the 100 to 200 basis points of improvement by 2020, we'll look to execute . . . other things within the rest of our organization to offset the shortfall." *Id.*  Plaintiffs have failed to sufficiently allege facts that show that Defendants did not believe these opinions and expectations at the time they made the statements. *See In re Lululemon*, 14 F. Supp. 3d at 578 (finding that statements about the company's expectation with respect to the quality of its product were not false or misleading because the complaint failed to allege "any facts that tend to show that the company did not believe this expectation at the time").  That Metals was experiencing challenges does not mean that Defendants' expectations of still achieving certain improvements in Metals and/or the 200 basis points goal were false or unreasonably held, or that any CW ever told any Defendant as much.

In sum, Defendants' statements about what they "think," "believe," and "expect" to occur in

the future are inactionable statements of opinion or belief.  *See, e.g.*, *Steamfitters Local 449 Pension Plan v. Sketchers U.S.A., Inc.*, No. 17 Civ. 8107 (AT),  2019 WL 4640217, at \*5-6 (S.D.N.Y. Sept. 23, 2019).  The SAC thus fails to adequately allege that any of Defendants' statements—of fact or opinion—were false or misleading at the time they were made, or that Defendants omitted any material facts that made them so.

**B.  Many of the Challenged Statements are Inactionable for Additional Reasons**

Even if the SAC were to have adequately pled that Defendants' statements were false or misleading when made, the statements are nonetheless inactionable because they are forward-looking statements accompanied by meaningful cautionary language and/or inactionable puffery.

**1.  Forward-Looking Statements**

Forward-looking statements may be precluded from liability under the PSLRA's safe harbor. *See* 15 U.S.C. § 78u-5.  As a general rule, forward-looking statements are "statements whose truth cannot be ascertained until some time after they are made."  *In re Vale S.A. Sec. Litig.*, No. 15-cv-9539-GHW, 2017 WL 1102666, at \*24 (S.D.N.Y. Mar. 23, 2017) (quoting *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011)).  The PSLRA specifically defines "forward-looking statements" as those that contain, among other things, "the plans and objectives of management for future operations," "future economic performance," and "a projection of revenues, income . . . , [or] earnings."  15 U.S.C. § 78u-5(i)(1).

Under the PSLRA's safe harbor, a defendant "shall not be liable with respect to any forward-looking statement" if (1) the forward-looking statement is "identified" as such and "accompanied by meaningful cautionary statements," or (2) the forward-looking statement is "immaterial," or (3) the plaintiff "fails to prove that the forward-looking statement . . . if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(A)-(B).  "Because the statute is written in the disjunctive, statements are protected by the safe

harbor if they satisfy any one of these three categories."  *Lopez*, 173 F. Supp. 3d at 25 (citing *Slayton*

*v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)); *see also In re WEBMD Health Corp. Sec. Litig.*,

No. 11 Civ. 5382 (JFK), 2013 WL 64511, at *7 (S.D.N.Y. Jan. 2, 2013) ("As the Second Circuit has

noted, the safe harbor is written in the disjunctive, meaning that a defendant is not liable if *any* of

these provisions apply.") (citing *Slayton*, 604 F.3d at 766).[12]

  To fall within the "meaningful cautionary statements" prong of the safe harbor, the cautionary

language "must convey substantive information about factors that realistically could cause results to

differ materially from those projected in the forward-looking statement."  *Slayton*, 604 F.3d at 771.

In other words, "defendants must demonstrate that their cautionary language was not boilerplate and

conveyed substantive information."  *Id.* at 772; *see also In re Salix Pharms., Ltd.*, No. 14-CV-8925

(KMW), 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("Vague disclosures of general risks

will not protect defendants from liability.") (quoting *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F.

Supp. 2d 277, 304 (S.D.N.Y. 2013)); *Lopez*, 173 F. Supp. 3d at 25 ("Plaintiffs may establish that

cautionary language is not meaningful 'by showing, for example, that the cautionary language did not

expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss.'")  (quoting

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).

  The PSLRA safe harbor also "specifies an 'actual knowledge' standard for forward-looking

statements," which means that "the scienter requirement for forward-looking statements is stricter

than for statements of current fact.  Whereas liability for the latter requires a showing of either

---

[12] Similarly, the judicially-created "'bespeaks caution' doctrine generally protects forward-looking statements that adequately disclose the risk factors that might cause a different outcome to occur than the the one then forecast by the issuer." *Lopez*, 173 F. Supp. 3d at 39 (citing *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) ("*Iowa Pub.*")).  This doctrine provides that a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  *Iowa Pub.*, 620 F.3d at 141.  "In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency."  *Id.*

knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 773 (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)).  For a forward-looking statement to be actionable, the plaintiff must show that the statement was "made with actual knowledge of [its] falsity by the speaker."  *In re Salix*, 2016 WL 1629341, at *9 (citing 15 U.S.C. § 78u-5(c)(1)(B)(i)-(ii)); *see also In re WEBMD*, 2013 WL 64511, at *7 ("In evaluating forward-looking statements (as opposed to statements of current fact), a[n] inference of mere recklessness is not enough[.]").

Statements about Adient's projected margin expansion and how the Company planned to achieve that goal are forward-looking under the PSLRA.  Such statements, at a minimum, involve "the plans and objectives of management for future operations" and "future economic performance." 15 U.S.C. § 78u-5(i)(1); *see also, e.g.*, *Lefkowitz v. Synacor, Inc.*, No. 18 Civ. 2979 (LGS), 2019 WL 4053956, at *9 (S.D.N.Y. Aug. 28, 2019) (statements about projected increases in revenue and adjusted EBITDA are forward-looking); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (statements about company's earnings projections and "prospective performance" are forward-looking); *In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603 (RWS), 2004 WL 1415973, at *11-12 (S.D.N.Y. June 23, 2004) (statements about company's "earning forecasts" are forward-looking).  Indeed, the SAC makes it clear that Defendants consistently spoke about the projected margin expansion in future terms.  *See, e.g.*, SAC ¶ 117 ("We've kind of cemented that number and are marching towards a 200 basis point improvement plan from that over the next, let's say, 3 years."); *id.* ¶ 124 ("We've talked about a journey towards 200 basis points of margin improvement over the next couple of years.").  Moreover, it is undisputed that the projected margin expansion was based on a number of factors, including but not limited to an anticipated improvement in the Metals business.  While statements about improvements in Metals may not be as obviously

"forward-looking," the SAC nonetheless confirms that these statements also contained a "plan[] and objective[] of management for future operations," to be realized several years in the future, and thus can also be characterized as "forward-looking." That Defendants repeatedly spoke about Metals as a "2018," "2019," or even "2020" "story" throughout the Class Period reinforces this conclusion. *See, e.g.*, *id.* ¶¶ 130, 136, 148, 149, 157.[13]

Even statements about Adient being "on track" with respect to its projected margin expansion are "forward-looking" statements within the meaning of the PSLRA, and not statements of "present fact," as Plaintiffs suggest. The Second Circuit has held that "'[a] statement may contain some elements that look forward and others that do not,'" and that "'forward-looking elements' *may* be 'severable' from 'non-forward looking' elements." *See In re Vivendi*, 838 F.3d at 246 (quoting *Iowa Pub.*, 620 F.3d at 144) (emphasis added). "However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." *In re Supercom Inc. Sec. Litig.*, No. 15 Civ. 9650 (PGG), 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) (citation omitted).

The Court is persuaded by the analysis in *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009). There, the Third Circuit held that the company's statements that its first quarter results "position[ed]" it to meet goals for the year, and that company was "on track" to meet projections, "when read in context," could not "meaningfully be distinguished from the future

---

[13] Plaintiffs barely address whether any of the challenged statements can properly be categorized as "forward-looking," stating only that "Defendants' statements about historical or present facts are not protected" by the PSLRA's safe harbor. *See* Pl. Opp'n at 16-17. The Court does not disagree with Plaintiffs' assertion that statements "of historical or present fact" are not protected by the safe harbor, *id.* at 16, but for the reasons discussed herein, the Court finds that many of Defendants' statements are indeed forward-looking.

projection of which they [were] a part." 564 F.3d at 255. As the Third Circuit explained, "[t]hese statements do not justify the financial projections in terms of any particular aspect of the company's current situation; they say only that, whatever that situation is, it makes the future projection attainable. Such an assertion is necessarily implicit in every future projection." *Id.*; *see also id.* at 256 (noting that it "could be true, for example, both that current sales are weak, and that future sales will be strong").

*In re Supercom Inc. Securities Litigation* is also on point. As Judge Gardephe explained there, the "present tense portion" of a statement "that Defendants had 'all the information in hand to support these numbers'" for their projected revenue and margins "[did] not provide any specific information about [the company's] current circumstances" and was therefore "too vague to be actionable apart from the future projection[s]." 2018 WL 4926442, at *21 (citations omitted). Similarly, here, statements that the Company was "on track" to reach the projected margin expansion and related growth are "too vague to be actionable apart from the future projection." These statements provide no specific information as to Adient's current circumstances, but rather contain information related only to its future projections. *See also, e.g.*, *In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 Civ. 7840 (RJS), 2018 WL 2081859, at *12-13 (S.D.N.Y. Mar. 30, 2018) (finding that statements that "we remain on track to deliver adjusted EBITDA in line with expectations" are protected by the PSLRA's safe harbor because such statements "project future results and incorporate language, such as the words 'expect' and 'expectation,' that signal the statements' reference to future results"); *Int'l Ass'n of Heat v. IBM Corp.*, 205 F. Supp. 3d 527, 537 (S.D.N.Y. 2016) ("Defendants' statements that they were 'on track toward [the] 2015 roadmap for operating EPS of at least $20,' and 'expect[ed] to deliver at least $20 of operating EPS in 2015' were forward-looking statements."); *In re Molycorp, Inc. Sec. Litig.*, No. 13 Civ. 5697 (PAC), 2015 WL 1097355, at *14 (S.D.N.Y. Mar. 12, 2015)

("Defendants' statement that 'We also believe that we're on the path for market acceptance of XSORBX into drinking water purification markets[]' . . . is forward-looking, as it clearly identifies future intentions and includes language signaling a forward-looking statement, and is accordingly protected by the safe harbor provision."); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) (finding that a "press release stating that the Institutional Division 'is on track to deliver a turnaround at an underlying level, with excellent revenue growth' is not actionable" because "a good-faith statement that [the company] was 'on track' to achieve some goal does not serve as a guarantee that the goal will indeed be achieved").[14]

Having found that Defendants' statements are forward-looking statements, the Court must next address whether the statements were identified as such and accompanied by meaningful cautionary language, or whether Plaintiffs have failed to show that the statements were made with "actual knowledge" of their falsity.[15]   A determination of either in the affirmative is sufficient to confer safe harbor protection.  *See In re WEBMD*, 2013 WL 64511, at *7 ("Defendants will not be

---

[14] Statements about Adient's progress with respect to certain goals, including it being "on track," also constitute inactionable puffery. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-58 (S.D.N.Y. 2018) (finding that statements that the company had "made remarkable progress towards our stated goal of advancing our expanding pipeline towards commercialization," was "confident about and prepared for what lays ahead," was "'proud' to be 'on track to have these products reach the market in 2016,'" and was "confident in these products and our overall commercialization strategy," were inactionable puffery because "[s]uch statements do no more than place a 'positive spin on [certain] developments'"); *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) (finding that "statements by Defendants extolling their 'unique commercial business model' . . . noting that the company was 'on track' . . . and highlighting that prescription growth was 'exceeding [their] expectations'" are "textbook cases of corporate puffery or optimism" and thus "not actionable under the securities laws"); *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069 (LGS), 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015) (finding that "Defendants' characterization of the process in these statements—including use of the terms 'timely' and 'on track'—'reflect[] only the slightest degree of optimism,'" and thus "insofar as these statements place a positive spin on developments . . . , they constitute inactionable puffery and corporate optimism").  These statements may also be properly characterized as opinion statements.  *See Jiehua Huang v. AirMedia Grp. Inc.*, No. 15-cv-04966, 2017 WL 1157134, at *8 (S.D.N.Y. Mar. 27, 2017) (finding that "representations that a merger was 'on track . . . could not possibly be understood as anything but opinions' because of 'the usual level of uncertainty as to whether any proposed merger will actually be completed") (quoting *Elliot Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115 (SAS), 2000 WL 1752848, at *2 (S.D.N.Y. Nov. 28, 2000)).

[15] The Court finds that the challenged statements were "material" and thus does not address that prong.  *See Ganino*, 228 F.3d at 162.

liable as a matter of law for any forward-looking statements if the statements are identified as forward looking and accompanied by meaningful cautionary language; or, alternatively, if Plaintiffs fail to prove that the statement was made with actual knowledge that it was false or misleading.").

As detailed more fully in the scienter analysis below, Plaintiffs have failed to plead sufficient facts to support a strong inference of scienter or, as relevant here, an inference that any Defendant had "actual knowledge" of any statement's falsity.   The PSLRA's safe harbor thus protects Defendants' forward-looking statements from liability, regardless of whether those statements were accompanied by meaningful cautionary language.  *See id.* (holding that because "Plaintiffs have not proven actual knowledge, . . . the safe harbor shields Defendants from liability," and explaining further that "[b]ecause Defendants qualify for protection under the 'actual knowledge' prong of the safe harbor, the question whether they also qualify under the 'meaningful cautionary language' prong is moot").  Plaintiffs do not seriously address the question of whether the SAC adequately pleads "actual knowledge" as to any of the forward-looking statements.  They merely argue, in a footnote, that "[t]o the extent the statements are forward looking, . . . Defendants also knew they were misleading . . . , and so they are not protected."  Pl. Opp'n at 18 n.15.  Plaintiffs cite SAC paragraphs 88 through 106 for that assertion, but as discussed in the scienter analysis, none of the allegations contained in those paragraphs establish that any Defendant acted with sufficient recklessness so as to establish scienter, let alone had "actual knowledge" of any statement's falsity.  *See Slayton*, 604 F.3d at 776 n.9 ("We emphasize that under this prong of the statutory safe harbor, the plaintiffs must show more than recklessness—an objective inquiry—they must show actual subjective knowledge. Therefore, even if we were to conclude, based on the alleged facts, that [a certain issue was] 'so obvious that . . . defendant[s] must have been aware of it,' . . . this would not avail the plaintiffs.") (citations omitted).

Plaintiffs instead focus their arguments regarding the safe harbor on the contention that Defendants' cautionary language was not "meaningful" because the disclosures (1) "never mention Metals or its ongoing problems," (2) "fail to mention the risk that by cutting its SG&A staffing as part of the margin expansion plan, Adient was actually significantly hampering Metals and its ability to launch new programs," and (3) "did not change over time, rendering them even less meaningful." Pl. Opp'n at 18.  Although the Court need not find that the statements were accompanied by meaningful cautionary language to preclude liability under the safe harbor, it nonetheless concludes that several of the challenged statements were indeed accompanied by such language.  For instance, the first slide of the presentations for the quarterly earnings conference calls, where many of the challenged statements were made, was titled "Forward looking statement,"[16] and explicitly stated that Adient had "made statements in this document that are forward-looking," such as statements about "Adient's future financial position, sales, costs, earnings, cash flows, other measures of results of operations, capital expenditures or debt levels and plans, objectives, outlook, targets, guidance or goals."  See Def. Mot. Ex. 4 at 2; see also Def. Mot. Ex. 6 at 2, Ex. 8 at 2, Ex. 10 at 2, Ex 12 at 2, Ex. 14 at 2, Ex. 16 at 2, Ex. 18 at 2.  Defendants cautioned that statements made on the calls were "subject to numerous important risks, uncertainties, assumptions and other factors, some of which are beyond Adient's control, that could cause Adient's actual results to differ materially from those expressed or implied by such forward-looking statements."  See, e.g., Def. Mot. Ex. 4 at 2.[17]  The disclaimers also

---

[16] Starting with the November 2, 2017 presentation, the slide was instead titled "Important information," although it still contained the same substance of the Company's disclaimer on forward-looking statements.  See, e.g., Def. Mot. Ex. 12 at 2.

[17] These risks included, for instance, risks related to: "the expected tax treatment of the spin-off, the impact of the spin-off on the businesses of Adient, the ability of Adient to meet debt service requirements, the risk that disruptions from the spin-off will harm Adient's business, competitive responses to the spin-off, general economic and business conditions that affect Adient following the spin-off, the strength of the U.S. or other economies, automotive vehicle production levels, mix and schedules, energy and commodity prices, the availability of raw materials and component products, currency exchange rates, and cancellation of or changes to commercial arrangements."  See, e.g., Def. Mot. Ex. 4 at 2.

specifically referenced "certain projections provided by Adient with respect to the anticipated future performance of Adient's businesses," that such "projections reflect various assumptions of Adient's management concerning the future performance of Adient's businesses, which may or may not prove to be correct," and that the "actual results may vary from the anticipated results and such variations may be material." *See, e.g.*, Def. Mot. Ex. 4 at 2.[18]   It is true that Defendants' cautionary language could have identified other, more specific risks as well, as Plaintiffs suggest.   But regardless of whether it did so or not, Defendants' forward-looking statements are entitled to safe harbor protection because Plaintiffs have failed to show that any of the statements were made with "actual knowledge" of their falsity.

Moreover, the Form 10-Ks that Adient periodically filed with the SEC contained cautionary language with respect to potential "launch difficulties," as well as the fact that the Company's success depended on "attracting and retaining qualified personnel" and a "variety of other factors." *See, e.g.*, SAC ¶ 121.   In these risk disclosures, Adient explicitly addressed certain of the operational issues that the CWs reference in the SAC, stating that the Company's ability to "deliver its growth objectives and execute its strategic plan" could be adversely affected by, among other things, "[f]ailure to ensure that Adient has the leadership capacity with the necessary skill set and experience," "[o]rganizational

---

And, contrary to Plaintiffs' claim that the Company's language did not change at all over time, the risks identified on the disclaimer slide did vary throughout the Class Period.  For instance, the slide from the November 2, 2017 call added "the ability of Adient to effectively integrate the Futuris business" as a potential risk, *see* Def. Mot. Ex. 12 at 2, and the slide from the January 29, 2018 call added other risks such as "the ability of Adient Aerospace to successfully implement its strategic initiatives or realize the expected benefits of the joint venture" and "the impact of tax reform legislation through the Tax Cuts and Jobs Act," *see* Def. Mot. Ex. 14 at 2.

[18] Additionally, as made evident by the accompanying transcripts for the calls, Mark Oswald, Adient's Vice President in Investor Relations, started each call by stating that the "conference call will include forward-looking statements," that such "statements are based on the environment as we see it today, and therefore, involve risks and uncertainties."  *See* Def. Mot. Ex. 5 at 1; *see also* Def. Mot. Ex. 7 at 1, Ex. 9 at 1, Ex. 11 at 1, Ex. 13 at 1, Ex. 15 at 1, Ex. 17 at 1, Ex. 19 at 1.  He further warned that "actual results could differ materially from these forward-looking statements made on the call."  *See, e.g.*, Def. Mot. Ex. 5 at 1.  Oswald also consistently referred investors to the disclaimer slide of the presentation that included more information on these risks.  *See, e.g., id.*

and reporting changes as a result of any future leadership transition and corporate initiatives," and "any unplanned turnover or inability to attract and retain key employees." *Id.*[19] The Company further explained in its filings that "[t]he launch of new business is a complex process, the success of which depends on a wide range of factors," and that "Adient's failure to successfully launch material new [sic] or takeover business could have an adverse effect on Adient's profitability and results of operations." *Id.*; *see also id.* ¶ 166.[20] At a minimum, the cautionary language about "program launch difficulties" and the potential failure to "attract[] and retain[] qualified personnel" are examples of risks "directly relate[d] to the risks that ultimately are alleged to have, in part, brought about Plaintiffs' losses," and are thus sufficiently meaningful. *See In re Nokia Oyj*, 423 F. Supp. 2d at 401. That the disclaimers did not specifically include the word "Metals" does not render the cautionary language meaningless. *Id.*; *see also In re WEBMD*, 2013 WL 64511, at *9-10 (rejecting plaintiffs' argument that cautionary language was not meaningful in part because "Defendants were not obligated to predict correctly 'the particular factor that ultimately causes [their] projection not to come true'"); *In re Avon Prods., Inc. Sec. Litig.*, No. 05 Civ. 6803 (LAK) (MHD), 2009 WL 848017, at *25 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted by* 2009 WL 10698359 (S.D.N.Y. Mar. 18,

---

[19] It also explicitly stated that factors such as "the loss of, or changes in, automobile supply contracts, sourcing strategies or customer claims with Adient's major customers or suppliers; start-up expenses associated with new vehicle programs or delays or cancellations of such programs; underutilization of Adient's manufacturing facilities, which are generally located near, and devoted to, a particular customer's facility; inability to recover engineering and tooling costs; market and financial consequences of any recalls that may be required on products that Adient has supplied or sold into the automotive aftermarket; delays or difficulties in new product development and integration; quantity and complexity of new program launches, which are subject to Adient's customers' timing, performance, design and quality standards; interruption of supply of certain single-source components; the potential introduction of similar or superior technologies; changing nature and prevalence of Adient's joint ventures and relationships with its strategic business partners; and global overcapacity and vehicle platform proliferation" all could "materially and adversely" affect Adient's proposed operational plans. *Id.*

[20] Although Plaintiffs argue that some of the risks regarding "staffing and launches" had "already come to pass" at the time the disclosures were made, thereby undermining the contention that these disclosures concerned "potential risks," Pl. Opp'n at 18, as Defendants correctly point out, the SAC does not actually allege that such risks "already came to pass," *see* Def. Reply at 7.

2009) (rejecting plaintiffs' argument that cautionary language was not meaningful despite plaintiffs' assertion that the language "did not specifically reference the business practices that plaintiffs themselves have targeted").[21]

Because the SAC fails to plead that any of the forward-looking statements were made with actual knowledge, and because at least some of those statements were identified as forward-looking and accompanied by meaningful cautionary language, Defendants' forward-looking statements are precluded from liability under the PSLRA's safe harbor.

## 2.   Inactionable Puffery

Although the parties do not focus on whether the challenged statements constitute inactionable puffery, the Court nonetheless finds that many of them do, especially those concerning the Company's plan to improve the Metals business.  A statement of "puffery," i.e. "an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it," is not actionable. *Galestan*, 348 F. Supp. 3d at 297-98; *see Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (noting that "statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); *In re Lululemon*, 14 F. Supp. 3d at 572 (noting that statements of mere "[r]osy predictions" or "that are loosely optimistic regarding a company's well-being[]" are "too vague and general to be actionable" under the securities laws); *see also Galestan*, 348 F. Supp. 3d at 298 (explaining that the rule regarding puffery "permits companies 'to operate with a hopeful outlook,' because corporate officers 'are not required to take a gloomy, fearful or defeatist view of the future'") (quoting *Rombach*, 355 F.3d at 174).

---

[21] Plaintiffs also assert that the PSLRA's safe harbor does not apply to Defendants' statements because Defendants "failed to disclose material problems and uncertainties concerning Metals and its ability to contribute to margin improvement." Pl. Opp'n at 18-19.  While it is true that the safe harbor "does not protect material omissions," *In re Salix*, 2016 WL 1629341, at *9, Plaintiffs have failed to sufficiently plead any material omissions, as discussed above.  This argument thus fails.

Notwithstanding the rule against puffery, statements regarding "projections of future performance may be actionable . . . if they are worded as guarantees or are supported by specific statements of fact, . . . or if the speaker does not genuinely or reasonably believe them." *In re IBM*, 163 F.3d at 107 (citations omitted); *see also Jiehua Huang v. AirMedia Grp. Inc.*, No. 15-cv-04966, 2017 WL 1157134, at *8 (S.D.N.Y. Mar. 27, 2017) ("Mere opinions and predictions of future performance are not actionable under the securities laws unless they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them.") (internal quotation marks and citation omitted).

Many of the challenged statements in the SAC are too general for a reasonable investor to have relied on them. This is particularly true where they were "accompanied by the types of qualifiers which render the statements even more in the nature of puffery," such as what Defendants "expected" to see, what they "felt confident" about, and what they were "comfortable" with. *See In re Vale*, 2017 WL 1102666, at *22 (statements were puffery where they concerned "what Vale is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are"). These types of general statements of corporate optimism are inactionable under the securities laws because they are not "sufficiently specific that a reasonable investor could rely on [them] as a 'guarantee of some concrete fact or outcome.'" *Lopez*, 173 F. Supp. 3d at 29 (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014)); *see also, e.g.*, *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (statement describing results of findings as "encouraging" was puffery); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 810-11 (2d Cir. 1996) (statements that the company was "optimistic" about earnings and "expected" good performance were puffery).

While statements do not constitute inactionable puffery where they "contradict facts that are

47

known to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or where they amount to "'misrepresentations of existing facts' that were made even though the speaker 'knew that the contrary was true,'" *Galestan*, 348 F. Supp. 3d at 298 (quoting *Novak*, 216 F.3d at 315), Plaintiffs have not sufficiently pleaded such facts here.  Put differently, Plaintiffs have not alleged specific contradictory facts that would have rendered false Defendants' general statements about improvements in Metals or progress within the Company.  Indeed, the key inquiry in determining whether a statement amounts to puffery is "not whether the topic of a statement was a key to corporate success, but the nature of the specific statement and whether it concretely assured investors of anything." *Lopez*, 173 F. Supp. 3d at 29.  Metals may have been important to Adient's success, but Defendants' statements about improvements in Metals were not sufficiently specific or concrete to mislead reasonable investors.

As just two examples, Stafeil's statements on November 8, 2016 that the Company had seen "a big improvement in [M]etals" and "a little bit of improvement on the metals side," SAC ¶ 118, and McDonald's statement on January 11, 2017 that Metals was "on [the] upwards trajectory," *id.* ¶ 125, are broad statements of corporate optimism.  These statements, and others like them, did not reference specific improvements in Metals that were actually false at the time or could have misled a reasonable investor, and Plaintiffs have failed to show that such statements were concrete, specific statements of fact.  These types of statements are therefore not actionable. *See Lopez*, 173 F. Supp. 3d at 27-28 ("[S]tatements that are too vague or general or are merely reflections of corporate puffery are not actionable.").

Finally, Defendants argue that Plaintiffs' allegations concerning statements made after May 3, 2018, when Adient publicly disclosed that the projected margin expansion was no longer achievable, are "nonsensical."  Def. Mot. at 19.  According to Defendants, the "gravamen of the SAC"

48

is that Defendants' statements were false and misleading because they failed to disclose "facts that 'made a 200 basis point margin expansion unachievable.'" *See id.* (quoting SAC ¶ 6); *see also* SAC ¶¶ 115, 167, 181, 192, 206, 231, 342. Thus, Defendants argue, "the SAC fails to allege how, under that theory, Defendants' statements *after* Adient disclosed the expansion was unachievable could be misleading." Def. Mot. at 19. Plaintiffs do not directly address this contention in their opposition, and only briefly touched upon it at oral argument. In any event, the Court finds the statements from this time period inactionable for many of the same reasons discussed above.

The challenged statements made during and after the May 3, 2018 disclosure generally concern the expected "turnaround" in Metals, notwithstanding the disclosed challenges. As to those statements, Plaintiffs allege that Defendants "continued to mislead the market by falsely reassuring investors that a strategic review of the [Metals] division and new management in [Metals] was rapidly stabilizing the business and driving near-term improvements." SAC ¶ 201. But, like many of the others, these statements amount to inactionable opinions and/or puffery. Specifically, these statements detail Defendants' expectations and hopes for the Company, in light of the disclosed operational challenges. *See, e.g.*, *id.* ("[W]e expect a combination of improved operating performance and lower capital expenditures to drive significantly higher cash generation."); *see also id.* ¶¶ 157, 169, 178, 179, 189, 190, 202, 216, 226, 227.[22] They were broad statements of optimism that were not "worded as guarantees" or supported by specific statements of fact, and thus are inactionable. *Jiehua Huang*, 2017 WL 1157134, at *8.

---

[22] As to the portions of the challenged statements such as "We do have a backlog that we've built up, and we expect to see top line growth, again, here in '19 and beyond," *id.* ¶ 201, and "We've seen positive improvement in our next-generation mechanisms production output. We've seen our production stabilize for the rear-seat structures for the Ford Expedition and the Lincoln Navigator programs, which we talked about earlier this year," *id.* ¶ 226, which could be construed as containing statements of fact, Plaintiffs nevertheless do not plead facts to show that any of these statements were false or inaccurate at the time they were made.

C. **The SAC Fails to Sufficiently Allege a Violation of Section 10(b) Based on Impairment Charges, Item 303 Disclosures, or SOX Certifications**

1. **Impairment Charges**

Plaintiffs allege that Defendants made false and misleading representations to the market concerning "Metals assets" by taking a goodwill impairment charge in the second quarter of 2018, stating that no further impairments were necessary at the time, and then "belated[ly]" taking a long-lived asset impairment charge in the fourth quarter of 2018, apparently "erasing more than one-third of Metals' total assets and of Adient's total property, plan[t], and equipment" as a result.  *See* Pl. Opp'n at 14-15; *see also* SAC ¶¶ 259-260.  Plaintiffs also allege that Adient should have recorded a valuation allowance for its deferred tax assets in the second quarter of 2018 rather than in the fourth quarter.  *See* Pl. Opp'n at 15; SAC ¶ 278.

"Failure to take an impairment charge" may constitute securities fraud "when the need to write-down the asset was so apparent to the defendant before the announcement, that a failure to take an earlier write-down amounts to fraud."  *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 268-69 (S.D.N.Y. 2009) (quoting *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (internal quotation marks and alteration omitted)).  But "management's failure to accurately forecast evolving business conditions does not equate to fraudulent conduct."  *Id.* at 269; *see also In re Loral Space & Comm'ncs Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *17 (S.D.N.Y. Feb. 27, 2004) ("When the impairments became so severe as to require specific accounting charges, and whether the requirements of the accounting principles were satisfied, necessarily involved issues of judgment.").  In order to sufficiently plead a violation based on a failure to take an impairment charge, the complaint must typically show, at a minimum, "the amount by which certain assets should have been written down" and "when the write-down[] should have occurred."  *See Vodafone*, 655 F. Supp. 2d at 269 (citing *Caiafa*, 525 F. Supp.

2d at 410-11 & 411 n.10).

The facts alleged in the SAC show that, at the time that Adient took the goodwill impairment charge in the second quarter, the Company had already disclosed a multitude of challenges in the Metals division, had ultimately acknowledged that the projected margin expansion was no longer achievable, and had specifically tested for "additional impairment considerations of other long-lived assets" and found that "[n]o further impairments were identified." SAC ¶ 254. Plaintiffs do not plead with particularity facts to show that "failure to take an earlier impairment charge was so clearly required by accounting principles that the failure to take such a charge was fraudulent, particularly in view of the disclosures of the ongoing poor performance" of Metals and the Company more generally. *See In re Loral Space*, 2004 WL 376442, at *17. While Plaintiffs allege that Adient should have written down an additional impairment charge for long-lived assets in the second quarter of 2018, when the Company took the impairment charge for goodwill, they nonetheless do not allege "the amount by which certain assets should have been written down." And although they suggest that the impairment test used in the second quarter should have identified other necessary impairment charges at that time, their speculative allegations about "what really happened in the second quarter," *see* SAC ¶ 265, are insufficient to state a claim. *See Vodafone*, 655 F. Supp. 2d at 271 ("The Complaint identifies certain business risks in the Company's ambitious expansion strategies, but it does not sufficiently allege when and why corrective actions were required of the Company."); *id.* at 269-70 (securities fraud claim based on failure to take impairment charge is "undermined by a failure to allege," among other things, "which specific losses known to the Company should have triggered an impairment charge," and by the "litany of non-actionable allegations that can fairly be characterized as broad and conclusory").

Moreover, that Adient "ultimately would take an impairment charge" in the fourth quarter

"does not in itself provide an actionable basis to claim that the failure to do so earlier was fraudulent." *See Vodafone*, 655 F. Supp. 2d at 272; *see also Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.") (citation omitted); *Lopez*, 173 F. Supp. 3d at 40 ("The fact of a later correction, made a short time after an initial statement is made, does not connote that that [sic] the Company's earlier statement about its earnings expectations was false or misleading when made.") (citation omitted).  Accordingly, the SAC fails to sufficiently plead a Section 10(b) claim based on Defendants' statements and assurances related to the Company's impairment charges.

## 2. Item 303 Disclosures

Plaintiffs allege that Defendants violated Item 303 of Regulation S-K by failing to disclose in the Company's periodic SEC filings certain "known trends" about various operational issues and risks in its Metals business.  Item 303 requires a company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii). While "Item 303's affirmative duty to disclose in Form 10-Qs can serve as the basis for a securities fraud claim under Section 10(b)," the "failure to make a required disclosure under Item 303 . . . is not by itself sufficient to state a claim for securities fraud under Section 10(b)."  *Stratte-McClure*, 776 F.3d at 101-02.  As the Second Circuit has held, "a violation of Item 303's disclosure requirements can only sustain a claim under Section 10(b) and Rule 10b–5 if the allegedly omitted information satisfies [the] test for materiality" from *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  *Id.* at 103.

As Defendants correctly point out, the SAC does not actually allege that Defendants omitted any disclosures required under Item 303.  *See* Def. Mot. at 20 n.6.  Rather, Plaintiffs argue that Defendants omitted material trends and uncertainties related to "Metals' severe operational

challenges." *See* Pl. Opp'n at 15-16.  Because the Court has found that the SAC fails to sufficiently plead any material misstatements or omissions, however, Plaintiffs' claim based on purported Item 303 violations also fails.  *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 235-36 (S.D.N.Y. 2018).

### 3.  SOX Certifications

Finally, Plaintiffs allege that McDonald and Stafeil "falsely certified" Adient's periodic SEC filings during the Class Period.  *See* SAC ¶¶ 285-286.  In particular, Plaintiffs argue that the SOX certifications were false because McDonald and Stafeil failed to disclose that Metals "was plagued by problems and inefficiencies," and, as a result, "Adient failed to timely assess an impairment to long-lived assets and deferred tax assets."  Pl. Opp'n at 16.  The Court has already rejected Plaintiffs' arguments based on purported failures to timely take impairment charges and has discussed the many disclosures that Defendants made regarding issues in Metals.  Moreover, "SOX certifications do not 'constitute a standalone basis for liability.'"  *In re Glob. Brokerage, Inc.*, No. 17-cv-000916-RA, 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019) (quoting *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017)).  Because Plaintiffs have not sufficiently alleged that Defendants made any false or misleading statements with respect to Metals, Defendants cannot be held liable for their SOX certifications on the basis that they failed to disclose issues related to that area.  *Id.*

While Plaintiffs also argue in their opposition that the SOX certifications are actionable because Defendants "had knowledge of [their] falsity," *see* Pl. Opp'n at 16, the SAC does not actually allege that Defendants had knowledge of the certifications' falsity.  Similarly, the SAC contains no factual allegations to show that either McDonald or Stafeil (or Henderson, who certified the July 30, 2018 Form 10-Q since McDonald was no longer CEO at that time) had such "knowledge."  *See* SAC

¶¶ 285-286. In sum, the SAC's barebones allegations with respect to the allegedly false SOX certifications do not satisfy the pleading standards for a Section 10(b) claim.

## IV. Whether Plaintiffs Adequately Allege that Defendants Acted with Scienter

Not only does the SAC fail to sufficiently plead that Defendants made any false or misleading statements with respect to the projected margin expansion or improvements in Metals, but also it fails to sufficiently plead that any Defendant acted with the requisite scienter.

"Scienter is the mental state embracing an intent to deceive, manipulate, or defraud by the maker of a statement." *In re Lululemon*, 14 F. Supp. 3d at 573 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 323 (2007)). The "scienter requirement is met where the complaint alleges facts showing" either (1) a "motive and opportunity to commit the fraud," or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *see also Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). To adequately plead that the statements were made with the requisite scienter, plaintiffs must plead facts that, "taken together[,] give rise to a strong inference that the makers of the statements . . . knew that their statements were false or misleading when made, or recklessly disregarded that possibility." *In re Lululemon*, 14 F. Supp. 3d at 581 (citing *Tellabs* 551 U.S. at 323-24 and *Novak*, 216 F. 3d at 308-09). The question is thus "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323.

At the motion to dismiss stage, "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24. "In other words, it is not enough to set out facts from which, if true, a reasonable

54

person *could* infer that the defendant acted with the required intent." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotation marks and citation omitted). Rather, the scienter requirement is met "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The court must therefore ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 326). The PSLRA likewise requires that a plaintiff "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A).

## A. The SAC Fails to Sufficiently Allege that Defendants Acted with Scienter

Plaintiffs argue that the SAC pleads a strong inference of scienter under both the "motive and opportunity" theory and the "conscious misbehavior or recklessness" theory. *See* Pl. Opp'n at 20. The Court disagrees, and holds that under either theory, Plaintiffs have failed to sufficiently plead scienter as to any of the Defendants.[23]

### 1. Motive and Opportunity Theory

To sufficiently allege scienter under the "motive and opportunity" theory, plaintiffs generally show that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08; *see also In re Lululemon*, 14 F. Supp. 3d at 573 ("Motive and opportunity require plausible allegations that the maker of a statement could, and had the likely prospect of, realizing concrete benefits by the misstatement."). It is undisputed that the SAC adequately alleges that the Individual Defendants—the CEO and CFO of the Company—had the "opportunity" to

---

[23] Although, based on the arguments made at oral argument, Plaintiffs seem to concede that they are relying solely on the "recklessness" theory for scienter, *see, e.g.*, Tr. 27, 40, the Court nonetheless addresses both theories.

commit the alleged fraud by virtue of their executive positions at Adient. *See Nguyen v. New Links Genetics Corp.*, 297 F. Supp. 3d 472, 492 (S.D.N.Y. 2018). The SAC fails to plead, however, sufficient facts to show that either Individual Defendant had a "motive" to do so.

As to motive, Plaintiffs allege (1) that McDonald and Stafeil's compensation was "closely tied to the Company's top-line growth," SAC ¶¶ 317-320; and (2) that McDonald and Stafeil were provided "Founders' Grants," i.e., stock incentive awards given to certain Adient executives in connection with the spinoff from JCI, *id.* ¶¶ 321-324. It is well established that allegations of "the type of 'corporate profit' motive possessed by most corporate directors and officers," like those asserted here, are insufficient to establish a strong inference of scienter. *In re Lululemon*, 14 F. Supp. 3d at 573 (citing *Kalnit*, 264 F.3d at 139); *see also In re Salix*, 2016 WL 1629341, at *13 ("Motives common to corporate officers, like 'the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation,' do not suffice to plead scienter.") (quoting *ECA*, 553 F.3d at 198); *Nguyen*, 297 F. Supp. 3d at 498 ("[A]s a general matter, 'incentive compensation can hardly be the basis on which an allegation of fraud is predicated.'") (quoting *ECA*, 553 F.3d at 201). In addition, the SAC fails to plead facts to show how either McDonald or Stafeil "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08. Plaintiffs' theory of scienter based on any purported motive and opportunity thus fails.

## 2. Conscious Misbehavior or Recklessness Theory

Absent a showing of motive, plaintiffs may demonstrate scienter through allegations regarding conscious misbehavior or recklessness, but "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142). "Conscious misbehavior," on one hand, "generally consists of deliberate, illegal behavior." *In re Lululemon*, 14 F. Supp. 3d at 573 (citing *Novak*, 216 F.3d at 308). Recklessness, on the other hand, can be adequately

pleaded where the allegations show that defendants' conduct was "highly unreasonable" and constituted "an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it.*" *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) (emphasis in *S. Cherry St.*).  In other words, the recklessness required to plead scienter is "conscious recklessness—i.e., a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*." *Id.* (quoting *Novak*, 216 F.3d at 312) (emphasis in *S. Cherry St.*).

Circumstantial evidence can support a strong inference of scienter, under the "conscious misbehavior or recklessness" theory, where defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (citation omitted).  Under the third prong, recklessness may be sufficiently pleaded where there are "[p]lausible allegations that a defendant had facts at his disposal contradicting material public statements, but then ignor[ed] such facts or proceed[ed] despite them."  *In re Lululemon*, 14 F. Supp. 3d at 574 (citing *Novak*, 216 F.3d at 308-09); *see also In re Salix*, 2016 WL 1629341, at *13 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.") (quoting *Novak*, 216 F.3d at 308).  Where plaintiffs allege that defendants knew about or had access to contrary facts, however, "they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.  "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness."  *In re Lululemon*, 14 F. Supp. 3d at 574 (citation omitted).

The crux of Plaintiffs' scienter allegations seems to be that McDonald and Stafeil knew about certain operational issues in Metals—through internal meetings, reports, and conversations, as reported by the CWs—which made the projection margin expansion of 200 basis points "unrealistic" to achieve.  *See* SAC ¶ 307 ("The CWs make clear that Defendants' false and misleading statements were not simply a mistake or mismanagement; but rather that the Defendants knew or recklessly disregarded that the Company's 200 basis point margin expansion was not achievable due to serious operational and launch issues in its [Metals] segment that existed at the beginning of the Class Period and persisted throughout the Class Period."); *see also* Tr. at 40 (arguing that Defendants were "reckless" in "talking about" the "200 bps margin improvement plan").  Thus, Plaintiffs contend, the Individual Defendants had knowledge of contrary facts, or at least were in reckless disregard of such facts, when they made public statements about the projected margin expansion and the Company's efforts to improve the Metals business.

As a preliminary matter, Plaintiffs state in their opposition that McDonald and Stafeil had "actual knowledge" that "most of their Class Period statements were false or misleading."  *See* Pl. Opp'n at 20.  Nowhere in the SAC, however, do the facts support an inference that either McDonald or Stafeil had "actual knowledge" of any falsity.[24]  As discussed above, this determination is fatal to Defendants' forward-looking statements since the PSLRA's safe harbor "specifies an 'actual knowledge' standard for forward-looking statements."  *Slayton*, 604 F.3d at 773 (citation omitted).

Plaintiffs rely heavily on the CWs' statements set forth in paragraphs 88 to 106 of the SAC to support their assertion that the SAC pleads a "very strong inference of recklessness," i.e., that

---

[24] Indeed, at oral argument, the Court pressed Plaintiffs' counsel on which specific allegations in the SAC demonstrated that the Individual Defendants had actual knowledge that their statements were false or misleading.  *See* Tr. at 26-29. Plaintiffs' counsel pointed to paragraphs 69, 84, 96, 98 of the SAC, but none of those paragraphs show that either Individual Defendant was told that the projected margin expansion or the Company's plan to improve Metals were unachievable or unrealistic, or that either Individual Defendant ever indicated that he knew or believed it to be.

Defendants either knew or "had access to facts that suggested their public statements were not accurate." *See* Pl. Opp'n at 20-23.  Even accepting all of those statements as true and viewing them in the light most favorable to Plaintiffs, however, the Court finds that Plaintiffs fail to sufficiently allege circumstantial evidence that could give rise to a strong inference of scienter.  There are no allegations in the SAC that any CW ever told McDonald or Stafeil that the projected margin expansion or the improvements in Metals were not achievable, or that McDonald or Stafeil—or any other executive at the Company—ever admitted, suggested, or believed as much.

Where scienter is based on a defendant's knowledge of and/or access to certain facts, "Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (quoting *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009)).  Plaintiffs here fail to show what "specific contradictory information" was available to any Defendant at the time they made any alleged false or misleading statement.  First, as to meetings that the Individual Defendants purportedly participated in and/or "ran," in which issues in Metals were frequently discussed, the CWs' general allegations concerning the existence of such meetings are insufficient to show that the Individual Defendants had knowledge of "specific contrary information" that rendered their public statements false or misleading.  The fact that Metals was regularly discussed at these meetings, and even that certain "serious operational and launch issues" were discussed, *see* SAC ¶ 307, does not show that Defendants' statements about the projected margin expansion, of which Metals was just one component, or the Company's efforts to improve Metals despite certain challenges, were false.  That McDonald and Stafeil were executives of the Company and regularly attended certain meetings is also insufficient to demonstrate that they knew, reasonably believed, or were in reckless disregard of facts that rendered their statements inaccurate.  *See In re*

*MBIA*, 700 F. Supp. 2d at 588 (holding that "generalized allegation[s] of [company's then-Chairman and CEO] and [CFO and VP's] membership on various corporate committees is insufficient to show that they were personally aware of the [alleged fraud]"); *Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) ("Courts may not infer scienter solely from the fact that, due to defendants board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.") (internal quotation marks and citation omitted).

Similarly, with respect to the reports that McDonald and Stafeil were allegedly provided concerning issues in Metals, the SAC fails to "specifically identify the reports" or the allegedly contradictory information contained therein. *Novak*, 216 F.3d at 309; *see also In re MBIA*, 700 F. Supp. 2d at 590 ("Lead Plaintiff has failed to plead with particularity what reports or information concerning the [alleged fraud] were available to [company's then-Chairman and CEO] and [CFO and VP] so that 'the danger [of misleading investors] was either known . . . or so obvious that [they] must have been aware of it.'") (quoting *S. Cherry St.*, 573 F.3d at 109, 115). Plaintiffs argue that the Individual Defendants were "provided specific reports, including a 'standard operational packet' presented to executive management, detailed overviews and presentation decks from each business segment with a particular focus on Metals, and color-coded deliverables with specific metrics." Pl. Opp'n at 21. But as Defendants rightly point out, the SAC does not allege what information was contained in those reports or how that information contradicted Defendants' public statements. *See* Def. Reply at 8.

Furthermore, the CWs' statements described in paragraphs 68 through 106 of the SAC, even taken together, fail to adequately plead recklessness—that is, that Defendants' conduct was so "highly unreasonable" as to constitute "an extreme departure from the standards of ordinary care." *Novak*,

216 F.3d at 308.  The CWs' statements essentially amount to the contention that problems within Metals were widespread and common knowledge throughout the Company and that the Individual Defendants thus knew, or recklessly disregarded the fact, that both the projected margin expansion and improvements in Metals were unachievable. *See, e.g.*, SAC ¶ 66 (CW-7 alleging that "Metals had been unprofitable for many years, so the idea that Metals would turn around in two years was unrealistic," and that there were "discussions internally in 2016 where Adient employees would question how Metals would be profitable after so many years of being unprofitable"); *id.* ¶ 77 (CW-3 alleging that "Spring and Summer 2017 were the 'height of chaos' at Adient"); *id.* ¶ 79 (CW-6 alleging that "beginning in early 2017, it was clear that Adient was 'heading for a train wreck'"); *id.* ¶ 84 (CW-4 alleging that certain "inefficiencies and difficulties in keeping up with schedules and cost targets" in the Metals division "were common knowledge throughout the Company"); *id.* ¶ 87 (CW-5 alleging that "everybody knew Metals was having problems, and had been having problems for some time").

Although the CWs "offer their thoughts and opinions as to various [operational] issues experienced by the company . . . , they do not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue."  *In re Lululemon*, 14 F. Supp. 3d at 581.  As noted already, none of the allegations in the SAC support Plaintiffs' argument that the CWs made statements to McDonald or Stafeil that provided them with "actual knowledge" that their statements were false or misleading. Even the allegation that people were "raising the flags" about "their concerns with Metals achieving the numbers needed to reach the 200 basis points," *see* SAC ¶ 99, is insufficient.  As Defendants point out, such vague allegations "fail to provide any specific information sufficient to suggest, let alone adequately plead, that Defendants' statements concerning the projected margin expansion were false

when made, or that Defendants' belief in them was unreasonable." Def. Mot. at 2; *see also id.* at 13 ("These allegations do not explain what 'flags' were raised, their supposed content, who supposedly raised them, or who supposedly heard them.").

Finally, the allegations surrounding CW-6's purported statements to his superiors— apparently including McDonald, Stafeil, Lambert, and Mitchell—warrant further discussion. Plaintiffs allege that CW-6, a "former functional Vice President at Adient" during most of the Class Period, SAC ¶ 57, raised concerns about certain "data points" and questioned certain "numbers he was seeing" based on documents handed out at the monthly Operational Review "prep meetings," which, according to CW-6, "'did not tie to the story' that Adient was telling the market," *id.* ¶ 96. CW-6 allegedly raised his concerns to Lambert, who told him to "stay in [his] lane," and also "elevated" them to McDonald, Stafeil, and Mitchell, because "the data points were so concerning to him." *Id.* Although the SAC alleges that CW-6 "questioned the numbers he was seeing based on the 'prescriptive process for manufacturers,' which assessed the level of efficiency at each plant, and because those numbers (related to the [Metals] business) 'did not tie to the story' that Adient was telling the market," *id.*, the SAC does not contain any details about what "concerns" CW-6 actually raised to his superiors—especially to McDonald or Mitchell—how those concerns related to operational issues in Metals, what "numbers" he was seeing, how those numbers failed to "tie to the story" that Adient was publicly promoting, what that "story" was, or how that "story" was false or misleading.

The vague allegations surrounding CW-6's statements fail to meet the heightened pleading requirements under Rule 9(b) and the PSLRA. Instead, the SAC merely alleges that, when CW-6 reported his "concerns" to Stafeil, as well as "Lambert's reaction to his pointed questions on Metals," Stafeil apparently "told [CW-6] he was not misinterpreting the data points." *Id.* ¶ 97. In their

opposition, Plaintiffs somehow—and inexplicably—jump to the conclusion that Stafeil's statement that CW-6 was "not misinterpreting the data points" equates to admissions by Stafeil that (1) Adient's "internal data did not support the representations to the market," Pl. Opp'n at 1, and (2) "as of approximately January 2017, Adient's data contradicted what Defendants were publicly telling the market," *id.* at 20.  But that is simply not what the SAC alleges.  The SAC contains no allegations that Stafeil and CW-6 ever discussed any of Adient's or the Individual Defendants' public statements, or that Stafeil ever admitted or expressed a belief that any of those statements were false or inaccurate. Plaintiffs' arguments as to CW-6's conversation with Stafeil are unsupported by the allegations in the SAC and, put simply, mischaracterize the facts as pleaded.

The other allegations listed in the SAC as additional scienter allegations, including (1) that Metals "was extremely important to the Company's success post spinoff and Defendants spoke frequently about how [growth in the Metals business] would fuel the Company's margin expansion plans," (2) McDonald's "abrupt ouster" as CEO in June 2018, and (3) the contention that "[t]he Company admitted that senior management, including the Individual Defendants, closely tracked the problems with the [Metals] business and were at least reckless in setting guidance for the Company," SAC ¶ 295, provide no support to Plaintiffs' arguments.

First, Plaintiffs' allegations regarding the importance of Metals to the Company's business and post-spinoff success appears to be based on the "core operations" doctrine.  *See* Pl. Opp'n at 23. "The core operations doctrine permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business."  *Das*, 332 F. Supp. 3d at 816 (quoting *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013)).  "Core operations 'include matters critical to the long term viability of the company and events affecting a significant source of income.'"  *Id.*  The core operations doctrine,

however, "typically applies only where the operation in question constitute[s] nearly all of a company's business," and moreover, "does not independently establish scienter." *Id.* (quoting *Lipow v. Net1 UEPS Tech., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015)).  "[At] most," the doctrine "constitutes 'supplemental support' for alleging scienter." *Id.*  Here, Metals did not constitute "nearly all" of Adient's business, and even if it did, allegations regarding Metals' importance to the Company are insufficient to plead scienter. *See also Lululemon*, 14 F. Supp. 3d at 582 (rejecting CWs' argument that "because black luon yoga pants were so important to revenue, when quality issues arose that impacted these products, defendants downplayed those quality issues in order to mislead the marketplace and maintain a higher stock price," and finding instead that those arguments were "unsupported by any allegations in the [complaint]," especially since "the CWs do not allege that any of the makers of the alleged false and misleading statement [sic] did not believe the truth of those statements").

Second, although Plaintiffs characterize McDonald's retirement as an "abrupt ouster," the SAC does not provide any facts—other than an allegation that there was no "succession plan in place"—to support the notion that his retirement was either "abrupt" or could be properly viewed as an "ouster."  *See* SAC ¶¶ 218, 309.  The SAC alleges that Adient disclosed on June 11, 2018 that McDonald would be "'retiring' from his role as Chairman and CEO[,] effective immediately," and that Henderson was appointed as interim CEO. *Id.* ¶ 218.  Terminations or resignations of corporate executives are insufficient alone to establish an inference of scienter.  *See Das*, 332 F. Supp. 3d at 815.  Further, "there are any number of reasons that an executive might resign, most of which are not related to fraud."  *Id.* (citation omitted).  Although Plaintiffs have characterized McDonald's retirement as an "abrupt ouster" and have argued in their opposition that McDonald's departure occurred under "highly unusual or suspicious circumstances," *see* Pl. Opp'n at 23-24, they have not

provided factual support for those assertions, and the Court cannot discern anything "highly unusual or suspicious" about McDonald's retirement.

Finally, Plaintiffs allege that Adient "admitted" that its "senior management," including the Individual Defendants, "closely tracked the problems" in Metals and were "at least reckless in setting guidance for the Company." *See* SAC ¶¶ 313-316.  To support these allegations, the SAC includes statements made by Henderson on July 26, 2018 and statements made by Del Grosso and Stafeil on November 9, 2018, but none of those statements demonstrate what Plaintiffs have claimed.  As to Henderson's July 2018 statements, it is not clear how the fact that Adient's senior executives "tracked" problems in Metals, *id.* ¶ 314, establishes a strong inference of scienter.  Indeed, starting in late 2017, Adient and its top executives publicly disclosed problems that they encountered in Metals. As to Del Grosso and Stafeil's November 2018 statements, Plaintiffs claim that statements that the Company had not been "exactly spot-on with guidance" and that "some of the expectations" they had in Metals were "a bit optimistic or proved to be a bit optimistic" amount to an "admission that Defendants knew or were reckless in setting guidance for the Company." *Id.* ¶ 315.  Those statements simply do not constitute an admission, and the SAC fails to explain how or why such an inference can be drawn.

### B.  Corporate Scienter

With respect to scienter on the part of Adient, corporate scienter may be pleaded by alleging "facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*

*Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008)).  Although "the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant," it is also possible "to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."  *Das*, 332 F. Supp. 3d at 813 (quoting *Teamsters Local*, 531 F.3d at 195).  And, while "there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants."  *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006); *see also In re Vale*, 2017 WL 1102666, at *34 ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority.") (citation omitted).

Here, however, the vast majority of the challenged statements were made by either McDonald or Stafeil, both of whom the Court has found did not act with the requisite scienter.  Neither party has raised any argument as to how or why the Court should find corporate scienter based on another executive's statements.  Since the Court has also concluded that the SAC fails to allege that any of the challenged statements are actionable misstatements or omissions, it need not address other potential theories of corporate scienter

## V.     Whether Plaintiffs Adequately Allege a Section 20(a) Claim

Finally, under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."  15 U.S.C. § 78t(a).  To state a claim under Section 20(a), a plaintiff must show (1) "a primary violation by the controlled person," (2) "control of the primary violator by the defendant," and (3) "that the defendant was, in some meaningful sense, a culpable participant in

the controlled person's fraud." *ATSI*, 493 F.3d at 108.

Control person liability under Section 20(a) requires an underlying primary violation of Section 10(b) of the Securities Exchange Act. *See id.* Since Plaintiffs have failed to adequately plead a violation of Section 10(b), their claim for Section 20(a) control person liability by the Individual Defendants also fails. *See, e.g.*, *Das*, 332 F. Supp. 3d at 817-18; *Lopez*, 173 F. Supp. 3d at 42; *In re Lululemon*, 14 F. Supp. 3d at 587.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Second Amended Consolidated Class Action Complaint is granted. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 56 and close the case.

SO ORDERED.

Dated:      April 2, 2020
            New York, New York

                                        _____
                                        Ronnie Abrams
                                        United States District Judge

67